1  **MARLIN & SALTZMAN**
   Stanley D. Saltzman, Esq. (SBN 90058)
2  Louis M. Marlin, Esq. (SBN 54053)
   Marcus J. Bradley, Esq. (SBN 174156)
3  Christina A. Humphrey, Esq. (SBN 226326)
   29229 Canwood Street, Suite 208
4  Agoura Hills, California   91301
   Telephone:     (818) 991-8080
5  Facsimile:     (818) 991-8081
   ssaltzman@marlinsaltzman.com
6  louis.marlin@marlinsaltzman.com
   mbradley@marlinsaltzman.com
7  chumphrey@marlinsaltzman.com

8  *(Additional Plaintiff's counsel on next page)*

9  Attorneys for Plaintiff and Proposed Class

10                      **UNITED STATES DISTRICT COURT**

11            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12

13  ALICIA HARRIS, as an individual and on          CASE NO. CV 08-5198 EMC
    behalf of all others similarly situated,
14                                                   (Assigned to Hon. Edward M. Chen)
                        Plaintiff,
15                                                   **PLAINTIFF'S NOTICE OF MOTION FOR**
    v.                                               **FINAL COLLECTIVE CLASS ACTION**
16                                                   **CERTIFICATION; MEMORANDUM OF**
    VECTOR MARKETING                                 **POINTS & AUTHORITIES IN SUPPORT**
17  CORPORATION, a Pennsylvania                      **THEREOF AND NOTICE PURSUANT TO**
    corporation; and DOES 1 through 20,              **SECTION 216(b) OF THE FLSA**
18  inclusive,
19                      Defendants.                  DATE: October 27, 2010
                                                     TIME: 10:30 a.m.
20  _____                 CTRM:      C
                                                     JUDGE:     Hon. Edward M. Chen
21
                                                     Discovery Cutoff:    March 2, 2011
22                                                   Trial Date:          June 6, 2011

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1    **Additional Plaintiff's Counsel**

2    **DIVERSITY LAW GROUP**
     Daniel H. Chang, Esq. (SBN 183803)
3    Craig S. Hubble, Esq. (SBN 200789)
     Larry W. Lee, Esq. (SBN 228175)
4    444 S. Flower Street
     Citigroup Center, Suite 1370
5    Los Angeles, California  90071
     Telephone:     (213) 488-6555
6    Facsimile:     (213) 488-6554
     dchang@diversitylaw.com
7    chubble@diversitylaw.com
     lwlee@diversitylaw.com
8
     **LAW OFFICES OF SHERRY JUNG**
9    Sherry Jung, Esq. (SBN 234406)
     444 S. Flower Street
10   Citigroup Center, Suite 1370
     Los Angeles, California   90071
11   Telephone:     (213) 488-6555
     Facsimile:     (213) 488-6554
12   sherryj23@hotmail.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice of Motion for Final Collective Class Action Certification; Memorandum of Points & Authorities
Case No. Cv 08-5198 EMC

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on October 27, 2010, at 10:30 a.m., or as soon thereafter as the matter may be heard in the above-entitled court, located at 450 Golden Gate Ave., San Francisco, CA, 94102, Courtroom C, 15th Floor, Plaintiff will and hereby does move this Court for an Order:

1.    granting "final" collective action certification on behalf of all individuals who worked for Defendant Vector Marketing Corporation in the State of California as "Sales Representatives" from October 15, 2005, through the resolution of this case;

2.    permitting inclusion in the opt-in class those individuals in the collective action who filed their consent to join forms after the deadline set by this Court in its previous order - July 26, 2010 - for any number of reasons specified in a separate motion that will be filed soon hereafter;

3.    granting Plaintiff the right to send a second FLSA opt-in notice prior to a merits determination in this case, at a date to be determined by this Court.

The motion for final certification will be based on this Notice, the Memorandum of Points and Authorities and declarations filed herewith, and the pleadings and papers filed herein.


DATED:   September 22, 2010          **MARLIN & SALTZMAN**
                                     **DIVERSITY LAW GROUP**
                                     **LAW OFFICES OF SHERRY JUNG**



                                     By:/s/ Louis M. Marlin
                                        Louis M. Marlin, Esq.
                                        of Marlin & Saltzman
                                        Attorneys for Plaintiff

1  **MARLIN & SALTZMAN**
Stanley D. Saltzman, Esq. (SBN 90058)
2  Louis M. Marlin, Esq. (SBN 54053)
Marcus J. Bradley, Esq. (SBN 174156)
3  Christina A. Humphrey, Esq. (SBN 226326)
29229 Canwood Street, Suite 208
4  Agoura Hills, California  91301
Telephone:     (818) 991-8080
5  Facsimile:     (818) 991-8081
ssaltzman@marlinsaltzman.com
6  louis.marlin@marlinsaltzman.com
mbradley@marlinsaltzman.com
7  chumphrey@marlinsaltzman.com

8  *(Additional Plaintiff's counsel on next page)*

9  Attorneys for Plaintiff and Proposed Class

10              **UNITED STATES DISTRICT COURT**

11       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12

13  ALICIA HARRIS, as an individual and on        **CASE NO. CV 08-5198 EMC**
behalf of all others similarly situated,
14                                               (Assigned to Hon. Edward M. Chen)
                    Plaintiff,
15                                               **MEMORANDUM OF POINTS AND**
    v.                                           **AUTHORITIES IN SUPPORT OF MOTION**
16                                               **FOR FINAL COLLECTIVE CLASS ACTION**
    VECTOR MARKETING                             **CERTIFICATION AND NOTICE**
17  CORPORATION, a Pennsylvania                  **PURSUANT TO SECTION 216(b) OF THE**
    corporation; and DOES 1 through 20,          **FLSA**
18  inclusive,
                                                 DATE: October 27, 2010
19                  Defendants.                  TIME: 10:30 a.m.
                                                 CTRM:        C
20  _____             JUDGE:       Hon. Edward M. Chen

21                                               Discovery Cutoff:    March 2, 2011
                                                 Trial Date:          June 6, 2011
22

23

24  / / /

25  / / /

26  / / /

27  / / /

28
                                    iv
    _____
    Notice of Motion for Final Collective Class Action Certification; Memorandum of Points & Authorities
    Case No. Cv 08-5198 EMC

1  **Additional Plaintiff's Counsel**

2  **DIVERSITY LAW GROUP**
   Daniel H. Chang, Esq. (SBN 183803)
3  Craig S. Hubble, Esq. (SBN 200789)
   Larry W. Lee, Esq. (SBN 228175)
4  444 S. Flower Street
   Citigroup Center, Suite 1370
5  Los Angeles, California  90071
   Telephone:    (213) 488-6555
6  Facsimile:    (213) 488-6554
   dchang@diversitylaw.com
7  chubble@diversitylaw.com
   lwlee@diversitylaw.com
8
   **LAW OFFICES OF SHERRY JUNG**
9  Sherry Jung, Esq. (SBN 234406)
   444 S. Flower Street
10 Citigroup Center, Suite 1370
   Los Angeles, California  90071
11 Telephone:    (213) 488-6555
   Facsimile:    (213) 488-6554
12 sherryj23@hotmail.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   CLASS DISCOVERY CONDUCTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  PLAINTIFF ALICIA HARRIS' EXPERIENCE WAS SIMILARLY SITUATED TO
      THE CLASS MEMBERS' EXPERIENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.   PLAINTIFF ALICIA HARRIS MEETS THE LEGAL STANDARD OF
      "SIMILARLY SITUATED" FOR PURPOSES OF "FINAL" STAGE-TWO
      COLLECTIVE ACTION CERTIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Plaintiff Alicia Harris and Opt-In Members were Subject to Defendant's
            Uniform Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    The Issue of Entitlement to Payment for Training can be Determined on a
            Class-wide Basis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            (1)    The test applicable to "hired" employee trainees. . . . . . . . . . . . . . . . 10

