**MARLIN & SALTZMAN**
Stanley D. Saltzman, Esq. (SBN 90058)
Louis M. Marlin, Esq. (SBN 54053)
Marcus J. Bradley, Esq. (SBN 174156)
Christina A. Humphrey, Esq. (SBN 226326)
29229 Canwood Street, Suite 208
Agoura Hills, California 91301
Telephone: (818) 991-8080
Facsimile: (818) 991-8081
ssaltzman@marlinsaltzman.com
louis.marlin@marlinsaltzman.com
mbradley@marlinsaltzman.com
chumphrey@marlinsaltzman.com

*(Additional Plaintiff's counsel on next page)*

Attorneys for Plaintiff and Proposed Class

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

ALICIA HARRIS, as an individual and on behalf of all others similarly situated,

Plaintiff,

v.

VECTOR MARKETING CORPORATION, a Pennsylvania corporation; and DOES 1 through 20, inclusive,

Defendants.

**CASE NO. CV 08-5198 EMC**

(Assigned to Hon. Edward M. Chen)

**NOTICE OF MOTION AND MOTION MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP RULE 23; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

DATE: October 27, 2010
TIME: 10:30 a.m.
CTRM: C
JUDGE: Hon. Edward M. Chen

Discovery Cutoff: March 2, 2011
Trial Date: June 6, 2011

/ / /

/ / /

/ / /

/ / /

**Additional Plaintiff's Counsel**

**DIVERSITY LAW GROUP**
Daniel H. Chang, Esq. (SBN 183803)
Craig S. Hubble, Esq. (SBN 200789)
Larry W. Lee, Esq. (SBN 228175)
444 S. Flower Street
Citigroup Center, Suite 1370
Los Angeles, California   90071
Telephone:      (213) 488-6555
Facsimile:      (213) 488-6554
dchang@diversitylaw.com
chubble@diversitylaw.com
lwlee@diversitylaw.com

**LAW OFFICES OF SHERRY JUNG**
Sherry Jung, Esq. (SBN 234406)
444 S. Flower Street
Citigroup Center, Suite 1370
Los Angeles, California   90071
Telephone:      (213) 488-6555
Facsimile:      (213) 488-6554
sherryj23@hotmail.com

# TABLE OF CONTENTS

Page

II. VECTOR'S BUSINESS MODEL . . . . . 2

III. PROPOSED CLASS REPRESENTATIVE ALICIA HARRIS' EXPERIENCE AT VECTOR . . . . . 4

IV. THE STATUTORY PREREQUISITES FOR CLASS CERTIFICATION UNDER RULE 23(B)(3) . . . . . 11

- A. Numerosity and Ascertainability Exist . . . . . 12
- B. Plaintiff's Claims are Typical of the Class Pursuant to Rule 23 . . . . . 13
- C. Plaintiff And Her Counsel Will Adequately Represent the Class . . . . . 15
- D. Common Questions of Law and Fact Predominate as to Claims Arising out of the Training and Post-Training Periods . . . . . 16
  - 1. The Legal Test for Claims Arising out of the Training Period . . . . . 17
  - 2. The Legal Test for Claims Arising out of the Post-Training Period . . . . . 19
- E. Common Questions of Law and Fact Predominate as to the Issue of Whether or Not Plaintiff and the Class Are Entitled to Reimbursement of Their Business Expenses under LC §2802 . . . . . 26
- F. Common Questions of Law and Fact Predominate as to Plaintiff's UCL Restitutionary Claims and Paga Claims . . . . . 27
- G. The Class Satisfies the Superiority Requirement of Rule 23(b)(3) . . . . . 28
- H. Damages Can Be Calculated On a Class-Wide Basis . . . . . 30

V. CONCLUSION . . . . . 31

# TABLE OF AUTHORITIES

Page

## STATE CASES

*Arias v. Superior Court*
46 Cal.4th 969 (2009) . . . . . . . . . . 1

*Estrada v. FedEx Ground Package System, Inc.*
154 Cal. App. 4th 1, 10 (2007) . . . . . . . . . . 20

*Gattuso v. Harte-Hanks Shoppers, Inc.*
42 Cal.4th 554 (2007) . . . . . . . . . . 26, 27

*Reynolds v. Bement*
36 Cal. 4th 1075 . . . . . . . . . . 20

## FEDERAL CASES

*Aiken v. Obledo*
442 F. Supp. 628 (E.D. Cal. 1977) . . . . . . . . . . 13

*Amchem Prod., Inc. v. Windsor*
521 U.S. 591 (1997) . . . . . . . . . . 15, 29

*Anderson v. Mt. Clemens Pottery*
(1946) 328 U.S. 680 . . . . . . . . . . 31

*Arthur Young & Co. v. United States Dist. Court*
549 F.2d 686 (9th Cir. 1977) . . . . . . . . . . 11

*Blackie v. Barrack*
524 F.2d 891 (9th Cir. 1975) . . . . . . . . . . 11, 12

*Bogosian v. Gulf Oil Co.*
561 F.2d 434 (3rd Cir. 1977) . . . . . . . . . . 12

*Crawford v. Honig*
37 F.3d 485 (9th Cir. 1995) . . . . . . . . . . 15

*Dalton v. Lee Publications, Inc.*
2010 U.S. Dist. Lexis 75132 (S.D. Cal. July 27, 2010) . . . . . . . . . . 23

*Deposit Guaranty Nat. Bank v. Roper*
445 U.S. 326 (1980) . . . . . . . . . . 29

*duPont Glore Forgan, Inc. v. American Telephone and Telegraph Co.*
69 F.R.D. 481 (S.D.N.Y. 1975) . . . . . . . . . . 28, 29

*Eisen v. Carlisle & Jacquelin*
417 U.S. 156, 177-78 (1974) . . . . . . . . . . 11

*Gutierrez v. Kovacevich ""5" Farms*
CIV-F-04-5515OWWDLB, 2004 WL 3745224 (E.D. Cal. Dec. 2, 2004 . . . . . . . . . . . . . 19

*Haley v. Medtronic, Inc.*
169 F.R.D. 643 (C.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13,15,16

*Hanlon v. Chrysler Corp.*
150 F.3d 1011 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Harris v. Palm Springs Alpine Estates, Inc.*
329 F.2d 909 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*Ikonen v. Hartz Mountain Corp.*
122 F.R.D. 258 (S.D. Cal. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Badger Mountain Irrigation Dist. Sec. Litigation*
143 F.R.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Brown*
743 F.2d 664 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re MDC Holdings Securities Litigation*
754 F. Supp. 785 (S.D. Cal. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Northern Dist. of California Dalkon Shield IUD Products Liability Litigation,*
693 F.2d 847 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Sugar Industry Antitrust Litigation*
73 F.R.D. 322 (E.D. Pa. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*In re United Energy Corp., Etc., Securities Litigation*
122 F.R.D. 251 (C.D. Cal. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Jordan v. Los Angeles County*
669 F.2d 1311 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lerwill v. In-flight Motion Pictures, Inc.*
582 F.2d 507 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mace v. Van Ru Credit Corp.*
109 F.3d 228 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Mendez v. Tween Brands, Inc.*
2010 WL 2650571, *4 (E.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Molski v. Gleich*
318 F.3d 937 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Moore v. Hughes Helicopters, Inc.*
708 F.2d 475 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*O'Connor v. Boeing North American, Inc.*
184 F.R.D. 311 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rosario v. Livaditis*
963 F.2d 1013 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*S.G. Borello & Sons, Inc. v. Department of Indus. Relations* 48 Cal. 3d 341 (1989) . . . . . . . . . . 20

*Siegel v. Chicken Delight, Inc.* 271 F. Supp. 722 (N.D. Cal. 1967) . . . . . . . . . . 19

*Slaven v. BP Am., Inc.* 190 F.R.D. 649 (C.D.Cal.2000) . . . . . . . . . . 16

*Smith v. Cardinal Logistics Mgmt. Corp.* 07-2104SC, 2009 WL 2588879 (N.D. Cal. Aug. 19, 2009) . . . . . . . . . . 26

*Staton v. Boeing Co.* 327 F.3d 938 (9th Cir. 2003) . . . . . . . . . . 14, 15

*Sterling v. Velsicol Chemical Corp* 855 F.2d 1188 (6th Cir. 1988) . . . . . . . . . . 12

*Stuart v. RadioShack Corp.* 641 F. Supp. 2d 901 (N.D. Cal. 2009) . . . . . . . . . . 27

*Sullivan v. Chase Investment Services of Boston, Inc.* 79 F.R.D. 246 (N.D. Cal. 1978) . . . . . . . . . . 14

*Valentino v. Carter-Wallace, Inc.* 97 F.3d 1227, 1231-32 (9th Cir. 1996) . . . . . . . . . . 11, 28

*Walling* . . . . . . . . . . 17, 18

*Wofford v. Safeway Stores, Inc.* 78 F.R.D. 460 (N.D. Cal. 1978) . . . . . . . . . . 14

*Young v. Polo Retail, LLC* C-02-4546 VRW, 2006 WL 3050861 (N.D. Cal. Oct. 25, 2006) . . . . . . . . . . 19