            (2)    The test applicable to not yet hired trainees. . . . . . . . . . . . . . . . . . . . 12

      C.    There are No Defenses to Class Members' Claims that Need be Litigated
            on an Individual Basis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      D.    An Evaluation of Fairness and Procedural Concerns Mandates Certification. . . . . 21

V.    DAMAGES CAN BE PROVEN ON A CLASS-WIDE BASIS. . . . . . . . . . . . . . . . . . . . 22

vi

Notice of Motion for Final Collective Class Action Certification; Memorandum of Points & Authorities
Case No. Cv 08-5198 EMC

1

<u>**TABLE OF AUTHORITIES**</u>

2

Page

**FEDERAL CASES**

3

*Anderson v. Mt. Clemens Pottery*

4
    (1946) 328 U.S. 680. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

5
*Bonilla v. Las Vegas Cigar Co.*
    61 F.Supp.2d 1129 (D.Nev.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

6

*Castle v. Wells Fargo Financial Inc.*

7
    2008 WL 495705 (W.D. Wash Feb. 20, 2008). . . . . . . . . . . . . . . . . . . . . 9

8
*Chase v. AIMCO Properties, L.P.*
    374 F. Supp. 2d 196 (D.D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9

*Donovan v. Sureway Cleaners*

10
    656 F.2d 1368 1370 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

11
*Falcon v. Starbucks Corp.*
    580 F.Supp.2d 528 (S.D.Tex.2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12

*Grayson v. K Mart Corp.*

13
    79 F.3d 1086 (11th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14
*Hernandez v. United Auto Credit Corp.*
    2010 WL 1337702 *5 (N.D. Cal. Apr. 2, 2010). . . . . . . . . . . . . . . . . . . . 21

15

*Hunter v. Sprint Corp.*

16
    346 F. Supp. 2d 113 (D.D.C. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

17
*Johnson v TGF Precision Haircutters, Inc.*
    2005 WL 1994286 (S.D. Tex. Aug. 17, 2005). . . . . . . . . . . . . . . . . . . . . 21

18

*Leuthold v. Destination Am.*

19
    224 F.R.D. 462 (N.D.Cal.2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

20
*Marshall v. Baptist Hosp., Inc.*
    473 F. Supp. 465 (M.D. Tenn. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

21
*Maynor v. Dow Chem. Co.*
    671 F. Supp. 2d 902 (S.D. Tex. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

22

*McLaughlin v. Ensley*

23
    877 F.2d 1207 (4th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

24
*Pendlebury v. Starbucks Coffee Co.*
    518 F.Supp.2d 1345 (S.D.Fla.2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

25

*Proctor v. Allsups Convenience Stores, Inc.*

26
    250 F.R.D. 278 (N.D.Texas 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

27
*Smith v. T-Mobile USA Inc.*
    2007 WL 2385131 (C.D. Cal. Aug. 15, 2001). . . . . . . . . . . . . . . . . . . . . 9

28

*Thiessen v. Gen. Elec. Capital Corp.*
     267 F.3d 1095 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Walling v. Portland Terminal Co.*
     330 U.S. 148. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 12, 21

**STATUTES AND RULES**

29 C.F.R. §785.27. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 21

29 C.F.R. §785.7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**MISCELLANEOUS**

50 A.L.R. Fed. 632 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fair Labor Standards Act, Section 216(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

viii

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Pursuant to Section 216(b) of the Fair Labor Standards Act ("FLSA"), Plaintiff Alicia Harris ("Plaintiff") seeks an order from this Court granting "final" collective action certification of Plaintiff's third cause of action for relief.  Plaintiff Alicia Harris' FLSA claim is predicated on the allegation that Sales Representative recruits at Defendant Vector Marketing Corporation were employees during the initial training period and thus were entitled to be paid minimum wages for that time.  The class for which Ms. Harris seeks certification is the same defined class approved by this Court in its Order granting Conditional Certification:

**all individuals who worked for Defendant Vector Marketing Corporation in the State of California as 'Sales Representatives' from April 15, 2006 through the resolution of this case.**

In addition to seeking "final" certification of the FLSA collective action, Plaintiff also seeks permission to

(1)    send a second FLSA opt-in notice to those putative class members who worked as a Sales Representative for Defendant at some point between May 13, 2010, through a date to be determined by this Court which is prior to any merits determination of the FLSA claim; and

(2)    through a separate motion filed soon hereafter,[1] to include those individuals in the collective action who filed their consent to join forms after the deadline set by this Court in its order - July 26, 2010 -  for any number of reasons specified in the motion.

### II.    CLASS DISCOVERY CONDUCTED

As this Court is well aware, following the issuance of its Order granting Plaintiff's Motion for Conditional Collective Action Certification (hereby referred to as "Cert Order"), the parties have engaged in substantial class discovery, some of which inevitably overlapped with merits discovery,

---

[1] After the relevant documents are received from the Third Party Administrator, Epiq Systems, Plaintiff anticipates being able to file a motion for inclusion of these individuals, as well as inclusion of other class members that may have incurred problems with submission prior to the deadline, within the next 10 days this Motion is filed.

1

1  but which overwhelmingly demonstrates that Alicia Harris is sufficiently "similarly situated" with

2  class members to meet Rule 216(b)'s standards for "final" collective action certification.

3        The class discovery completed includes Defendant's "sampling" depositions of 50 of the over

4  5,000 class members who elected to opt-in to the FLSA collective action, as well as Plaintiff's

5  gathering of sales and statistical data relevant to the approximately 47,000 sales representatives who

6  completed training during the proposed class period.  In this Motion and the Rule 23 motion, Plaintiff

7  relies heavily on the deponents testimony, who were randomly picked and subject to cross-

8  examination, as opposed to declarants typically submitted with such motions, who are generally

9  cherry-picked for support of respective positions.

10        The goal at this stage of the case is not to determine whether sales representative "recruits" are

11  in fact employees or compensable trainees; rather, the goal at certification is to demonstrate that the

12  relevant issues can be determined on a class wide basis for every class member in the one single action.

13  Analysis of the data gathered from Defendant's 50 depositions, corporate testimony, and the statistical

14  data gathered overwhelmingly demonstrates that the issue presented can indeed be tried in one action.

15  Discovery has revealed that literally every step of Vector's interaction with its recruits is

16  choreographed, such that the experiences of each class member is virtually identical to each other, as

17  well as to the experience of Plaintiff  Alicia Harris.

18  **III.   PLAINTIFF ALICIA HARRIS' EXPERIENCE WAS SIMILARLY SITUATED TO THE CLASS MEMBERS' EXPERIENCE**

19

20        First, just as occurred with Alicia Harris, the sales rep recruits typically respond to a

21  solicitation, blind ad, or flyer which indicates that positions are available for "sales," which position

22  requires no skills or prior job experience. *Compilation of Depo. Testimony re: How Recruits Learned*

23  *About the Job attached as Ex. 1 to the Declaration of Christina A. Humphrey, submitted concurrently*

24  *herewith, including Harris Depo. Vol. 1 40:14-22[2] ; Vector Job Ads, Ex. 2 CAH Dec.* The recruit is

25  then scheduled for an "interview" which often consists of a large group interview of 20-25 people,

26  from whom about 50% are then asked to wait around for an additional interview.  These further

27  interviews, usually the very same day, are normally done in smaller settings, such as a 2 on 1 or 3 on

28       [2]Hereinafter referred to as CAH Dec.