**STATUTES AND RULES**

29 C.F.R. §785.27 . . . . . . . . . . 18

California Business & Professions Code §17200 . . . . . . . . . . 1, 19, 28

F.R.C.P. 23 . . . . . . . . . . 1, 11-13, 15, 16, 19

*Federal Rules of Civil Procedure* Rule 23 . . . . . . . . . . 1

Lab. Code §201 . . . . . . . . . . 1

Lab. Code §203 . . . . . . . . . . 1

Lab. Code §3353 . . . . . . . . . . 20

Lab. Code §450 . . . . . . . . . . 19

*Labor Code* §1197 . . . . . . . . . . 1

Labor Code §226 . . . . . . . . . . 1

Labor Code §2698 . . . . . . . . . . 1

Labor Code §2802 . . . . . . . . . . 1

**MISCELLANEOUS**

1 *Newberg on Class Actions* § 4.25 . . . . . . . . . . 12

1 *Newberg on Class Actions*, §4.26 . . . . . . . . . . 12

2 Newberg, *Newberg on Class Actions* §7.24 . . . . . . . . . . 15

7A Charles A. Wright, *Federal Practice and Procedure* §1764 . . . . . . . . . . 14

Advisory Committee Notes to the 1966 Amendments to Rule 23, 39 F.R.D. 69 (1966) . . . . . . . . . . 12

*Manual for Complex Litigation*, Fourth §21.222 . . . . . . . . . . 13

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on October 27, 2010, at 10:30 a.m., or as soon thereafter as the matter may be heard in the above-entitled court, located at 450 Golden Gate Ave., San Francisco, CA, 94102, Courtroom C, 15th Floor, Plaintiff will and hereby does move this Court for an Order:

1. Certifying this case as a class action on behalf of all individuals who worked for Defendant Vector Marketing Corporation in the State of California as "Sales Representatives" from October 15, 2004, through the present;

2. Authorizing Plaintiff to send Notice and a Request for Exclusion Form pursuant to Rule 23 (in a form to be approved by the Court and attached as Exhibit "A" and "B" to the Saltzman Declaration, submitted herewith) to all absent class members;

3. Reserving to Plaintiff and the class the right to send out further notice prior to a merits determination of the Rule 23 claims;

3. Certifying plaintiff Alicia Harris as the representative of the class;

4. Appointing Marlin & Saltzman, Diversity Law Group and Sherry Jung, Esq., of the law office of Sherry Jung, as class counsel.

The motion for class certification will be based on this Notice, the Memorandum of Points and Authorities and declarations filed herewith, and the pleadings and papers filed herein.

DATED: September 22, 2010

**MARLIN & SALTZMAN**
**DIVERSITY LAW GROUP**
**LAW OFFICES OF SHERRY JUNG**

By: /S/
Christina A. Humphrey, Esq.
of Marlin & Saltzman
Attorneys for Plaintiff

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Pursuant to F.R.C.P. 23(b)(3), Plaintiff Alicia Harris ("Plaintiff") seeks an order from this Court certifying her state law claims including her Second Cause of Action for Failure to Pay Minimum Wages in Violation of Labor Code §1197; Sixth Cause of Action for Violation of Labor Code §2802; Seventh Cause of Action for Violation of Labor Code §2698 *et. seq.*;[1] and Eighth Cause of Action for Violation of Labor Code California Business & Professions Code §17200 *et. seq.*[2] Plaintiff moves on behalf of a class defined as "all individuals who worked for DEFENDANTS in the State of California as 'Sales Representatives' from October 15, 2004 through the present classified as independent contractors" ("the Class"). (Plaintiff's TAC [Docket No. 184] at ¶ 17.)

As explained herein, this action satisfies each of the statutory prerequisites for class certification under *Federal Rules of Civil Procedure* Rule 23. Analysis of the data gathered from fifty (50) depositions of putative class members taken by defendant, Vector Marketing Corporation ("Defendant" or "Vector"), Defendant's corporate testimony and documents, and the statistical data gathered, overwhelmingly demonstrates that the issues presented can indeed be tried in one action.

---

[1] In an excess of caution, Ms. Harris moves for class certification as to her PAGA claim in the event this Court declines to follow prior California authority stating that a plaintiff need not satisfy class action requirements to bring a representative action under PAGA. *See Arias v. Superior Court* 46 Cal.4th 969 (2009); *see also Mendez v. Tween Brands, Inc.* 2010 WL 2650571, *4 (E.D. Cal. 2010).

[2] In this Court's order granting in part and denying in part defendant's motion for summary judgment against Alicia Harris [Docket No. 35], this Court granted summary adjudication as to Plaintiff's individual claims as to her Fourth Cause of Action (Violation of Cal. Lab. Code §226) and Fifth Cause of Action (Violation of Cal. Lab. Code §§ 201/203). Subsequently, in its Order Granting in Part and Denying in Part Defendant's Motion to Strike ("Order re: Motion to Strike")[Docket No. 193], this Court held that Ms. Harris was not an appropriate class representative given her lack of standing as to those claims: "[T]he Court generally agrees with Vector's position. That is, it is clear that Ms. Harris has no standing to bring the §§226 and 201/203 claims given the Court's ruling on summary judgment. Moreover, the class at present has no representative for those claims." (Order re: Motion to Strike at 3:9-10.) In that same order, this Court ordered that any motion to intervene by a proposed class representative be filed no later than August 23, 2010. Subsequently, on September 17, 2010, this Court denied intervention under Rule 24(a) or (b) to Proposed Intervenors on grounds of lack of timeliness. Given this Court's rulings, Plaintiff does not move for certification of those claims at this time.

This evidence has revealed that literally every step of Vector's interaction with its Sales Representatives from recruitment through employment is choreographed, such that the experiences of each class member is virtually identical to each other, as well as to the experience of Plaintiff Alicia Harris. Accordingly, the Court should grant Plaintiff's motion for class certification.

## II. VECTOR'S BUSINESS MODEL

Vector Marketing Corporation is a wholly owned subsidiary of Cutco Corporation, which manufactures Cutco Cutlery. (*Vector website, Ex. 30 to Declaration of Christina A. Humphrey ("CAH Dec" submitted concurrently herewith*)[3] This "marketing" is effectuated by sales representatives who market Cutco products direct to consumers through one-on-one in-home appointments. (*Id.*) Defendant maintains that its Sales Representatives are "independent contractors" and advertises its Sales Representative positions as "flexible" and "great" for students. (*See Vector Solicitation Letters, Ex. 2 CAH Dec*) Accordingly, its not surprising that the average age of a Vector Sales Representative is nineteen. (Ex. 31 *CAH Dec*, "*The Vector Voice" Spring 2008*). On its website, Vector describes its view of a "typical work" day, based on the experience of Katie Fingerhut Heaney , a Cutco Sales Professional (CSP) whose "career sales exceed $725,000", as follows:

> My typical work day begins with getting up between 6:30 and 7AM and eating a healthy breakfast of oatmeal and fruit with my husband, Mike. I usually read a few pages of my book or Newsweek. I then get ready, check my email briefly, then head out of the house around 8 or 8:30AM to either meet with a realtor or mortgage lender or present Cutco gifts at a realtor sales meeting.
>
> I usually do a 7-minute presentation about Cutco engraved closing gifts at 2-3 realtor offices per week and book my day with appointments and phone calls until 5 or 6PM each day. I average between 4 and 6 appointments per day. I like to end my work day by 6PM, when I usually go for a run in downtown St. Louis then cook dinner with Mike. Sometimes we meet friends out for dinner, go to a Cardinals baseball game, or visit with my siblings, parents, and 2 nephews, who all also live in St. Louis.
>
> I usually do 2-5 residential appointments per week; I love my past customers over the last 8 years or so! I spend most of my work days meeting with realtors, lenders, and business owners. I transitioned from residential selling to more business selling in 2007, and I love it. Selling engraved Cutco gifts to businesses not only helps them brand themselves better with their gifts than gift cards and food items, but it also provides us representatives with a tremendous opportunity to gain a residual income selling Cutco knives.

---

[3]Unless otherwise indicated, all exhibit references are to the Declaration of Christina A. Humphrey submitted concurrently herewith.

(Vector Website, Ex. 30 *CAH Dec*)

As the testimony of Ms. Harris and fifty class members deposed by Defendant demonstrate, Vector's depiction of Ms. Heaney's experience is in no way typical of the average Vector sales rep. The stark reality is that the position of a sales representative is, in fact, a revolving door by which Defendant recruits young, inexperienced and unsuspecting individuals, forces them to purchase its product, pumps them for customers and recruits, and then discards them once they have depleted all their resources. Sales Representatives typically make sales to their family and friends, and once the well of those individuals has been drained, their work as a Sales Representative ends shortly thereafter. Statistical evidence gathered by Plaintiff in preparation for her motion for class certification demonstrates that Vector carefully stages its interaction with recruits and sales representatives in a manner that makes the recruits' experience not only consistent, but ensures that Vector is indeed the primary beneficiary of the relationship. For example -

- Of 53,252 recruits who signed a sales representative agreement during the class period, **60.95% ceased making sales, and did not receive any further commission checks, within four weeks of signing the sales rep agreement.** (Declaration of Martin Shapiro "Shapiro Dec" at ¶ 7.) An additional 15% dropped off over the next four weeks, such that **after only eight weeks, fully 76.71% of the sales representatives never again received a commission check.**
- Although Defendant contends that its sales representatives are "guaranteed" to be paid for appointments, in 2009, the only year for which the class currently has data, Vector paid out only 18,000 QSP payments in California. With approximately 10,000 persons on board each year in California, this works out to about $28.00 per person for that year. Imaheson Dec. Filed 3/24/10 (Document No. 124, Para. 12)
- In contrast to Ms. Heaney, who has $785,000 in career sales, the average sales representative will achieve sales of only $1,685.00,which based on Vector's acknowledged commission rates, would yield **total average lifetime commissions of only $202.75 each.** (Ex. 22 *CAH Dec* at 21:18-22:12) Based on total average sales and commissions, and the likely income from QSP's, it thus appears that the total average income flowing to the average class member would be

approximately $231.55. It is thus not surprising that 61% are gone within four weeks, and about 76% are gone within eight weeks.