2

Notice of Motion for Final Collective Class Action Certification; Memorandum of Points & Authorities
Case No. Cv 08-5198 EMC

1 interview (2 or 3 applicants and 1 manager), as the case was with Alicia Harris, or on a one-on-one basis with the manager. *Compilation of Depo. Testimony re: The General Interview Process*, *Ex. 3 to CAH Dec.*

At the conclusion of this interview process, the recruit is normally told right then by the manager (or called shortly thereafter and then told) words to the effect of "Welcome to the team!" or "Congratulations!" or "You're in!" or even in some situations, as with Alicia Harris, "You're hired!" *Compilation of Depo. Testimony re: How Applicants are Told They are Hired, Ex. 4 CAH Dec.; Dec. Of Ryan Casey (Docket 144), p. 4:21-23; Dec. of Paul Comstock (Docket 145), p. 4:9-11; Dec. of Karl Gedris (Docket 147), p. 3:4-7; Dec. of Evan Keller (Docket 149), p. 4:14-16.* Predictably, as with Ms. Harris, the use of such language, and the interviewing process itself, led 48 of the 50 deponents (the other two simply could not recall) to believe that they had been hired for the job at that time, <u>before any training had begun</u>. The recruit is then <u>immediately</u> scheduled for the initial 3-day training session (while it can be longer, this is the most common length). The immediacy of the follow-on training also led many deponents to believe that they had been "hired" for the job, which they were now going to be trained to do. *Compilation of Depo. Testimony re: When Scheduled for Training, Ex. 5 CAH Dec; Congratulatory Letters, Ex. 6 CAH Dec.*

The impact of this overwhelmingly consistent testimony will obviously have a dramatic impact on the eventual class-wide trial of this case. If this Court indeed determines at the merits stage that this testimony, examined in conjunction with the sales training seminar manual's "Welcome to the Vector team!" verbiage *(See Sales Training Manual, Ex. 7 CAH Dec. At Vector0023)*, demonstrates that recruits were employees for training purposes, then the six-factor test established in *Walling v. Portland Terminal Co.*, 330 U.S. 148 test is by-passed all together. The analysis would then proceed directly to the four-part test set forth under 29 C.F.R. §785.7, which examines, among other factors, whether the attendance at training was voluntary and whether the training was directly related to the employee's job for purposes of determining whether the training time is compensable. This motion will also establish that the requisite analyses under these factors can indeed be conducted on a class-wide basis.

Of the fifty witnesses who testified in deposition, all fifty believed, as did Alicia Harris, either

3

by being affirmatively told or by being given the impression from the manager, that <u>training was</u> <u>mandatory</u>. *Compilation of Testimony re: Training Was Mandatory, Ex. 8 CAH Dec.* All fifty, like Alicia Harris, then immediately attended the initial training session. *Ex. 5 CAH Dec.* During training, the recruits all were provided the same or very similar sales training manuals to those provided to Alicia Harris during her training, and were instructed how to sell the Cutco knives.[3] *Ex. 7 CAH Dec.; Matheson Depo. 03/25/09 , Ex. 9 CAH Dec. at 132:12-19, Arlie Depo., Ex. 10 CAH Dec. at  127:16-20, 131:4-7, 134:15-18,* When asked during deposition whether they felt the training was specific to Cutco knives, or rather constituted more generalized sales technique training, the vast majority of deponents testified consistently with Alicia Harris that the training was specific to selling Cutco knives and provided minimal generalized sales tips. *Dec. of Alicia Harris (Docket 134) ¶8*; *Compilation of Depo. Testimony re: Training is Specific to Cutco, Ex.11 CAH Dec.* [4]; *Compilation of Testimony re: Benefit Derived from Training, Ex. 12 CAH Dec.*

In fact, at the eventual class trial of this case, Plaintiff will offer proof that the ***only training*** ***received by the class members*** is that which is needed to allow them to sell Cutco knives on day one of their sales representative status, to use the scripted presentations taught for that purpose, to display the brochures provided to them by Cutco for that purpose, and to fill out the order forms required by Cutco for that purpose. *Dec. of Alicia Harris (Docket 134) ¶8*; *Ex. 7 CAH Dec.; Training Seminar Agenda, Ex. 13 CAH Dec.* It is and will be Plaintiff's and the class' position that the foregoing summarizes the entirety of the training "experience," and that it is the same for each and every class member.  There is literally nothing more taught or instilled during this training, and the class members are certainly not "taught" in this ever-so-short training time anything of note that they can or do carry with them throughout their lives.  Vector's arguments to the contrary are illusory, and while posted throughout its website, the claims are unrecognizable to the huge majority of the class.   This is a product and "company" indoctrination session, and nothing more.

---

[3] Plaintiff herein shall refer to the knives and cutlery products the class members were recruited by Defendant Vector Marketing to sell as "Cutco" knives or products.  Vector is nothing more than the marketing or sales arm of Cutco Cutlery products.

[4] Indeed, this Court has previously held that the training is specific to Vector. [Docket No. 71, p.19:19-19:20; Docket No. 132, pp. 12:26-13:2]

4

1    In addition, during training, as occurred with Alicia Harris, the recruits/deponents were

2  consistently instructed by Vector to

3    (1)    generate potential customer lists, by listing everyone they know, including "contacts"

4  from their cell phones (all fifty deponents testified to this); *Harris Dec. (Docket 134) p. 4:9-14;  Ex.*

5  *13 CAH Dec. at Vector0057, 0079, 0081;  Compilation of Testimony re: Customer List*, *Ex. 14 CAH*

6  *Dec.; Compilation of Documents Produced by Various Class Members at Deposition, Ex. 15 CAH*

7  *Dec.*

8    (2)    rank the customers on the list according to criteria given by Vector that

9  would maximize the recruits' chances of making sales;[5] *Ex. 13 CAH Dec. at Vector 0097-0098*;

10  *Compilation of Testimony re: Ranking of Customer List, Ex. 16 CAH Dec.*

11    (3)    call and make appointments, during training, with those people on their list for the days

12  immediately following training, or to participate in a Vector    "phone jam" with other sales

13  representatives at night during training to make appointments

14  *Ex. 13 CAH Dec. at Vector0097-0098*; *Compilation of Testimony re: Use of Customer List During*

15  *Training, Ex. 18 CAH Dec.;*

16    (4)    purchase the sample kit from Vector so that they would be able to make  presentations

17  following training (all fifty deponents, like Alicia Harris,  purchased the sample kit); *Ex. 13 CAH Dec.*

18  *at Vector0057,0115*; *Compilation of Testimony re: Purchase of Sample Kit, Ex. 19 CAH Dec.;*

19    (5)    sign the sales representative agreement toward the end of training and/or the third day

20  of training. *Matheson Depo. Ex. 9 CAH Dec. at 104:24-105:7, 99:9-12;  Harris Dec. (Docket 134) p.*

21  *4:15-18; Arlie Depo. Ex. 10 CAH Dec. at 113:3-6;*  and

22    (6)    create a list of other people the deponents knew who might need a job, and turn that list

23  over to Vector.  *Compilation of Testimony re: Recruit List, Ex. 20 CAH Dec* The deponents generally

24  recalled this list to be the "recruit" list.  Typically, without the knowledge of the deponents that they

25  would do so, Vector would then call those people on the "recruit" list turned in by the deponents.

26  _____

27    [5] Many deponents testified to this.  Not every deponent was asked this question, as this
  information came to light after a number of depositions were taken.  However, once this issue came

28  to light and the relevant inquiries were made, the testimony was very consistent.