- Of Vector's total sales generated over the class period, 45% are generated within the first 10 days of signing the sales representative agreement, and fully 76.5% are created within the first eight weeks. That of course is the time that 76% of the Sales Reps have stopped selling. (Shapiro Decl. Para. 7)

- By the time the average sales rep is gone, given the average income set forth above, and accounting for the average cost of the sample set at about $150.00, plus applicable sales tax of $12.75 on average, for a total outlay of $162.75, the average sales representative will have made, before expenses such as mileage, bus fare, cell phone charges, and the like, about $68.00. If we deduct only a minimal assumed expense allocation of $40.00 per person, **the average sales representative will have netted about <u>$28.80</u> for his or her total time devoted to this enterprise**.

Although a sales representative's likelihood of success is minuscule, Vector's business model has proven tremendously effective for the company. Vector's annual sales are in excess $200 million dollars which Defendant touts as "a compelling testament to the fundamentals of our business." (Such facts are particularly startling given Vector's purported business philosophy– "In order to succeed, we must first help others to succeed". (Ex 6, *CAH Dec*)

## III. PROPOSED CLASS REPRESENTATIVE ALICIA HARRIS' EXPERIENCE AT VECTOR

In addition to the facts set forth below, Plaintiff respectfully incorporates herein by reference Section III of Plaintiff's FLSA motion, to demonstrate that her experience was indeed "typical" and "representative" of class members, and obviously more realistic than that of Ms. Heaney discussed on Vector's website.

The typical Vector sales rep is not, as Vector would like the potential recruits to believe, Ms. Fingerhut Heany, but rather Alicia Harris. Ms. Harris' testimony regarding her experience with Vector comports with that provided by Defendant's fifty deponents from start to finish. Like many Vector sales representatives, Alicia Harris' tenure with Vector was brief, lasting only one month in

summer 2008. (Ex. 32 *CAH Dec* at 27:1-2.) Her recruitment perfectly comports with the Vector model.

Like other sales reps who testified, she first became aware of the position via a job posting on the website Craig's list. (*Id.* at 40:14-18.) Upon seeing the ad, Plaintiff telephoned the number provided and, like most of the other sales representatives who were deposed, she was scheduled for an interview within the week. (Ex. 32, *CAH Dec* 42:15-20.) Plaintiff was then subjected to Vector's standardized interview process involving both a group and semi-private interview. When she arrived at the interview there were approximately twenty (20) other applicants. (*Id.* at 49:2-3.) All of the applicants were given a demonstration on the Vector product and then broken into pairs for smaller interviews. (*Id.* at 48:9-49:23, 43:14-20.) Plaintiff was interviewed by Mike Bell, who would later become her manager. (*Id.* at 42:21-43:1.) At the end of the interview, like many of the applicants, Plaintiff was informed that she would be contacted if she were hired. Not surprisingly, Mr. Bell called Plaintiff shortly thereafter and informed her that she was "hired." (Ex. 4, *CAH Dec* at 48:3-6; 45:10-20.) Like many of the other representatives, Plaintiff was told that Vector "went through a lot of people" and selected her for the position. (Ex. 4, *CAH Dec* at 48:3-6.) Plaintiff was subsequently contacted and promptly scheduled for training which Plaintiff was told was mandatory. (*Id.* at 59:2-4.) Like 48 of the 50 deponents (2 could not recall) who testified during Vector's sampling of class members, Plaintiff believed that she had been hired by Vector prior to training. (Harris Decl.; *Ex. 4, CAH Dec ).*

Although Plaintiff cannot recall the exact duration of the training, she did, in fact, attend all the days of training. (*Id.* at 66:4-7) During training, like all other Sales Representatives, Plaintiff was given a training manual. On the very first page of the training Manual were the words "Welcome to the VECTOR team!" (Ex. 7, *CAH Dec* ) Like the overwhelming majority of deponents, Plaintiff was clearly instructed to follow the manual in her sales presentations. (Harris Depo. at 75:23-24; see Ex. 24, *CAH Dec.*) As evidenced by the script contained in the training manual, and the testimony of deponents, the sales training seminar manual controls each and every aspect of the representative's sales presentation. The manual includes a detailed script which was to be strictly adhered to during

presentations, including language and prompts designed to anticipate potential questions or concerns which may arise during the presentation. During training the representatives were coached on demeanor for presentations, informed regarding the required dress for presentations and their actions were choreographed including instructing representatives on exactly when to turn pages in the manual, how to hold the manual, how to perform the demonstrations, how to present Defendant's pre-designed product brochures, and even when to "smile and nod". (Ex. 24, *CAH Dec* ) Plaintiff and the individuals deposed by Defendant all testified to practicing this script, rehearsing the choreography and participating in "role playing" exercises.(Ex. 24, *CAH Dec* ; see also Ex. 7)

Additionally, during training, Plaintiff was made to create potential customers lists and to schedule appointments, thus performing two essential functions of a "sales representative". Plaintiff was also made to purchase a sample kit of knives, a requirement sprung on Plaintiff during training. This requirement was expressly set forth in the Sales Representative Agreement which was signed by each member of the class.[4] In clear and unambiguous terms, the agreement, which was drafted solely by Defendant, provided "Sales Rep shall obtain and utilize a sample kit for demonstration purposes." (Ex. 27, *CAH Dec.*) This agreement was provided to the employees on a take-it-or-leave-it basis without opportunity to negotiate <u>any</u> of the terms therein. (*Id.* at 9.) Pursuant to this Agreement, failure to comply with the requirement to obtain the sample knife kit was grounds for termination. (*Id.* at 8)(expressly providing Defendant with the power to terminate an employee for breach of the Sales Representative Agreement). Moreover, as discussed below, in order to qualify for base pay a sales representative was required to do a "full CUTCO sales presentation, including all visual demonstrations" (*Id.* at ¶2.) Without the knives, a sales representative would not qualify for the "base pay *per appointment*" which Defendant represents on its website is paid "whether or not the customer purchases". (Ex. 30, *CAH Dec* "FAQ Section".) After her employment with Defendant ended, Plaintiff wanted to return the knives but could not do so due the limited times and dates available for return and conflicts with her schedule and transportation limitations. (Ex. 32, *CAH Dec* at 38:3–39:7)

---

[4]Defendant requires all of its sales representatives to sign Sales Representative Agreements. None of the substantive terms of the agreement have changed in any of the versions of the Sales Representative Agreement used over the past six years. (Matheson Deposition at 95:7-11.).

Understandably, given the time lag between deposition and employment, as well as her brief tenure with the company, Plaintiff struggled to recall the specific individuals to whom she made sales presentations. Of the individuals set forth on her customer list, which she located months after her first deposition while searching for other documents (and immediately produced to Defendant upon her discovery), Plaintiff made approximately twenty-one (21) sales presentations. Not surprisingly, like Alicia Harris, other deponents had difficulty recalling the specifics regarding their sales presentations. For example, Kristin Hyde testified:

Q Okay. Let's go through your presentations.
Do you remember your very first sales
presentation?
A No.
Q Do you remember who it was to?
A No.
00103
Q Do you remember if -- at your first
presentation you sold anything?
A I don't remember.
Q How about for your second presentation, do you
remember who it was to?
A No.
Q Do you remember if you sold anything?
A No.
Q How about for any of your presentations do you
remember any of your customers?
A Yeah.
Q Okay. Can you list them for us?
A Candy Hallman. Kathleen Ferrant. My parents,
I did a presentation, Anna and Scott Hyde.
Q And do you remember which of these
individuals, if any, purchased?
A Candy Hallman did and Kathleen Ferrant.

(Ex 35, *CAH Dec* at 102:21-103:17).

To put such testimony in better perspective, Ms. Hyde recalled performing approximately ten to fifteen sales presentations. (*Id.* at 63:10-15.) Clearly, as with Plaintiff, Ms. Hyde could recall only a fraction of the individuals to whom such presentations were made. Perhaps Ms. Harris' presentations would have been more memorable had they resulted in sales. Instead, the *only* sale effectuated by Plaintiff, other than the purchase of the sample set of knives, was a sale to her mother. (Ex. 32, *CAH Dec* at 27:13-17). This sale elevates Ms. Harris above the 28% of class members who never made a sale at all. Plaintiff believes she submitted requests to be paid for the 20 other presentations which had

not resulted in a sale, but for which she believed she was owed payment. Pursuant to Defendant's uniform payment policy and as set forth in their standardized and adhesive Sales Representative Agreement Defendant "offers the Sales Rep a minimum commission (Minimum incentive program) for each qualified presentation performed by the Sales Rep". (Ex. 27, *CAH Dec* at ¶2.)