1  Vector would at that time, or thereafter, attempt to recruit those people to become trainees, to go

2  through the same "program," and then sell these persons a sample kit as well.[6]

3      During training, recruits were also informed of Vector's FASTSTART program, which is a

4  contest that takes place during the first ten days following training, and offers prizes, including a trip

5  to Hawaii, for sales representatives who reach certain levels of gross sales.[7] *Ex. 13 CAH Dec. at*

6  *Vector0057,0069-0070*; *Compilation of Testimony re: "Fast Start" and the First Two Weeks of Sales*

7  *Activity After Training, Ex. 21 CAH Dec.*  This initial time period of ten days following training is a

8  crucial period for Vector, given that Plaintiff now knows that fully 45% of all of Vector's sales occur

9  within this 10-day time frame, and given that sales reps often exhaust their best prospective customers,

10  *i.e.*, close family members and friends, rather quickly.  *Matheson Depo. 08/27/10, Ex. 22 CAH Dec.*

11  *at 25:7-11.*

12      The initial training period also sets the stage for Vector to impose its class wide set of controls

13  on all the recruits, which  Vector knows will maximize the odds of sales occurring within the first 10

14  days, before the inevitable sales rep "burn-out" occurs.  These controls include:

15      (1)    the Personal Daily Interest requirement of daily contact with the branch manager,

16  which, was testified to during the deposition of Alicia Harris, and for many deponents, included

17  contact before, during, and after each demonstration. *Ex. 7 CAH Dec.* at *Vector* 0052; *Ex. 13 CAH Dec.*

18  *at Vector0127-0128*; *Compilation of Testimony re: PDI,  Ex. 23 CAH Dec.*

19      (2)     reading and/or memorizing the manual for demonstrations  *Ex. 7 CAH Dec.* at *Vector*

20  0050; *Compilation of Testimony re: Follow Manual or Script,  Ex. 24 CAH Dec.*

21      (3)    the distribution of materials to use during demonstrations, including sales forms, rope

22  and leather to cut, and colored brochures.  *Compilation of Testimony re: Use of Vector Materials,  Ex.*

23  *25 CAH Dec.*; *Cutco Price List, Brochures and Comparison Chart, Ex.  26 CAH Dec.*

24      [6] **Deponent Randall Magno is a class member, who was recruited from the "recruit" list
submitted by his friend, and who in turn purchased his own sample kit at the end of his own training.**

25  *See Magno Depo. 38:22-39:21 in Ex.* 1 *CAH Dec.*

26      [7] While the numbers are not yet known, it is clear that the odds of winning these trips are and

27  always have been extremely remote.  It is rather clear that the 28% who were never able to make a

28  sale were not amongst the winners.

1    (4)     restrictions on advertising and the prohibition of the use of the Vector name without

2  approval; this is set forth in the Sales Representative Agreement introduced toward the end of training,

3  *Sales Representative Agreement, Ex. 27 CAH Dec.; Compilation of Testimony re: Advertising and*

4  *Marketing Restrictions, Ex. 28  CAH Dec.*   and

5    (5)     price restrictions on the products, such that no price changes are permitted without the

6  manager's express prior approval. *Compilation of Testimony re: Pricing Restrictions and Approval*

7  *Needed for Bonus Items,  Ex. 29 CAH Dec.*, *incl.  Matheson 137-38, 183-84.*

8  **IV.    PLAINTIFF ALICIA HARRIS MEETS THE LEGAL STANDARD OF "SIMILARLY SITUATED" FOR PURPOSES OF "FINAL" STAGE-TWO COLLECTIVE ACTION CERTIFICATION**

9

10    "Determining whether a collective action is appropriate is within the discretion of the district

11  court. [citation omitted] To certify a FLSA collective action, the court must evaluate whether the

12  proposed lead plaintiffs and the proposed collective action group are "similarly situated" for purposes

13  of §216(b).  Plaintiffs bear the burden of making this showing [citation omitted]."  *Leuthold v.*

14  *Destination Am.*, 224 F.R.D. 462, 466 (N.D.Cal.2004).

15    The statute does not define the term "similarly situated," and the Ninth Circuit has yet to

16  interpret this phrase.  *See id.* at 467.  However, to determine whether the plaintiffs are similarly

17  situated, "[c]ourts generally follow one of two approaches: (1) evaluating the FLSA collective action

18  in terms of Rule 23's class certification requirements; or (2) applying a two-step approach involving

19  initial notice to prospective plaintiffs followed by a final evaluation whether such plaintiffs are

20  similarly situated." *Id.* at 466 (internal citations omitted).  This ad hoc approach "involves examination

21  of the distinct legal and factual similarities and differences between and among class members' legal

22  claims, though not in reference to the requirements listed under Rule 23."  *Chase v. AIMCO*

23  *Properties, L.P.*, 374 F. Supp. 2d 196, 200 (D.D.C. 2005).  A collective action is not subject to the

24  numerosity, commonality, and typicality rules of a class action under Rule 23. *Hunter v. Sprint Corp.*,

25  346 F. Supp. 2d 113, 117 (D.D.C. 2004); see also *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 n. 12

26  (11th Cir.1996) ("it is clear that the requirements for pursuing a §216(b) class action are independent

27  of, and unrelated to, the requirements for class action under Rule 23 of the Federal Rules of Civil

28  Procedure").  As the Court noted in *Thiessen v. Gen. Elec. Capital Corp.*,

7

1    Arguably, the ad hoc approach is the best of the three approaches outlined because it

2    is not tied to the Rule 23 standards. Congress clearly chose not to have the Rule 23

3    standards apply to class actions under the ADEA, and instead adopted the "similarly

4    situated" standard. To now interpret this "similarly situated" standard by simply

5    incorporating the requirements of Rule 23 (either the current version or the pre 1966

6    version) would effectively ignore Congress' directive.

7 *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1112 (10th Cir. 2001)

8         In its Order of May 18, 2010 conditionally certifying this class, this Court adopted the two-step

9 approach noted above, and ordered that notice be mailed to class members by May 24, 2010.  On

10 August 2, 2010, Rachel Wnorowski of Epiq Class Actions and Claims Solutions, the third party

11 administrator, filed a declaration with this Court acknowledging that the Court-approved notice and

12 consent to join form was mailed to 47,961 potential class members on May 24, 2010, in compliance

13 with this Court's order, and that 5,569 consent to join forms were received by Epiq as of July 28, 2010.

14 [Document No. 230]

15         After sending out notice and conducting class discovery, Plaintiff Alicia Harris now seeks an

16 order from this Court granting "final" Stage - 2 collective action certification, so that she can represent

17 those class members who have, or will opt-in to the class.  "At this juncture, the court uses a higher

18 standard to analyze the similarly situated issue." *Thiessen*, *supra*, 996 F.Supp. at 1080.  As set forth

19 by the Northern District of California in *Leuthold*, *supra*, 224 F.R.D. at 467:

20         **The court then must make a factual determination regarding the propriety and**

21         **scope of the class and must consider the following factors: (1) the disparate**

22         **factual and employment settings of the individual plaintiffs; (2) the various**

23         **defenses available to the defendants with respect to the individual plaintiffs; and**

24         **(3) fairness and procedural considerations.**

25         However, a requirement that the class members be <u>identical</u> would be inconsistent with the

26 intent of the FLSA's provision that a case can proceed as a collective action. *Pendlebury v. Starbucks*

27 *Coffee Co.* 518 F.Supp.2d 1345, 1361 (S.D.Fla.2007).  The presence of a common policy, plan, or

28 practice affecting all class members, although not necessarily required, is helpful to showing a similar

8

Notice of Motion for Final Collective Class Action Certification; Memorandum of Points & Authorities
Case No. Cv 08-5198 EMC

1   factual setting.  *Maynor v. Dow Chem. Co.* 671 F. Supp. 2d 902, 931 (S.D. Tex. 2009) citing *Falcon*

2   *v. Starbucks Corp.*, 580 F.Supp.2d 528, 534-35 (S.D.Tex.2008) (collecting cases).