With Plaintiff, as with each and every one of its sales representatives, Defendant dictated what constituted a qualified presentation for purposes of a Sales Rep being compensated for an in-home demonstration. Pursuant to the Sales Representative Agreement, amongst other restrictions,

> A "Qualified CUTCO Sales Presentation" must meet the following criteria:
> A. A potential customer must be twenty-five (25) years of age;
> B. A potential customer must be gainfully employed on a permanent basis, or, in the case of a married couple, the full presentation must be given in the presence of the person employed;
> C. Sales Representative must complete a "full CUTCO sales presentation, including all visual demonstrations and quoting prices. The presentation must be a 'one on one' situation, not a group selling with more than one potential buyer.

(Ex. 27, *CAH Dec* at ¶2)

Like the overwhelming majority of the class member deponents, Plaintiff Harris testified that she adhered closely with the training manual during her presentations, and, in fact read directly therefrom:

Q. Right. So let's look at pages 28 to 30, then.
9 In every presentation you did, you went through
10 word for word everything that was on 28 to 30?
11 A. Yes.
12 MR. LEE: That's Vector 28 to 30.
13 BY MR. ZAIMES:
14 Q. Right. And similarly, with 25, 26 and 27, you
15 went through all of that in each presentation?
16 A. Yes.
17 Q. 24, also?
18 A. Yes.

(Ex 24, *CAH Dec* at 81:8-18)

However, in the event that reading from Defendant's script was inadequate to close the sale, Defendant had a failsafe – Plaintiff was required to call her managers during the presentation for further instructions. *(See* Harris Decl.; Ex. 24; Ex. 23, *CAH Dec* at 28:23-25, 32:4-11) Because Plaintiff followed the script as written, as was common among class members, Plaintiffs' presentations took approximately one hour. Plaintiff also utilized the tools and materials provided by Vector during

each and every one of her presentations, as required in her training manual. Plaintiff and each and every one of Defendant's deponents testified to receiving rope and leather from Vector for use in the sales presentations as was required by their script. (Ex. 25, *CAH Dec* .) Moreover, much like Plaintiff, Defendant's deponents testified to utilizing these materials in their sales presentations. (Ex. 24 *CAH Dec* ; Ex. 25, *CAH Dec* )

Throughout the course of her employment, Plaintiff became increasingly frustrated by the tremendous control Vector asserted over her and the performance of her duties. (Ex. 32 at 27:18-28:25.) Many of these constraints were set forth in the standardized Sales Representative Agreement which Vector unilaterally drafted and presented to its sales representatives on a take-it-or-leave-it basis. Pursuant to the agreement which applied equally to Plaintiff and each member of the class, sales representatives were prohibited from:

- selling the product in a store (Ex. 27, *CAH Dec* at ¶ 7);
- selling the product door-to-door (*Id.*);
- selling the product in a booth (*Id.*);
- creating and utilizing their own sales presentations materials (*Id.*)
- contacting customers who appear on the "Cutco Do Not Call List" which the Sales Representative was charged with the obligation to consistently monitor via www.Vectorconnect.com. (*Id.* at ¶6.)

Of course, Plaintiff and the members of the Class were "free" in Vector's view to market however the wished, provided of course that they did not utilize the "Vector Marketing Corporation" or "CUTCO Cutlery Corporation" in any medium including but not limited to:

> business cards; directories; stationary; advertisements; phone listings; bank accounts; or any electronic media. (*Id.* at ¶7.)

Moreover, sales representatives were expressly prohibited from altering the pricing of products (Ex 9, *CAH Dec* at137-38, 183-84).). Vector had the sole power to set and adjust the pricing of the Cutco products sold by the sales representatives. Shockingly, neither Plaintiff nor the representatives deposed by Defendant delighted in such freedoms.

Additionally, and as testified to by ***all fifty deponents***, Ms. Harris states in her deposition testimony

and declaration that she was required to call her managers each day. (Ex 23, *CAH Dec* at 87:14-88:9; 89:7-21) In fact, Vector's own website acknowledges that a sales representative's daily activities may include:

"Reviewing personal performance with the local office manager over the phone daily." (Ex. 30, *CAH Dec* )

By its own admission, Defendant has recognized that daily contact is one of the most important duties of a sales representative. The training manual provided to Plaintiff and the class members expressly provides the following:

**Daily contact with the office is essential for your success....At a minimum you should call in daily. Along with the daily reports that must be filled out by the managers, the purpose of the call is to inform you of special contests, promotions, standing, new programs, and other timely information that will help you be more effective in the field....Be sure to call in on time. If the line is busy, try again. <u>PDI is one of the most important aspects of working with Vector</u>. Before you call, please take a minute to jot down your report for the day. Your report will include:**

- **Number of presentations set for the next day**
- **Number of sales**
- **CPO amount**
- **Number of recommendations**
- **Example, 6 appointments, 4 sales, $675 CPO, 12 recommendations**

(Ex 7, *CAH Dec* at p.); see also Ex. 13 (**<u>"[PDI] is to ensure your success[;] if we're going to pay you so much we have to be able to have daily influence with you</u>**. . . . Not calling in for PDI is like not showing up for work. . . .")

The notes taken by the sales representatives provide further evidentiary support for this claim. The training manuals of Eric Rivera, Aldo Alvarez, Stephen Africa, Amber Meyer, Christian Garcia, Loren Robles, Arshae Shears Miguel Pimental and Shelby Baker and all contain notes that PDI was "the most important part of my job." (Ex. 23, *CAH Dec* ; Ex. 15, *CAH Dec* ; Ex. 7, *CAH Dec* , Ex. 13, *CAH Dec*

.)

Furthermore, contrary to Defendant's repeated assertions that Ms. Harris did not comply with the PDI requirement, Plaintiff did, in fact, comply with such requirement. As is the nature of communication in the modern age, Plaintiff primarily communicated with her managers via text message. This manner of communication was commonly employed by both sales representatives and their managers. (Ex. 33,*CAH Dec* ) Although Plaintiff's tenure with Defendant was extremely brief, Plaintiff and her manager exchanged no less than seventy-four (74) text messages. (Ex 34, *CAH Dec.*)

## IV. THE STATUTORY PREREQUISITES FOR CLASS CERTIFICATION UNDER RULE 23(B)(3)

Fed.R.Civ.P. 23(a) sets forth four threshold requirements which must be met for class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Plaintiff bears the burden of establishing that the proposed class meets the requirements of Rule 23(a). *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 647 (C.D. Cal. 1996). However, Plaintiff need not prove the merits of his claims "or even [ ] establish a probability that the action will be successful." *Id.* As the Ninth Circuit clarified in *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475 (9th Cir. 1983):

> **Although some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits to the class certification stage.**

*Id.* at 480, citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1231-32 (9th Cir. 1996).

Instead, all factual allegations in Plaintiff's operative Third Amended Complaint are accepted as true for purposes of class certification. *Arthur Young & Co. v. United States Dist. Court,* 549 F.2d 686, 688 n.3 (9th Cir. 1977), *cert. denied* 434 U.S. 829, 98 S.Ct. 109 (1977); *Blackie v. Barrack*, 524 F.2d 891, 900 n. 17 (9th Cir. 1975), *cert. denied* 429 U.S. 816, 97 S.Ct. 57 (1976).

For certification pursuant to Rule 23(b)(3), Plaintiff must also demonstrate that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is the superior method for adjudication of the controversy." Rule 23(b)(3) sets forth, as matters pertinent to such a determination: (1) the interest of the individual class members in individually controlling the prosecution; (2) the extent and nature of any previously commenced class litigation concerning the controversy; (3) the desirability of concentrating litigation in a single forum; and (4) any difficulties likely to be encountered in management of a class action.

By definition, "predominance" contemplates the existence of some individual issues. *See*, 1 *Newberg on Class Actions* §4.25 at 4-82 through 4-83. Defendants typically point to the need for individual determinations on issues of causation, choice of law and/or affirmative defenses in an attempt to defeat a finding of predominance. However, the existence of some amount of individual issues does not defeat predominance so long as the core liability issues can be adjudicated on a class wide basis. *Sterling v. Velsicol Chemical Corp*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Bogosian v. Gulf Oil Co.*, 561 F.2d 434, 456 (3rd Cir. 1977), *cert denied* 434 U.S. 1086 (1978). See, also, 1 *Newberg on Class Actions*, §4.26 (Common Challenges to Predominance Test Satisfaction), *citing* Advisory Committee Notes to the 1966 Amendments to Rule 23, 39 F.R.D. 69, 103 (1966).