3            **A.      Plaintiff Alicia Harris and Opt-In Members were Subject to Defendant's**

4                      **Uniform Policies**

5            When analyzing a class of plaintiffs' factual and employment settings, courts evaluate whether

6   the plaintiffs have provided substantial evidence that their claims arise out of a single policy, custom

7   or practice that leads to FLSA violations.  *Smith v. T-Mobile USA Inc.*, 2007 WL 2385131 at *6-*8

8   (C.D. Cal. Aug. 15, 2001); *Castle v. Wells Fargo Financial Inc.*, 2008 WL 495705 at *5(W.D. Wash

9   Fed. 20, 2008); see also *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278 (N.D.Texas

10  2008); *Bonilla v. Las Vegas Cigar Co.*, 61 F.Supp.2d 1129, 1139 n. 6 (D.Nev.1999).

11           Here, in Plaintiff's Third Amended Complaint, third cause of action, Plaintiff alleges that she

12  and other putative class members are owed minimum wages for training time.  Paul Matheson,

13  Defendant's Legal Affairs Manager, testified that none of the putative class members (sales reps) are

14  paid to attend training.  *Matheson Depo. Ex. 9 CAH Dec. at 76:23-25*.  In Defendant's Answer to

15  Plaintiff's Second Amended Complaint, Defendant denies that it owes Plaintiff and class members

16  minimum wages for training under the FLSA because they were not employees of Defendant.  *See*

17  *Defendant's Answer to Plaintiff's Second Amended Complaint, Second Affirmative Defense*,

18  p. 10:26-28.  Vector's single decision not to pay minimum wages for training is subject to class-wide

19  analysis making "final" certification appropriate.  The ultimate decision on the merits of this issue will

20  be driven by the manner and method by which defendant hires the "trainees" and by which it conducts

21  its training sessions.  As set forth in the Statement of Facts derived from the testimony of fifty class

22  members, this is carefully and closely choreographed by Vector, so that it is virtually the same for

23  everyone.

24           At the end of the day, this Court should be deciding whether all, or none, of the class members

25  are entitled to be paid for the time spent in training.  There is nothing so unique about each and every

26  trainees' experience with Vector that would or could justify the need for individual trials as to the

27  "compensability" of the time spent in training.  One trial can determine this issue as to all the

28  thousands of class members.

**B.**     **The Issue of Entitlement to Payment for Training can be Determined on a Class-wide Basis**

There are two avenues available in order to examine whether the time spent in training is compensable.

**(1)     The test applicable to "hired" employee trainees.**

The first avenue flows from the answer to a preliminary question, to wit, "[A]re the recruits hired as employees before they commence their training session"?  If the answer at trial, or post-certification motions, is that they are in fact hired prior to training, then the merit inquiry moves immediately to the 4-part test outlined in 29 C.F.R. §785.27.[8]

Plaintiff asserts that the class members, and she, were hired as of the end of the interview.  The fifty deponents sampled by Defendant testified that they were typically informed by their manager of his or her decision right after the interview process was completed (or called shortly thereafter) with words to the effect of "Welcome to the team!" or "Congratulations!" or "You're in!" or even in some situations, as with Alicia Harris, "You're hired!" *Ex. 4 CAH Dec.*  Many managers who submitted declarations in support of Vector's Opposition to Plaintiff's Motion for Conditional Certification also indicated that they themselves used similar language indicating that the recruit had been "accepted to the team."  *Order Granting Plaintiff's Conditional Certification Motion (Docket 176), p. 13:17-21.*

Predictably, as occurred with Ms. Harris, the use of such language by Vector and its managers, and the interviewing process itself, led 48 of the 50 deponents (the other two simply could not recall) to believe that they had been hired for the job at that time, before any training had begun. *Ex. 4 CAH Dec.* The recruits, as with Alicia Harris, were then immediately scheduled for the initial training session, wherein the sales training seminar that was distributed included the same "Welcome to the Team!" language, which reinforced the understanding by many deponents that they had been "hired" for the job for which they were now training. *Ex. 5 CAH Dec.*

Assuming the finding is ultimately made by this Court, or the trier of fact, that the recruits were

---

[8] This test will apply to the overall merits analysis regardless of whether this Court determines whether recruits were "hired" before training, or constitute "employees" rather than "trainees" under the *Walling* test.  If the *Walling* test becomes applicable, then this test is a secondary test to determine whether the training itself constitutes compensable "hours worked."

1  hired prior to commencing their training, then the application of the 4-part test is easily analyzed for
2  all the similarly situated employees.  Federal regulations provide:

3     Attendance at lectures, meetings, training programs and similar activities need not be counted
4  as working time if **ALL** the following four criteria are met:

5     (a)    Attendance is outside of the employee's regular working hours;

6     (b)    Attendance is in fact voluntary;

7     (c)    The course, lecture, or meeting is not directly related to the employee's job; and

8     (d)    The employee does not perform any productive work during such attendance.

9  29 C.F.R. §785.27.  Thus, so long as any one of the four factors can be tried on a class-wide basis in
10 favor of Plaintiff, final certification should be granted.

11    With respect to factors (a) and (b), as noted earlier, of the fifty witnesses who testified in
12 deposition, all fifty believed, as did Alicia Harris, from either being affirmatively told or being given
13 the impression from the manager, that <u>training was mandatory</u>. *Ex. 8 CAH Dec.* All fifty, like Alicia
14 Harris, then immediately attended the initial training session at scheduled times.  In fact, Vector's
15 computer database indicates that all 47,000 individuals on the class list attended the initial training
16 session, as testified to by Paul Matheson.  *Matheson Depo 08/27/10 Ex. 22 CAH Dec. at 24:13-22.*

17    With respect to factor (c), the testimony of the fifty deponents confirmed Plaintiff's previously
18 submitted evidence that the sales training seminar manual is used throughout California, as well as the
19 same training outlines, as all fifty deponents testified that they were all were provided the same or very
20 similar sales training manuals to those provided to Alicia Harris during her training. Clearly, the
21 content of the training program itself, is conducive to an analysis that will apply to the entire class.
22 This Court acknowledged this point in the Cert Order, when it stated the following:

23    **...[T]his Court has previously noted in its summary judgment order that is**
24    **"doubtful whether criteria (c) applies [in the instant case because] [t]he training**
25    **appears to be related to the job.  Indeed the training is keyed to the specifics of the**
26    **Vector sales program and Cutco knives." [Docket No. 132, pp. 12:26-13:2]**

27    Class members agree.  When asked during deposition whether they felt the training was
28 specific to Cutco knives, or rather constituted more generalized sales techniques, the vast majority of

1   deponents testified consistently with Alicia Harris that the training was specific to selling Cutco knives

2   and provided minimal generalized sales tips. *Harris Dec. (Docket 134) p. 4:2-5; Ex.* 11 CAH Dec.

3   **(2)    The test applicable to not yet hired trainees.**

4   If the court or trier of fact were to conclude that the recruits were not hired prior to the training

5   commencing, then the alternative analysis of the case would proceed under the so-called *Walling* test.

6   As this Court recognized in its Conditional Cert Order, most courts dealing with whether trainees

7   should be classified as employees during training are guided by the Supreme Court's decision in

8   *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), and its progeny.  In its Cert Order, this Court

9   chose to apply the *Walling/DOL* training test for purposes of examining certification, as opposed to

10  the post-training test asserted by the defendant, arising out of *Donovan v. Sureway Cleaners* 656 F.2d

11  1368, 1370  (9th Cir. 1981). [Docket No. 132, p. 7:6-7]

12  The *Portland Terminal* case has been construed by some courts as essentially setting up an

13  economic realities test in the specific context of training.  *See Marshall v. Baptist Hosp., Inc.*, 473 F.