For similar reasons, differences among class members concerning the amount of their individual damages, which are unavoidable in class action litigation, do not prevent a suit from proceeding as a class action. *Blackie*, *supra,* 524 F.2d at 905. As the district court explained in *In re MDC Holdings Securities Litigation,* 754 F. Supp. 785 (S.D. Cal. 1990), "it would defy common sense to find that class certification is defeated by the possibility of individual questions appertaining to one of the elements of the case's cause of action." *Id.* at 804.

**A. Numerosity and Ascertainability Exist**

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. "'Impracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-914 (9th Cir. 1964). No magic number exists with regard to the number of class members which is required

as a matter of law to satisfy the numerosity requirement. As a general rule, however, classes of forty or more are considered sufficiently numerous. *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988). See, also, *Jordan v. Los Angeles County*, 669 F.2d 1311, 1319 fn. 10 (9th Cir. 1980), *opinion amended* 726 F.2d 1366 (9th Cir. 1984) (collecting cases).

In this case, numerosity cannot fairly be disputed. On May 21, 2010, pursuant to this Court's order, Defendant provided a class list with 47,961 names to the third party administrator in this case, Epiq Systems, for mailing of notice to class members for purposes of the FLSA action, which class is defined similarly to the class defined in the Rule 23 case. *See Declaration of Rachel Wnorowski* [Document No. 230, para. 5] As this proposed Class reached back even further in time, it is even more numerous. In short, it is indisputable that the class defined for purposes of this motion satisfies the requirement of numerosity under Rule 23(a)(1).

Plaintiff's class definition also meets the standards for ascertainability. A class definition must be "precise, objective and presently ascertainable." *Manual for Complex Litigation*, Fourth §21.222 at 305 (2005). In order to satisfy this standard, the definition of the class must be "sufficiently definite so that it is administratively feasible for the Court to determine whether a particular individual is a member." *Aiken v. Obledo,* 442 F. Supp. 628, 658 (E.D. Cal. 1977). *See, also*, *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).

The class definitions proposed by Plaintiff in this action satisfy the test of "administrative feasibility" because they set forth objective criteria which may be used to ascertain membership in the Class, which Defendant has already accomplished by production of the class list to Epiq systems on May 21, 2010.

**B. Plaintiff's Claims are Typical of the Class Pursuant to Rule 23**

A claim is "typical" pursuant to Rule 23(a)(3) if it: "(1) arises from the same event or practice or course of conduct that gives rise to the claims of other class members; and (2) is based on the same legal theory as their claims." *Haley*, 169 F.R.D. at 649, citing *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). The theory behind this two-prong test for typicality was articulated in *In re United Energy Corp., Etc., Securities Litigation*, 122 F.R.D. 251 (C.D. Cal. 1976) as follows:

**A plaintiff's claim is typical of the claims of the proposed class members if it is aligned with the claims of other class members. The plaintiff's claim must arise from the same event or course of conduct giving rise to the claims of other class members. Furthermore, the claims must be based on the same legal theory. The theory behind this prerequisite is that a plaintiff with typical claims will pursue her own self-interest and advance the interests of class members accordingly.**

*Id.* at 256.

The claims of the named plaintiff do not have to be identical to the claims of the other class members. *Harris*, 329 F.2d at 914-915; *Blackie*, 524 F.2d at 902. Rather,"[u]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003), quoting *Hanlon*, 150 F.3d at 1020. "[T]he requirement may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the other members of the class." 7A Charles A. Wright, *Federal Practice and Procedure* §1764 at 235- 41. In other words, "[f]actual variations are not fatal to a proposed class when the claims arise out of the same remedial and legal theory." *Sullivan v. Chase Investment Services of Boston, Inc.*, 79 F.R.D. 246, 257 (N.D. Cal. 1978), quoting *Wofford v. Safeway Stores, Inc.*, 78 F.R.D. 460, 488 (N.D. Cal. 1978).

In this case, Plaintiff's claims -- and those of every other member of the Class -- arise from Defendant's uniform misclassification of recruits and sales reps, which resulted in:

- Defendant's failure to pay minimum wages to Plaintiff and the Class for time spent in training;
- Defendant's failure to reimburse Plaintiff and putative class members for expenses incurred during the course of their work as a sales representative for Vector;
- Defendant's violation of the Private Attorney's General Act and the Unfair Competition Act resulting from its misclassification and consequential underlying Labor Code violations.

In seeking to remedy Defendants' wrongdoing, Plaintiff is asserting identical legal claims against

Defendants on behalf of herself and the respective members of the putative class. As a result, Plaintiff's claims are "reasonably coextensive with those of absent class members" and, thus, typical of the claims of the members of the putative class.

**C. Plaintiff And Her Counsel Will Adequately Represent the Class**

The adequacy of representation requirement under Rule 23(a)(4) is also a two-prong test. Under this test, a plaintiff is considered "adequate" as a class representative if: "(1) the attorney representing the class is qualified and competent; and (2) the class representatives do not have interests antagonistic to the remainder of the class." *Haley*, 169 F.R.D. at 649-650, citing *Lerwill v. In-flight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *In re Northern Dist. of California Dalkon Shield IUD Products Liability Litigation,* 693 F.2d 847, 855 (9th Cir. 1982).

In *Staton*, the Ninth Circuit restated the test for adequacy of representation in the form of two questions:

(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and

(2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?

*Staton*, 327 F.3d at 957. See, also, *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003), quoting *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1995).

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). If there are any doubts as to the adequacy of representation or potential conflicts, they should be resolved in favor of upholding the class, subject to later possible reconsideration. 2 Newberg, *Newberg on Class Actions* §7.24 at 7-80 to 7-81 (3d ed. 1992).

Both prongs of the test for adequacy of representation are met here. First, Plaintiff understands her special role as a class representative and the duties which she owes to the members of the putative class. (Harris Decl.) Moreover, Plaintiff's claims do not conflict in any way with the interests of any

of the other putative class members. To the contrary, as demonstrated in Section III above, Plaintiff's experience as a Sales Representative and claims which stem therefrom are entirely consistent with the claims of the other putative class members.

Second, there can be no legitimate dispute that Plaintiff's counsel are well-qualified and sufficiently experienced to ensure the vigorous prosecution of this litigation on behalf of the putative class. Based on the Declaration of Stanley D. Saltzman, of Marlin & Saltzman, and Larry W. Lee of the Diversity Law Group, A.P.C., it is evident that counsel for the class have extensive experience in the handling of class actions, including "wage and hour" claims. The firms have won cases, they lost cases and/or claims and they have settled cases. In all matters, these cases are handled as effectively as possible and novel issues constantly arise. It is not expected that the Defendant will challenge the adequacy of counsel.

**D. Common Questions of Law and Fact Predominate as to Claims Arising out of the Training and Post-Training Periods**

Rule 23(a)(2) does not require that all questions be common to the class; a single common question can suffice. *Haley*, 169 F.R.D. at 648. As the Ninth Circuit emphasized in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998):

Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class. *Id.* at 1019; see also *Slaven v. BP Am., Inc.,* 190 F.R.D. 649, 655 (C.D.Cal.2000)(To satisfy the commonality requirement, plaintiffs need only point to a single issue common to the class). The allegations in the Third Amended Complaint relating to Defendant's actions and conduct alone can provide sufficient common questions of law and fact to support class certification. *In re Badger Mountain Irrigation Dist. Sec. Litigation*, 143 F.R.D. at 698.

The Allegations framed in the complaint as they relate to state claims are three-fold, and require separate inquiries:

(1) During the training period, are recruits employees for purposes of compensation for minimum wages and restitution under Labor Code §1197 and Business & Professions Code

§17200, or are they trainees not entitled to such compensation and restitution?

(2) During the training period, are recruits employees for purposes of restitution and PAGA penalties for the purchase of knives in violation of Labor Code §450?

(3) During the post-training period, are sales representatives "employees" or "independent contractors" for purposes of determining damages and/or restitution flowing from Vector's violation Labor Code §§2802 and 450, PAGA, and Business & Professions Code §17200?

**1. The Legal Test for Claims Arising out of the Training Period**

One common legal test predominates for determining whether putative class members were misclassified during the training period. Plaintiff asserts on behalf of class members that she is owed minimum wages and/or restitution from time spent in training, as well as restitution for the knives she was required to purchase from Vector during the training period. The Division of Labor Standards Enforcement has adopted the six-part *Walling* test in its opinion letters examining the issue of whether an individual is an employee for purposes of training. *See* DLSE OL 1998.11.12;[5] OL 2010.4.7. In doing so, the DLSE reasoned

**The State minimum wage requirements are set forth in various statutes and in Orders of the Industrial Welfare Commission. (Labor Code §1171 et. seq., IWC Orders 1 through 17) California courts long ago recognized that the power of the Legislature and**

---

[5] The DLSE has also adopted five other factors for purposes of determining whether an individual is a compensable employee or noncompensable trainee during training period. Those factors include (7) Any clinical training is part of an educational curriculum; (8) The trainees or students do not receive employee benefits; (9) The training is general, so as to qualify the trainees or students for work in any similar business, employee offering the program. In other words, on completion of the program, the trainees or students must not be fully trained to work specifically for only the employer offering the program; (10) The screening process for the program is not the same as for employment, and does not appear to be for that purpose, but involves only criteria relevant for admission to an independent educational program; and (11) Advertisements for the program are couched clearly in terms of education or training, rather than employment, although the employer may indicate that qualified graduates will be considered for employment. The DLSE has applied a strict interpretation of the 6 factors under Walling and the additional 5 factors set forth above, stating that an individual will not be considered an employee if all the criteria are met. For purposes of this certification motion, it is Plaintiff's position that she has set forth sufficient predominant common law and facts under the six-factor Walling test and additional five-factors set forth above to meet the standard for Rule 23 certification.