14  Supp. 465, 467-68 (M.D. Tenn. 1979), *rev'd,* 668 F.2d 234 (6th Cir. 1981); *see also* 50 A.L.R. Fed.

15  632, at *2,5 (2008) (discussing cases in which the court has evaluated whether "the economic realities

16  of the situation are such that the trainees are primarily working for the benefit of the employer

17  sponsoring the training rather than for their own benefit").

18  In its Cert Order this Court interpreted *Portland Terminal* as effectively prescribing an

19  economic realities test in the specific context of job training, and concluded further that the

20  determination of the economic realities inevitably depends on the context. [Docket No. 132, p. 6:13-18]

21  While this Court at the conditional certification stage declined to make a determination as to Plaintiff's

22  argument that Vector must meet the more stringent DOL burden requiring Vector to meet all six

23  criteria of the test,[9] this Court agreed that "[f]or purposes of this opinion, the Court assumes that the

24  DOL test in some form applies...." [Docket No. 132, p. 10:11-12]  After conducting class-wide

---

25  [9] This Court acknowledged that a number of courts have adopted the DOL test, while others
26  have taken somewhat of a middle position, stating that the DOL test need not be strictly or rigidly
    applied and that the totality of the circumstances controls whether a trainee should be deemed an
27  employee for purposes of the FLSA. [Docket No. 132, p. 10:1-10] It is Plaintiff's position that the
    DOL test should be applied "strictly" for purposes of this case, although that ultimate "merits"
28  question is obviously to be deferred for future consideration.

Notice of Motion for Final Collective Class Action Certification; Memorandum of Points & Authorities
Case No. Cv 08-5198 EMC

1   discovery, there is no question that the DOL's Six-Part test is conducive to class-wide analysis.

2   **Factor No. 1:**          **The training, even though it includes actual operation of the**
3                              **facilities of the employer, is similar to that which would be given in**
                               **a vocational school.**

4       With respect to this Factor, in the Order granting conditional certification, the Court noted that
5   Ms. Harris submitted evidence of the sales training seminar manual and training guidelines to
6   demonstrate consistency and uniformity as to the nature and content of the training to establish that
7   Ms. Harris is similarly situated to the other trainees. [Docket No. 132, pp. 10:25-11:1] The uniformity
8   and consistency of the use of the training manual has been confirmed through the testimony of all fifty
9   deponents who testified that they (1) all used the training seminar manual; and (2) all either memorized
10  it, followed the script, or read from it during demonstrations, which is fully consistent with the
11  testimony of Alicia Harris that she read from the manual during her demonstrations. *Ex. 24 CAH Dec.*
12  Furthermore, the testimony of the deponents was also fully consistent with Ms. Harris' testimony to
13  the effect that she felt that the training was entirely specific to the selling of Cutco knives, and
14  provided only minimal generalized sales tips. *Ex. 11 CAH Dec.; Ex. 12 CAH Dec.*

15      Whether such product specific training is or is not similar to that which is given in a vocational
16  school can therefore be determined on a class wide basis.  It will be the same conclusion as to all the
17  class members, as the training itself is created and controlled by Vector, and based on all the testimony
18  elicited, is clearly common to all the class members.

19  **Factor No. 2:  The training is for the benefit of the trainees; and**

20  **Factor No. 4:  The employer that provides the training derives no immediate advantage**
21                  **from the activities of the trainees; and on occasion operations may actually**
                    **be impeded.**

22      Whether or not it is the class or Vector who derives the greater benefit from the training is not
23  the issue before the Court through this motion.  Rather, the inquiry is whether or not the relative
24  benefit(s) can be weighed in one action on behalf of all class members.  While Plaintiff does not agree
25  with this Court's comment in the Cert Order (at 11:2-4) that Factors 2 and 4 are the inverse of each
26  other,[10] it is nonetheless true that  many of the same class-wide facts apply to the analysis under both

27
28      [10] Factor No. 2 appears to encompass a broader analysis of the relative benefit of the "entire"
    relationship, as opposed to Factor No. 4, which appears to focus on the "activities" of the trainees.

13

1   factors, and therefore the two factors are presented and discussed herein together.

2         One significant observation that has come to light during class discovery is that Vector
3   carefully stages its interactions with its trainees and sales representatives in a manner that clearly
4   demonstrates that Vector is preying on potential recruits, often college-age or young adults who have
5   no discernible skills or prior job experience.  Based upon sales and statistical evidence recently
6   gathered by Plaintiff and that will continue to be gathered during the merits stage discovery, it is clear
7   that Vector is well aware of precisely how the average recruits' unfolding relationship with it will
8   evolve, and ultimately end.  Based on its knowledge of the normal course of conduct, and the carefully
9   scripted training and subsequent sales representative relationship, Vector derives a significant financial
10  benefit from the recruits, commencing during the training process.  The recruits are extremely unlikely
11  to obtain any such significant benefit, nor in many cases, any benefit at all, as it is clear from the class
12  members' testimony and the sales training documents that Vector's training sessions constitute nothing
13  more than an indoctrination into the ways of the company, and its products.  This is not a vocational
14  school or anything close to it.

15        Even the argument that the recruits are trained to "hit the ground running" is illusory.  For
16  many, aside from being led into purchasing the sample kit from Vector, which results in an immediate
17  payment to Vector by the trainee, nothing more will flow from this relationship.  Based on testimony
18  recently obtained from Paul Matheson, a corporate witness produced by Vector, almost one in three
19  (28%) of all the recruits who actually complete training will never make a commissionable sale.
20  *Matheson Depo. 08/27/10 Ex. 22 CAH Dec. at 22:5-10.*  However, Vector will still benefit from these
21  recruits' purchase of the sample set, and the recruits' creation of a list giving contact information as
22  to other potential recruits so that Vector can sign up yet more potential recruits to purchase sample
23  knives.  As for those who do make sales, they clearly commence that process during the training time
24  by creating the potential customer list, ranking customers according to Vector's criteria, and setting
25  up appointments.  The fact that they are all  doing that, instead of being taught anything of a
26  substantive nature, is yet further class wide evidence of the lack of long-term benefit to the class
27  members.

28     *See, e.g., McLaughlin v. Ensley* 877 F.2d 1207 (4th Cir. 1989).

Notice of Motion for Final Collective Class Action Certification; Memorandum of Points & Authorities
Case No. Cv 08-5198 EMC

1  The training relationship cycle is both predictable and the same for all recruits, and the
2  revolving door of sales representatives is clear evidence that one side, Vector, is set up to obtain the
3  primary benefit of this training session, and that the sales representatives will on average be out the
4  door and no longer involved with Vector within just a few weeks.

5  As a result of the class related discovery conducted to date, and the documents produced by
6  the Defendant over the course of the case, certain underlying facts have come to the forefront.  The
7  recruits' experience as set forth throughout this motion has been derived from their perspective.  What
8  the recruits do not know, but what Vector does know, is what truly awaits them.  While these facts,
9  as they are set out, may look and feel like they relate to potential fraud claims, no such claims are
10  pending before this court.  These facts, and factors, however, will at the eventual class trial of this case
11  be offered by the class to support its assertion that the class members derive literally  no financial
12  benefit from their experience with Vector, be it the initial training session, or the ensuing time as a
13  sales representative.  Vector, by contrast, will derive a significant benefit from the training and sales
14  time of the sales representatives, and in fact its entire business flows from this interaction.

15  While further post-certification discovery will certainly be required in order to develop these
16  liability "themes", it appears at this time that Vector's business model  is driven by a basic "strength
17  in numbers" plan, and succeeds despite the revolving door of recruits it brings in and "spits out."  For
18  the vast majority of the recruits who are hired, trained, purchase the sample kit, and then sent off to
19  sell to their family and friends, Vector knows that no appreciable sales volume will ever be produced,
20  and the sales representatives will be gone in short order.  The numbers simply do not lie.