**the IWC to establish minimum wages of employees contemplates existence of an employment relationship in order for the minimum wage law to apply. (*Huchinson v. Clark* (1944) 67 Cal.App.2d 155, 160-161 [cosmetology students in training are not employees subject to IWC Order 2].) State provisions relating to coverage similarly define "employee" to mean "any person employed by an employer" and the term "employ" as meaning "to engage, suffer, or permit to work." (See e.g., IWC Order 4-2001, §2, Definitions [8 CCR 11040 §2].) Based upon the similarity of the definitional provisions for "employee" and "employ" which relate to coverage under the respective laws, and in view of the similar purposes for the State and Federal minimum wage law generally, it is reasonable to look to federal interpretations as guidance for purposes of enforcing the State's minimum wage and overtime provisions where there is no inconsistency. [citations]**

Consistent with the analysis set forth above, the DLSE has also adopted the standards set forth in 29 C.F.R. §§785.27 through 785.31, which test whether or not the training program constitutes "hours worked." DLSE Manual 46.6.5 and OL 1998.9.11.

Given the DLSE's reasoning and the adoption of the standards set forth in *Walling* and 29 C.F.R. §§785.27 through 785.31, Plaintiff herein incorporates by reference her motion under the FLSA and asserts herein that the law and facts set forth under the *Walling* test and CFR test are sufficient to establish that her claims during the training period can be determined on a class-wide basis. Plaintiff has already demonstrated that there are numerous, important questions of law and fact common to putative class members. These questions clearly must predominate over any conceivable individual issues, because Defendant's practices are uniform, and therefore necessarily common, as to the putative class members. The critical facts as they relate to Defendant's practice of failing to pay for time spent in training do not vary from one class member to another. Therefore, inasmuch as the claims against Defendants arise out of the same practices and are premised on the same legal theories (the claims for relief alleged in the Third Amended Complaint), the predominance of common questions of law and fact is clear and irrefutable.

Furthermore, other district courts have certified a class to proceed based on California state law claims related to failure to compensate for time spent in training that bear a strong similarity to those same claims alleged in this case. For example, in *Gutierrez v. Kovacevich ""5" Farms*, the plaintiff's central allegation was that Defendants failed to pay the named Plaintiffs and putative class members for work performed at the beginning of the day to prepare for the harvest and, during non-harvest seasons, for time spent in "training."*Gutierrez v. Kovacevich ""5" Farms*, CIV-F-04-5515OWWDLB, 2004 WL 3745224 (E.D. Cal. Dec. 2, 2004).

In this case, there are no significant, much less predominant, individual issues. Rather, the determination of each of the legal issues raised by this action revolves around a "common nucleus" of operative facts that underlies all of the claims asserted in this action. See, *Siegel v. Chicken Delight, Inc.*, 271 F. Supp. 722, 726 (N.D. Cal. 1967) [common questions exist and predominate when there is present a "common nucleus of operative facts"].

As to Plaintiff's Cal. Labor Code §450 claim alleged under Business & Professions Code §17200, which is obviously not part of Plaintiff's claim under the FLSA nor argued in the FLSA motion, but which is a claim that arises from the training period, Plaintiff asserts that common law and facts predominate for purposes of class-wide analysis. Cal. Lab. Code §450 provides in pertinent part that "[n]o employer, or agent or officer thereof, or other person, may compel or coerce any employee, or applicant for employment, to patronize his or her employer, or any other person, in the purchase of any thing of value.

Disposition of Plaintiff's § 450 claim is appropriate for class wide treatment because the claim stems from Defendant's uniform practice of selling its "sales representatives" sample kits of knives during training, which was consistently testified to by all fifty deponents.(Ex. 9) The facts which underlie this claim are invariable from sales representative to sales representative and failure to adjudicate the issue as a class action creates a risk of inconsistent judgment. Moreover, at least one district court has determined that similar claims can be adjudicated on a class wide basis. See e.g. *Young v. Polo Retail, LLC*, C-02-4546 VRW, 2006 WL 3050861 (N.D. Cal. Oct. 25, 2006) (certifying a settlement class pursuant to Fed.R.Civ.P. 23 where plaintiffs claimed that Defendant's practice of

requiring class members to purchase clothing manufactured by their employer on a seasonal basis violated California law including Cal. Lab. Code § 450.)

**2. The Legal Test for Claims Arising out of the Post-Training Period**

Under state law, in particular, the California Labor Code, whether a person is an independent contractor or an employee largely turns on whether the employer controls the details of the person's work. *See* Cal. Lab. Code §3353 (defining independent contractor as "any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished"); *S.G. Borello & Sons, Inc. v. Department of Indus. Relations*, 48 Cal. 3d 341, 350 (1989) (in workers' compensation case, noting that "'[the] principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired'"); *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1, 10 (2007)(in discussing claim for failure to reimburse under the California Labor Code, noting that the common law test of employment applies and that "[t]he essence of the test is the 'control of details' – that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work"); *Reynolds v. Bement*, 36 Cal. 4th 1075, 1086-87 (2005) (in discussing claim for unpaid overtime under the California Labor Code, applying the common law test of employment); *see also In re Brown*, 743 F.2d 664, 667 (9th Cir. 1984) (stating that, under California law, "the most significant factor is the right to control the means by which the work is accomplished").

There are, however, additional factors that are considered, including:

(1) whether the worker is engaged in a distinct occupation or business,
(2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision,
(3) the skill required,
(4) whether the principal or worker supplies the instrumentalities, tools, and place of work,
(5) the length of time for which the services are to be performed,
(6) the method of payment, whether by time or by job,

(7) whether the work is part of the principal's regular business, and

(8) whether the parties believe they are creating an employer-employee relationship. *Estrada*, *supra,* 154 Cal. App. 4th at 10 (noting that "there are a number of additional factors in the modern equation").

This action revolves around a common nucleus of uniform facts, asserts identical legal claims, and involves the application of uniform federal and state law. As such, it satisfies the predominance requirement under Rule 23(b)(3).

**(a) Common Facts and Law Predominate as to Whether or Not Vector has the Right to Control the Manner and Means of Accomplishing the Result Desired**

Through the Sales Representative Agreement, which applies equally to each and every class member, Vector "reserves the right to terminate th[e] Agreement at any time for good cause." (Ex. 27 at ¶ 8).) Vector further states in its agreement that "[t]ermination may be caused for various reasons, including but not limited to...", and then proceeds to define some obvious grounds for termination such as misappropriation of funds. However, without defining for putative class members specifically which other "various reasons" are grounds for termination, Vector retains a broad right to control the various actions of sales representatives, whether or not it chooses to exercise that right. Vector's right to control is further exemplified by the various restrictions imposed upon Sales Representatives in the Agreement, wherein Vector also retains the right to terminate on grounds for any breach of the provisions of the agreement which prohibits sales representatives from:

- setting or altering the pricing of products; (*See* Matheson Depo. Ex. 9 at137-38, 183-84);
- selling the product in a store; (*Sales Representative Agreement,* Ex. 27 at ¶7.)
- selling the product door-to-door; (*Id.*)
- selling the product in a booth; (*Id.*)
- creating and utilizing their own sales presentations materials [which constitutes further proof that sales reps had to follow a script and only sell Cutco products following Vector's methods][6];

[6] Defendant's Manual expressly states:
You are encouraged to use your own words and phrases to express the ideas of the presentation. *But be careful not to stray too far from the basic outline or to change the sequence.* Our sales program has been developed through many years of sales experience with CUTCO. It works! *Stay within the guidelines*, but be yourself. (*Ex. 7* at 28) (emphasis added). **The testimony from class members reinforces this**

- contacting customers who appear on the "Cutco Do Not Call List" which was which the Sales Representative was charged with the obligation to consistently monitor via www.Vectorconnect.com. (Sales Representative Agreement at ¶6);
- utilizing the "Vector Marketing Corporation" or "CUTCO Cutlery Corporation" brand name in any medium including but not limited to

  business cards; directories; stationary; advertisements; phone listings; b a n k accounts; or any electronic media.[7]

(Ex. 27 at ¶7.; see also Ex. 9, Matheson Depo. at 98-99, 168, 188.)

Instead, Sales Reps are effectively required to use Vector's prospectus (*i.e.*, brochure) as well as rope and leather, also provided by Vector to do the in home demonstrations. (Ex. 25, incl. Carrasco Depo. at 71-72 (indicating that managers set up the rope and leather for Sales Reps to use); Lewis Depo. at 106 (testifying that the rope and leather were provided by Vector) .

Furthermore, the Agreement requires that Sales Reps purchase the sample kit of knives. Also set forth in the Agreement, Vector unilaterally dictates what constitutes a qualified presentation for purposes of a Sales Rep being compensated for an in-home demonstration, and sets the scale for commissions. *See* Matheson Decl., Ex. F (Ex. 27 § 2).