21  In summary fashion, this revolving door is as follows:

22  (a)  In California alone, approximately 55,000 recruits have completed
23  the training session in the last five and one half years.  This works out to about 10,000 per year in this
24  state alone.  Decl. Martin Shapiro ¶ 8.

25  (b)  Of these 45,350 recruits who signed a sales representative agreement during the
26  FLSA class period, **63.88% ceased making sales, and did not receive any further commission**
27  **checks, within four weeks of signing the sales rep agreement** . Decl. Martin Shapiro ¶ 9.  An
28  additional 16% dropped off over the next four weeks, such that **after only eight weeks, fully 79.72%**

15

1 **of the sales representatives never again received a commission check.** Decl. Martin Shapiro ¶ 9.

2     (c)    Of these 55,000 recruits who became sales representatives during the entire class

3 period, fully **28% never made a commissionable sale.** *Matheson Depo. 08/27/10, Ex. 22 CAH Dec.*

4 *at 24:7-25:6.*

5     (d)    In 2009, the only year for which the class currently has data, Vector

6 paid out only 18,000 QSP payments.  With approximately 10,000 persons on board each year, this

7 works out to about $28.00 per person for that year.  Once further post-certification discovery is

8 conducted, this number can be verified, but this supposed benefit is obviously not significant.  Final

9 numbers will have to await, and it could move up or done, but since only 18,000 QSP payments were

10 made to the entire California group of sales reps in that year, this is one of those "it is what it is" items.

11 *Decl. of Matheson filed March 24, 2010* [Document No. 124, para.12 ]

12     (e)    The average sales representative will achieve sales of only

13 $1,685.00 in total during his or her relationship with Vector.  *Matheson Depo. 08/27/10, Ex. 22 CAH*

14 *Dec. at 21:18-22:12.*  Based on Vector's acknowledged commission rates, this would yield **total**

15 **average  lifetime commissions of only $202.75 each**.  (*Ex. 27 CAH Dec.*)

16     (f)    Based on total average sales and commissions, and the likely

17 income from QSP's, it thus appears that the total average income flowing to the average class member

18 would be approximately $231.55.  It is thus not surprising that 63.88% are gone within four weeks,

19 and 79.72% are gone within eight weeks.

20     (g)    Of the sales generated, as woeful as they may be on average, **45%**

21 **of the sales are in fact generated within the first 10 days** (*Matheson Depo. 08/27/10, Ex. 22 CAH*

22 *Dec. at 25:7-11)* of signing the sales representative agreement, and nearly 76.5%are created within the

23 first eight weeks. We now know that nearly 80% of these persons are no longer selling after these eight

24 weeks. (*See*, Shapiro declaration filed herewith, at ¶ 9)

25     (h)    By the time the average sales rep is gone, given the average income

26 set forth above, and accounting for the average cost of the sample set at about $150.00, plus applicable

27 sales tax of $12.75 on average, for a total outlay of $162.75, the average sales representative will have

28 made, before expenses such as mileage, bus fare, cell phone charges, and the like, about $68.00 net.

16

1   If we deduct only a minimal assumed expense allocation of $40.00 per person, **the average sales**

2   **representative will have netted about $28.80 for his or her total time devoted to this enterprise**.

3              (i)      Vector seems to revel in telling this Court that the sample set

4   purchase is fully refundable.  What it fails to note is that it fully understands human nature, and is well

5   aware based on its historical averages that a little over 6 out of 7 sets sold will never be returned for

6   refund.  Whether the people like the knives, or **simply never want to hear from or speak to their**

7   **manager again so long as they live**, the fact remains that Vector is able to book these sample set kits

8   as sold, and largely never to be returned, because the numbers don't lie.  Eighty seven percent are

9   never returned, and it simple terms, a sale is a sale.  Shapiro decl ¶ 10.

10              (j)      During the training period, the trainees will be "hit up" to provide

11  not only a potential sales lead list, but also a separate "recruits" list, comprised of the names of persons

12  the recruits know who may be interested in also signing up for the program.  Vector knows that these

13  people, if they sign up, will in turn end up purchasing a sample set of knives from it.  They, in turn,

14  will also end up providing  yet further recruit lists as they go through the program.

15            The foregoing represents just some of the information that Vector has available to it at all

16  times.  When it is seeking its flow of recruits, it knows that they will be gone shortly, but that the

17  knives sold to these recruits will not be coming back to it.  It is also able to make its margin (which

18  future discovery will undoubtedly develop) even  on the low average sales produced by each person,

19  and collectively, given the strength in numbers, it yields the substantial $197,000,000.00 annual

20  revenue which the Defendant boasts about on its website.[11]  This is a huge number which is built upon

21  thousands of recruits per year, nationally, averaging only $1685.00 in sales each.  However, the

22  individual sales representatives, on average, will have essentially wasted about two months of their

23  time chasing what one side of the equation - Vector - knows full well is never going to happen - the

24  recruits are simply not likely to ever find the pot of gold.     As soon as the newly trained employees

25  have mined their personal customer list of friends and family, and the leads are exhausted, Vector is

26  already moving on to the next batch of recruits.  The revolving door has proven to be limitless over

27  _____

28      [11]  "Vector Marketing's annual sales are in excess $200 million dollars. . .."
    _www.vectormarketing.com_ *Ex. 30 CAH Dec.*

17

Notice of Motion for Final Collective Class Action Certification; Memorandum of Points & Authorities
Case No. Cv 08-5198 EMC

the many years' of its operation.  In fact, as noted earlier, Vector even uses the current batch of recruits to help find its next batch of recruits.  All of these facts and assertions will of course need to be further explored and verified post-certification.  Nonetheless, it seems quite clear, based even solely on the average total lifetime sales of only $1685.00 per person, which figure came directly from Mr. Matheson's own testimony on behalf of the company, that the average class member's experience is simply not going to end well.  The training is a nothing more than a mini-training camp in Cutco knives, and accomplishes nothing more than to send the recruits out the door for Vector's benefit.  The average thirty dollar return, or even double that if the average yields that much, is obviously not a "benefit" to the average class member.

In summary, Vector will have sold the sample kit to almost every sales representative, it will have obtained sales leads, it will have obtained lists of potential further recruits, it will mine those lists for the next set of recruits, it will sell its sample kit to the next level of recruits, it will make its margin on all sales made by the sales representatives, (despite the low sales volume per person), and it will then begin the process anew.  This is largely a one-way street business, and the little guy does not control the road.

**Factor No. 3:  The trainees do not displace regular employees, but work under close observation.**

On first blush, it appears that this "factor" would probably not be particularly relevant to this case.  The trainees are not displacing Vector's other regular sales representatives in a classic sense, as they have little interaction with such persons, unless they are brought in to give "pep talk" type speeches typical of many training sessions.

However, on closer examination, and given the realities of this particular enterprise, it is at least worthy of note that while the trainees may not be displacing the existing sales reps in their daily work, they are in fact being trained to actually **replace** them.  It seems logical to assert that the ultimate "displacement" is the act of "replacing" someone.  Since Vector knows based on its own historical data that 61% of its trainees will be gone in four weeks, and 76% will be gone in eight weeks, all the trainees in this revolving door enterprise are being trained to displace all those who came through the door only weeks earlier.  To that extent therefore, this factor could certainly be evaluated on a class

18

1   wide basis, and if found to be applicable, the conclusion would apply to everyone.