Clearly, the Agreement, which is unilaterally imposed by Vector on sales reps, and which each and every class members has signed, establishes the <u>entire</u> parameters of the relationship, from how the product can be marketed (setting up appts - not door to door, through the internet, etc.), to whom the product can be marketed (one on one and no one on the Vector Do Not Call list), to the materials that the sales rep may use to make a presentation (cannot use your own materials), how to make the presentation, what tools to use during the presentation (requiring purchase of the sample kit); to how much to charge for Cutco products (no setting or altering prices), to how the sales rep can represent himself on behalf of Vector and the Cutco product (no business cards without approval or other use

---

**provision, as 48 out of 50 deponents testified that they were told to follow the script.** (Ex. 24)

[7] Defendant's internal memorandum evidence a clear and uniform policy regarding internet sales– if a sales representative attempts to sell the product via the internet (email excepted) the punishment is termination. (See Internet Selling Training Verbage (V2881)(stating, "In other words if you get on EBay and try to sell Cutco you could be terminated from the position. If you create your own websites to sell Cutco, same thing, you will be terminated from the position.") This policy applies to each and every one of Vector's California sales representatives.

of brand names), to how much the sales rep earns (Vector dictates what constitutes a qualified presentation for purposes of a Sales Rep being compensated for an in-home demonstration). Whether or not Vector exercised its controls under the agreement as to one individual class member and not another is irrelevant under the controlling analysis, which examines whether Vector had the "right to control" under the agreement.

In this regard, the very recent decision by Judge Moskowitz in the Southern District of California in the case of *Dalton v. Lee Publications, Inc.*, 2010 U.S. Dist. Lexis 75132 (S.D. Cal. July 27, 2010) is directly on point. In Dalton (also a wage and hour class action), as in the current case, the issue centered around whether the plaintiff and other class members were employees or independent contractors. *Id.* at *2. The plaintiffs and class members in the *Dalton* case were "home-delivery newspaper carriers." *Id.* at *21. The *Dalton* class members, just as in this case, were required to sign a contract with the employer, which described the compensation each carrier would receive, their job duties, liabilities, penalties, expense reimbursements, etc. *Id.* at *4. The *Dalton* contract also stated that the carrier would be an independent contractor. *Id.* at *4. Clearly, the *Dalton* contract sounds eerily similar to Vector's Sales Representative Agreement.

In his ruling certifying the class (and denying the employer's decertification motion), Judge Moskowitz held that the "primary factor" of right to control is susceptible to common proof based on the *Dalton* contract itself. *Id.* at *19-*21. Specifically, the Court held that due to all of the conditions and obligations provided for within the *Dalton* contract, "there is no evidence...that the parties' rights and obligations were substantially different from those set forth in the contracts....Thus, the contracts sets forth the contours of Defendant's control over the class" *Id.* at *20. The *Dalton* situation is completely identical to the one currently at issue. As explained above, it is undisputed that each of the class members in the current case signed identical Sales Representative Agreements that contained the same language regarding Vector's and the Sales Representative's duties and obligations. The Agreement sets forth the compensation scheme for the Sales Reps, their job duties, the requirements that each Sales Rep must meet in order to earn a QSP payment, and all of the other duties and obligations of each party. Moreover, Defendant cannot attempt to dispute that the Agreements

differentiated from one Sales Rep to another as its own PMK witness readily admitted that the Agreements are given on a "take it or leave it" basis without any room for negotiation of its terms. (Matheson Depo at 102:3-102:14).

Without question, the power Vector reserves to itself under the agreement is so broad that the agreement itself would be the central evidence at an eventual class-wide trial of this matter. Given the parameters of the agreement, Plaintiff would argue that there simply could not have been and there was not anything "independent" about this relationship. Thus, pursuant to the *Dalton* ruling, Plaintiff submits that based on the Sales Representative Agreement alone, this case should be granted class certification.

Plaintiff would further introduce class-wide evidence that Vector ensured that the relationship between sales reps and itself continued down a one-way street by imposing the PDI requirement. As this Court is well aware, Sales Representative were effectively required to call their Sales or District Managers every day under the principle of "PDI," *i.e.*, Personal Daily Interest, to inform them of their number of presentations for the next day, number of sales, CPO amount, and number of recommendations. **(Ex. 7 at 30)** For many Sales Representatives this included contact before, during, and after each demonstration or, at a minimum daily check-ins. Defendant's own materials, which were distributed and used by every class member, evidence this requirement:

> Daily contact with the office is essential for your success. We also encourage you to stop in to the office as much as possible. At a minimum, you should call in daily. . . . Be sure to call in on time. If the line is busy, try again. PDI is one of the most important aspects of working with Vector.

***See* Ex. 7 at 30; see also Ex. 13 at V0127-28)** ("[PDI] is to ensure your success[;] if we're going to pay you so much we have to be able to have daily influence with you. . . . Not calling in for PDI is like not showing up for work. . . . We have to here [sic] from everyone every day so we know what's going on.").

The testimony from Defendant's fifty depositions overwhelmingly supports the existence and

enforcement of this requirement, which managers would take upon themselves if class members did not comply, by calling them.

The evidence presented herein, taken together, demonstrates that common facts, stemming almost exclusively from the agreement, can indeed be examined all together at an eventual class-wide trial of this matter.

**(b) The Secondary factors under Borello can be Applied on a Class-Wide Basis, with Common Facts Predominating**

Whether or not the following facts would ultimately weigh in favor of Plaintiff or Vector, the following common facts apply across the board to all class members, and, would predominate a jury's analysis under Borello:

(1) Many of Vector's sales reps are college-age or first-time sales people; **(Ex___(Matheson Decl at ¶2).)**

(2) Sales Reps have managers who they are instructed to keep in contact with; **(Ex. 23)**

(3) Vector's own website acknowledges that a sales representative's daily activities may include **"Reviewing personal performance with the local office manager over the phone daily." (Ex. 30 – "Working as a Rep".)**

(4) Vector does not require that sales reps have any job experience or skills; **(Matheson Decl at ¶8); Ex__ (Arlie Decl at ¶114).)**

(5) Vector does not provide Sales reps with computers, machines, cell phones, or vehicles to assist them with their sales activities. (EX___(Matheson Decl at ¶20); Ex__ (Arlie Decl at ¶23 ; Ex__ (Leahy Decl at ¶22).) The sample kit must be purchased by sales reps.(Ex. 7 , *CAH Dec* at ¶6.) Vector does provide rope and leather, brochures, price lists and order forms for demonstrations, an office to utilize if needed, as well as telephones available to make appointments from the office. (Ex. 25)

(7) The sales representative agreement does not expire, and a sales rep can resume selling Cutco knives at any time. (Ex. 7, *CAH Dec* ) Statistical evidence demonstrates that active

selling occurs for on average 4-8 weeks. (Shapiro Decl. ¶ 9.)

(8) Sales reps are paid the same, as set forth by the Agreement, by QSP or on a commission basis, whichever is higher. (Ex. 7, *CAH Dec* at ¶2-3.)

(9) Vector is a direct selling business, who entire business is performed by its sells representatives. (Ex. 30, *CAH Dec* "About Vector")

(10) the Skills for Life brochure and Sales Rep Agreement both state that sales reps are classified as independent contractors; (Ex. 7, *CAH Dec* at ¶)

(11) Sales reps are not able to advertise Cutco products. (Ex. 7 at ¶1.)

(12) Sales reps are not able to market Cutco products in certain mediums. (Ex. 7 at ¶7.)

(13) Sales reps are not allowed to control or alter prices of Cutco products. (Ex. 7, *CAH Dec*)

(14) Sales reps are restricted as to whom they may make a presentation; and finally; (Ex. 71 and 5, *CAH Dec* .)

(15) The Sales Rep Agreement does not Prohibit Sales Reps "from selling and marketing other products or preclude them from working elsewhere." (Arlie Decl 19); Matheson Decl. 5 - MSJ.

**E. Common Questions of Law and Fact Predominate as to the Issue of Whether or Not Plaintiff and the Class Are Entitled to Reimbursement of Their Business Expenses under LC §2802**

Due to Defendant's corporate structure Plaintiff and the members of the Class have been required to incur many different expenses for the benefit of the Defendants' business operations, of a nature that "employees" in this state are simply not allowed to bear. A ruling in favor of the Plaintiffs on the employment issue should mandate that this situation be remedied in its entirety. Plaintiff and the class members are responsible for, *inter alia*, providing transportation to sales presentations and providing necessary office supplies such as notebooks and pencils (See ie Ex 6, *CAH Dec* ) Further, Plaintiff and the members of the class unanimously testified that they utilized their own personal telephones to contact customers, contact Defendant and schedule appointments. Moreover, because Plaintiff and the class members were required to consult www.Vectorconnect.com in order to access the Do Not

Call List prior to contacting potential customers, they were responsible for securing access to computer and internet services.