2
3       **Factor No. 5:  The trainees are not necessarily entitled to a job at the conclusion of the training period.**

4       As discussed previously, Plaintiff and class members assert that they were "employees" prior
5   to the commencement of the training session.  Assuming that finding to be made, then it will follow
6   that everyone who is accepted for training has in fact been offered a job, and begins training for it
7   immediately.  Thus, this factor would fall unambiguously on the Plaintiff's side.  More importantly,
8   for certification purposes,  this factor would also clearly be best analyzed on a class wide basis.[12]

9       If, as Vector will likely assert, the trainees are not actually employed until they sign the sales
10  rep agreement, this "factor" would still fall on the Plaintiff's side in terms of the current certification
11  analysis.  Since 50 out of 50 deponents testified that they were all presented with a sales rep agreement
12  to sign during training, that is pretty conclusive testimony that the trainees were in fact "necessarily"
13  entitled to a job at the conclusion of the training.  Plaintiff does not intend to assert that this literally
14  means that 100% of all trainees would be hired - there are always exceptions.  For example, someone
15  may have engaged in illegal behavior during training, or acted inappropriately, thus disqualifying him
16  or herself from the job.  But overall, the numbers yet again dictate that this issue is ripe for class wide
17  analysis.

18      **C.      There are No Defenses to Class Members' Claims that Need be Litigated on an Individual Basis**
19

20      The second factor in the analysis of whether this action should proceed as a collective action
21  is the available defenses that need to be litigated on an individual basis.  Defendant contends that
22  recruits are not employees and therefore should not be compensated for training time.  Any defenses
23  raised to Plaintiff and class members' alleged misclassification is therefore consistent among class
24  members.

25      Defendant may argue that individual defenses exist as to whether or not individuals were hired
26  prior to commencement of the training program. Defendant may introduce evidence regarding whether

27      _____
28      [12] The deferred act of being presented with the sales rep agreement a couple of days later, during training, then permits them to begin selling immediately after the training is complete.

19

Notice of Motion for Final Collective Class Action Certification; Memorandum of Points & Authorities
Case No. Cv 08-5198 EMC

1    or not deponents understood if Vector would allow them to actually sell the Cutco knives until after

2    completing the training and signing the Sales Representative Agreement. However, as pointed out in

3    this Court's Cert Order, at p. 13, just because Vector would not permit a sale until after the Agreement

4    was formally signed does not necessarily mean that an employment agreement did not exist earlier.

5           As noted immediately above, whether the employees are found to have commenced their

6    employment before or during training does not effect certification - that question can and should be

7    handled on a class wide basis. The eventual answer to that question will impact on liability asa to

8    everyone, such that it should be certified. Therefore, there are no potential individualized defenses

9    premised on this argument.

10          Defendant may also argue that individualized defenses exist regarding the level

11   of control exercised by Vector through its personal daily interest requirement. However, control is not

12   a factor examined under the *Walling* test or 29 C.F.R. §785.27. Furthermore, there is clear evidence

13   that the requirement for Personal Daily Interest exists.   46 of the deponents testified that they were

14   required to contact their manager regularly, and did keep in contact with their manager on a regular

15   basis, some as often as multiple times daily, and others every day or other day. Many testified that if

16   they did not contact their manager, their manager would contact them. *Ex. 23 CAH Dec.*  Training

17   materials produced by class members also demonstrate that this control factor was instilled during

18   training, as indicated in handwritten notes from trainees, and the testimony indeed demonstrates that

19   PDI was followed through thereafter.

20          To the extent the Defendant may rely on previous declarations it submitted in support of its

21   Opposition to Conditional Cert regarding the PDI requirement, after conducting class discovery, it is

22   now clear from all the data and statistics Vector has ever so reluctantly produced that all the

23   defendant's declarants were and are statistical "outliers," having little relation to the average

24   experience of the vast majority of the class members. As noted previously, the average tenure of a

25   sales rep throughout the class period is 4 weeks. The average tenure of the defendant's declarants is

26   __ weeks. Thus, those declarants have little or no relevance to the issue of whether Ms. Harris is

27   similarly situated to the class.  Ms. Harris is similarly situated to the class.

28

1

**D.    An Evaluation of Fairness and Procedural Concerns Mandates Certification**

2      One of the guiding principles, and a primary goal of Section 216 of the FLSA, is to implement

3 the broad remedial purposes of the FLSA. *Hernandez v. United Auto Credit Corp.*, 2010 WL 1337702

4 *5 (N.D. Cal. Apr. 2, 2010).  If the parties agreed as to the duties performed by plaintiffs, or reliable

5 evidence showed that employees performed substantially similar work, a collective action under

6 Section 216 would clearly be appropriate.  *Id*. In evaluating fairness and procedural considerations,

7 the Court must consider the primary objectives of a collective action: (1) to lower costs to the plaintiffs

8 through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently

9 resolves common issues of law and fact that arose from the same alleged activity.  *Johnson v TGF*

10 *Precision Haircutters, Inc.,* 2005 WL 1994286, at *7 (S.D. Tex.  Aug. 17, 2005).

11      Clearly, as demonstrated above, limiting this action to one proceeding will efficiently resolve

12 issues of law and fact that individual class members commonly share with Alicia Harris.  The damages

13 alleged by Plaintiff and class members under the FLSA are sufficiently minimal, *i.e.* minimum wages

14 for 3 or so days of training, such that pooling of class members' resources will cost less than pursuing

15 individual actions.  As such, Plaintiff herein requests that this Court grant Plaintiff's motion for "final"

16 collective action certification.

17

**V.    DAMAGES CAN BE PROVEN ON A CLASS-WIDE BASIS**

18      With regard to the issue of damages, the FLSA claims involved in this motion for final

19 certification can be easily handled on a class wide basis.  Vector's twice designated PMK on various

20 issues, Paul Matheson, has already testified that the normal and customary training session involves

21 three days of training.  There is no question that the recruits are also given homework assignments by

22 the trainers, and every one of the fifty witnesses deposed, plus the Plaintiff Alicia Harris, testified that

23 they worked on the homework as required.

24      Thus, the starting point for the calculation of the training time will be the three days required

25 of the class members.  A small percentage of the class members testified to either four or five day

26 sessions, and that testimony, and the frequency with which more than three days were involved, can

27 be honed in once the case is certified and in final preparation for trial.  If surveys or further sample

28 depositions are necessary to reach more definitive results on the average hours devoted to training by

21

1  the class members, including the night-time homework assignments, survey and sampling procedures

2  are routinely utilized in wage and hour actions, and the survey results offered by expert statisticians

3  who can compile such information.

4          Since the only reason there are not precise records of time spent in the training sessions is that

5  Vector did not attempt to track the actual hours, then the guiding principles of the U.S. Supreme Court,

6  in its long-standing decision in *Anderson v. Mt. Clemens Pottery* (1946) 328 U.S. 680, 687-688, 66

7  S.Ct. 1187, 90 L.Ed. 1515, would govern.  Under this decision, where exact records of hours worked

8  are not maintained by an employer, the Plaintiff and the class would be entitled to offer a reasonable

9  estimate of the average hours and damages for the entire class, as opposed to the exact amounts owed

10  to each person.

11          It is axiomtic under *Anderson* that the one result which would not be acceptable in a situation

12  where a defendant failed to maintain accurate records, would be to permit the Defendant to capitalize

13  on its own failure to maintain records in order to defeat the class on the issue of precise damages.

14

15  DATED:   September 22, 2010          **MARLIN & SALTZMAN**
                                        **DIVERSITY LAW GROUP**
16                                        **LAW OFFICES OF SHERRY JUNG**

17

18                                        By: /s/ Louis M. Marlin____
19                                            Louis M. Marlin, Esq.
                                             of Marlin & Saltzman
20                                            Attorneys for Plaintiffx

21

22

23

24

25

26

27

28

---

22