In *Gattuso v. Harte-Hanks Shoppers, Inc.*,the Supreme Court of California considered whether Harte-Hanks Shopper, Inc., a corporation that prepares and distributes advertising booklets and leaflets, could satisfy its obligation to reimburse outside sales representatives for their automobile expenses by paying them higher base salaries and higher commission rates than it paid to inside sales representatives. 42 Cal.4th 554, 559-60, 67 Cal.Rptr.3d 468, 169 P.3d 889 (2007). The court noted that Section 2802 "is designed to prevent employers from passing their operating expenses on to their employees." *Id.* at 562, 67 Cal.Rptr.3d 468, 169 P.3d 889. The Court held that an employer may satisfy this statutory reimbursement obligation by paying an increased salary or commission. *Smith v. Cardinal Logistics Mgmt. Corp.*, 07-2104SC, 2009 WL 2588879 (N.D. Cal. Aug. 19, 2009) applying *Gattuso v. Harte-Hanks Shoppers, Inc.* at 559, 67 Cal.Rptr.3d 468, 169 P.3d 889.

As this court previously determined in *Stuart v. RadioShack Corp.*:

> a fair interpretation of §§ 2802 and 2804 which produces 'practical and workable results' consistent with the public policy underlying those sections, focuses not on whether an employee makes a request for reimbursement but rather on *whether the employer either knows or has reason to know that the employee has incurred a reimbursable expense* . If it does, it must exercise due diligence to ensure that each employee is reimbursed.

*Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 903 (N.D. Cal. 2009) *motion to certify appeal denied,* C-07-4499 EMC, 2009 WL 1817007 (N.D. Cal. June 25, 2009)(citations omitted)(emphasis added).

The undisputed evidence establishes as a matter of law that Vector had actual knowledge that employees were incurring the above-described expenses. First and foremost, Defendant <u>sold</u> Plaintiff's their sample kit of knives. At a minimum, Defendant had knowledge of this expense as it: (1) required purchase of the kit (Sales Representative Agreement at paragraph 6); and (2) actually sold the product to the sales representatives. Defendant's knowledge cannot, however, be said to end there.

In its Motion for Summary Judgment, Defendant acknowledged that Plaintiffs and the class members furnished their own transportation, cell phones and sales materials. (Defendant's Motion for Summary Judgement [Doc 35] at13) Moreover, as described above, Defendant's "invitation to training letter" expressly instructs the trainee to bring a "pen and notebook" to the training. The facts underlying disposition of the claim are uniform for each and every sales representative employed by Defendant and thus the claim essentially presents a class wide liability and accounting matter.[8]

### F. Common Questions of Law and Fact Predominate as to Plaintiff's UCL Restitutionary Claims and Paga Claims

Proof of Vector's failure to pay all of the above described claims and expenses, as evidenced by the common and predominant facts set forth in the sections above, serves as the foundation for both liability and restitution owed to Plaintiffs under Bus. & Prof. Code §17200, and penalties under PAGA. The liability of the Defendants will be determined under the same methodology described throughout this brief, since the underlying Labor Code violations serve as the unlawful conduct alleged in this case. Additionally, proof of the Plaintiffs asserted wrongful acts will also easily satisfy the unfair and deceptive prongs of Bus. & Prof. Code §17200.

### G. The Class Satisfies the Superiority Requirement of Rule 23(b)(3)

A class action is superior to other methods of litigation "[w]here class wide litigation of common issues will reduce litigation costs and promote greater efficiency . . ." and "no realistic alternative exists." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-1235 (9th Cir. 1996).

It cannot be disputed that class wide resolution of the issues in this case will reduce litigation costs and promote efficiency for the Court as well as the litigants. The evidence which relates to Defendant's training practices, as well as its policies and practices regarding control of its sales representatives, does not vary from one class member to another. Any trier of fact will draw the same

---

[8] While class members may not have documented all such business expenses incurred, such expenses can be reasonably and accurately determined. For example, the monies paid by each sales representative for the sample set of knives can be ascertained by review of Defendant's business records.

conclusions from the same facts in the same manner from one class member to the next. Absent a class action, the trier of fact – be it judge or jury – will hear the same facts regarding Defendant's practices, over and over again.

Moreover, in this case, the typical claim is far too small for any individual class member to be expected to pursue a separate action. Each individual's claim, standing alone, is a "negative value" claim – that is, a claim whose value would be dwarfed by the cost of litigating the claim. A class action is the only feasible means by which individual employees with negative value claims can hope to obtain a cost-effective remedy. In that regard, any suggestion that individual class members have a strong interest in individually controlling the litigation is both unrealistic and contrary to the philosophy of Rule 23. As was pointed out by Judge Weinfeld in *duPont Glore Forgan, Inc. v. American Telephone and Telegraph Co.*, 69 F.R.D. 481 (S.D.N.Y. 1975), a case in which one of the class representatives had a claim of $130,000 (an amount far in excess of the anticipated individual claims in this action):

> [T]he time-cost factor of legal fees in view of the vigor of defendants' opposition make it uneconomical to proceed with the suit on an individual basis even assuming an ultimate recovery – in fact, Monsanto would, if required to proceed on an individual basis, forego its claim ... Thus, the assertion that this action will not go forward at all if class action status is denied is plausible. ***The hard fact is that economic reality indicates the likelihood that unless this action is permitted to proceed as a class suit, it is the end of this litigation.***

*Id.* at 487. (Emphasis is added.)

In the absence of class certification in this action, it is virtually certain that none of the other class members' individual claims will go forward, and none of the grievances so clearly suffered by the fifty sampling deponents will be addressed – much less resolved. "Where it is not economically feasible to obtain relief [in separate suits] . . . , aggrieved persons may be without effective redress unless they may employ the class-action device." *Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 339 (1980). Considering the expenses that would be involved in procuring individual evidence and expert

testimony on behalf of each class member, the pursuit of individual claims in this case is simply not economical. As the United States Supreme Court has noted, "'[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'" *Amchem*, 521 U.S. at 617, quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 228, 344 (7th Cir. 1997).

With respect to the issue of the nature and extent of any previously commenced class litigation concerning the practices at issue in this action, Plaintiff is not aware of any such other actions.

Lastly, Plaintiff foresees no management difficulties that will preclude the claims in this action from being adjudicated on a class wide basis. In any event, *possible* management problems are not, standing alone, a proper ground for denying class certification. As the district court explained in *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322 (E.D. Pa. 1976):

> The federal bench and bar must remain cognizant of the fact that difficulties in the management of class actions should not lead to a conclusion that class actions are not superior to other available means for the fair and efficient adjudication of the controversy. ***Manageability problems are significant only if they create a situation that is less fair and efficient than other available techniques*** ... This perspective is important in this litigation because defendants, after reciting potential manageability hassles, offer no other remedy that is better than this purportedly imperfect one.

*Id.* at 358. (Emphasis is added.)

In sum, the class action device is superior because there simply are no practical or economic alternative procedures available to the parties which might be used to adjudicate the claims for relief asserted in this action in a more fair and/or more efficient manner.

**H. Damages Can Be Calculated On a Class-Wide Basis**

With regard to the issue of damages, the FLSA claims involved in this motion for final certification can be easily handled on a class wide basis. Vector's twice designated PMK on various

issues, Paul Matheson, has already testified that the normal and customary training session involves three days of training. There is no question that the recruits are also given homework assignments by the trainers, and every one of the fifty witnesses deposed, plus the Plaintiff Alicia Harris, testified that they worked on the homework as required.

Thus, the starting point for the calculation of the training time will be the three days required of the class members. A small percentage of the class members testified to either four or five day sessions, and that testimony, and the frequency with which more than three days were involved, can be honed in once the case is certified and in final preparation for trial. If surveys or further sample depositions are necessary to reach more definitive results on the average hours devoted to training by the class members, including the night-time homework assignments, survey and sampling procedures are routinely utilized in wage and hour actions, and the survey results offered by expert statisticians who can compile such information.

Since the only reason there are not precise records of time spent in the training sessions is that Vector did not attempt to track the actual hours, then the guiding principles of the U.S. Supreme Court, in its long-standing decision in *Anderson v. Mt. Clemens Pottery* (1946) 328 U.S. 680, 687-688, 66 S.Ct. 1187, 90 L.Ed. 1515, would govern. Under this decision, where exact records of hours worked are not maintained by an employer, the Plaintiff and the class would be entitled to offer a reasonable estimate of the average hours and damages for the entire class, as opposed to the exact amounts owed to each person.

It is axiomatic under *Anderson* that the one result which would not be acceptable in a situation where a defendant failed to maintain accurate records, would be to permit the Defendant to capitalize on its own failure to maintain records in order to defeat the class on the issue of precise damages.

## V. CONCLUSION

For all of the foregoing reasons, and on the basis of the authorities cited herein and the evidence submitted herewith, Plaintiff respectfully requests that the Court grant her motion for class certification and enter an order in the form proposed.

Case3:08-cv-05198-EMC Document337 Filed09/23/10 Page40 of 40

DATED: September 22, 2010

**MARLIN & SALTZMAN**
**DIVERSITY LAW GROUP**
**LAW OFFICES OF SHERRY JUNG**

By: /S/
Christina A. Humphrey, Esq.
of Marlin & Saltzman
Attorneys for Plaintiff

32

**Notice of Motion and Motion for Class Certification Pursuant to FRCP Rule 23**
**CASE NO. CV 08-5198 EMC**