1  **MARLIN & SALTZMAN**
   Stanley D. Saltzman, Esq. (SBN 90058)
2  Louis M. Marlin, Esq. (SBN 54053)
   Christina A. Humphrey, Esq. (SBN 226326)
3  Kiley L. Grombacher, Esq. (SBN 245960)
   29229 Canwood Street, Suite 208
4  Agoura Hills, California  91301
   Telephone:      (818) 991-8080
5  Facsimile:      (818) 991-8081
   ssaltzman@marlinsaltzman.com
6  louis.marlin@marlinsaltzman.com
   chumphrey@marlinsaltzman.com
7  kgrombacher@marlinsaltzman.com

8  (Additional Plaintiff's counsel on next page)

9  Attorneys for Plaintiff and Proposed Class

10

11              UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13  ALICIA HARRIS, as an individual and on        **CASE NO. CV 08-5198 EMC**
    behalf of all others similarly situated,
14                                                 (Assigned to Hon. Edward M. Chen)
                 Plaintiff,
15                                                 **PLAINTIFF'S OPPOSITION TO**
    v.                                             **DEFENDANT'S MOTION TO DENY**
16                                                 **CERTIFICATION OF FAIR LABOR**
    VECTOR MARKETING                               **STANDARDS ACT COLLECTIVE CLASS**
17  CORPORATION, a Pennsylvania
    corporation; and DOES 1 through 20,
18  inclusive,
                                                   DATE:        October 27, 2010
19               Defendants.                       TIME:        10:30 a.m.
                                                   CTRM:        C
20

21

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

────────────────────────────────────────────────
     **Plaintiff's Opposition to Defendant's Motion to Deny Certification of FLSA Collective Class**
                                                   **Case No. CV 08-5198 EMC**

1 | <u>**Additional Plaintiff's Counsel**</u>

2 | **DIVERSITY LAW GROUP**
Daniel H. Chang, Esq. (SBN 183803)
3 | Craig S. Hubble, Esq. (SBN 200789)
Larry W. Lee, Esq. (SBN 228175)
4 | 444 S. Flower Street
Citigroup Center, Suite 1370
5 | Los Angeles, California   90071
Telephone:     (213) 488-6555
6 | Facsimile:     (213) 488-6554
dchang@diversitylaw.com
7 | chubble@diversitylaw.com
lwlee@diversitylaw.com

8 | **LAW OFFICES OF SHERRY JUNG**
9 | Sherry Jung, Esq. (SBN 234406)
444 S. Flower Street
10 | Citigroup Center, Suite 1370
Los Angeles, California   90071
11 | Telephone:     (213) 488-6555
Facsimile:     (213) 488-6554
12 | sherryj23@hotmail.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................... 1

II.   STATEMENT OF FACTS AND EVIDENCE .............................. 3

III.  ARGUMENT ....................................................... 7

      A.    THE APPLICABLE TEST FOR EMPLOYEES VS. TRAINEES ............ 7

      B.    THE SIMILARLY SITUATED STANDARD .......................... 9

      C.    THE OPT-IN PLAINTIFFS ARE SIMILARLY SITUATED UNDER
            THE APPLICABLE PORTLAND TERMINAL TEST .................... 10

            1.    Factor 1:  Whether the Training is Similar to That Which Would be
                  Given in a Vocational School ................................. 10

            2.    Factor 2:  Whether the Training is for the Benefit of the Trainee and
                  Factor 4:  Whether the Employer Derives No Immediate Advantage
                  from the Activities of the Trainees ........................... 13

            3.    Factor 3:  Whether the Trainees Displace Regular Workers ........... 15

            4.    Factor 5:  Whether the Trainees are not Necessarily Entitled to a Job
                  at the Completion of the Training Period ...................... 16

            5.    Factor 6:  Whether the Employer and the Trainees Understand that the
                  Trainees are Not Entitled to Wages for the Time Spent in Training ..... 18

      D.    THERE ARE NO INDIVIDUAL DEFENSES TO PLAINTIFFS' CLAIMS
            THAT RENDER COLLECTIVE TREATMENT INAPPROPRIATE ......... 18

      E.    FAIRNESS AND PROCEDURAL CONSIDERATIONS WEIGH HEAVILY
            IN FAVOR OF COLLECTIVE TREATMENT ....................... 19

IV.   CONCLUSION .................................................... 21

i

**TABLE OF AUTHORITIES**

<u>**FEDERAL CASES**</u>                                                                                           Page

*Anderson v. Mt. Clemens Pottery Co.*
    328 U.S. 680 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Berger v. Cleveland Clinic Found.*
    2007 WL 2902907, at *21 (N.D. Ohio, Sept. 29, 2007) . . . . . . . . . . . . . . . . . . . . . . 10

*Bradford v. Bed Bath & Beyond, Inc.*
    184 F. Supp. 2d 1342 (N.D. Ga. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Donohue v. Francis Servs., Inc.*
    2004 WL 1406080, at *1 (E.D. La. June 22, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Donovan v. American Airlines*
    686 F.2d 267 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 16

*Donovan v. Sureway Cleaners*
    656 F.2d 1368 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Donovan v. Trans World Airlines, Inc.*
    726 F.2d 415 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Falcon v. Starbucks Corp.*
    580 F. Supp. 2d 528 (S.D. Tex. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 18-21

*Frank v. Gold'n Plump Poultry, Inc.*
    2007 WL 2780504, at *4 (D. Minn Sept. 24, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Glass v. IDS Fin. Servs. Inc.*
    778 F. Supp. 1029 (D. Minn. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*Grayson v. K-Mart Corp.*
    79 F.3d 1086 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hill v. Muscogee County Sch. Dist.*
    2005 WL 3526669, at *2 (M.D. Ga. Dec. 20, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hipp v. Liberty Nat'l Life Ins. Co.*
    252 F.3d 1208 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hoffmann-LaRoche, Inc. v. Sperling*
    493 U.S. 165 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 19

*Mooney v. Aramco Servs. Co.*
    54 F.3d 1207 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Pendlebury v. Starbucks Coffee Co.*
    518 F. Supp. 2d 1345 (S.D. Fla. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18, 20

*Portland Terminal*
    330 U.S. at 149-50 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *in passim*

ii

*Prickett v. DeKalb County*
   349 F.3d 1294 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Reich v. Circle C. Invs. Inc.*
   998 F.2d 324 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Reich v. Parker Fire Protection Dist.*
   992 F.2d 1023 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rodolico v. Unisys Corp.*
   199 F.R.D. 468 (E.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Scott v. Aetna Servs., Inc.*
   210 F.R.D. 261 (D. Conn. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Summa v. Hofstra Univ.*
   (E.D.N.Y. 2010) 2010 U.S. Dist. LEXIS 53153, *29) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Thiessen v. Gen. Elec. Capital Corp.*
   267 F.3d 1095 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ulrich v. Alaska Airlines, Inc.*
   2009 U.S. Dist. Lexis 10104, *9-*17 (W.D. Wash. 2009) . . . . . . . . . . . . . . . . . . . . 14, 16

*Vaszlavik v. Storage Tech. Corp.*
   175 F.R.D. 672 (D. Colo. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Vela v. City of Houston*
   276 F.3d 659 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wilks v. Pep Boys*
   2006 U.S. Dist. Lexis 69537 (M.D. Tenn. Sept 26, 2006) . . . . . . . . . . . . 9, 10, 18, 20, 21

*Wren v. RGIS Inventory Specialists*
   256 F.R.D. 180 (N.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wren v. RGIS*
   2007 WL 4532218, at *4 (N.D. Cal. Dec. 19, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

## STATUTES AND RULES

29 U.S.C. §216(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## MISCELLANEOUS

Bettina W. Yip, Daniel E. Turner & Anthony Collins
   (ABA Section of Labor and Employment Law, EEO Committee),
   Defensive Strategies for Preventing Certification of Wage and Hour
   Collective and Class Actions, § I (March 23, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

iii

# I.     **INTRODUCTION**

Plaintiff Alicia Harris ("Plaintiff") hereby submits her Opposition ("Opposition") to Defendant Vector Marketing Corp.'s ("Defendant") Motion to Decertify Conditionally Certified FLSA Collective Action ("FLSA Decert Motion").

It is mysterious as to why the majority (20 of its total 30 pages) of Defendant's FLSA Decert Motion is based on a standard that this Court has previously found to be inapplicable and rejected. Specifically, for more than half of its FLSA Decert Motion, Defendant attempts to re-argue why Plaintiff's FLSA class should be decertified under the "*Donovan*/Economic Realities" factors, which is the same test Defendant asserted as being applicable in its opposition to Plaintiff's Motion for Conditional Certification under the FLSA. At that time, however, this Court held in its May 18, 2010 Order Granting Conditional Certification (Docket No. 176) (hereinafter referred to as the "May 18 Order"), that the *Donovan*/Economic Realities was inapplicable to the training time issue. Rather, the Court agreed with Plaintiff, and held that for purposes of analyzing Plaintiff's claim for training time under the FLSA, the applicable test was the *Portland Terminal* factors. Thus, the majority of Defendant's arguments in the current FLSA Decert Motion should be ignored in their entirety.

While Defendant does spend a small portion of its brief (10 of its total 30 pages) on the applicable *Portland Terminal* factors, the majority of that portion is spent on arguing the merits of the claims and very little is spent discussing the actual issue presently before this Court - whether Plaintiff can meet her burden for final certification under the FLSA. What is more interesting is the fact that some of the case law Defendant cites to regarding training time under the FLSA involves cases in which the ultimate merits issue relating to training time was indeed decided on a class-wide basis, further supporting Plaintiff's position that Plaintiff's claim for training time under the FLSA should be granted final class certification.

Defendant does not dispute several key facts establishing that the opt-in Plaintiffs are similarly situated. For example, Defendant does not dispute that the training it provides to its sales rep is the same for each and every sales rep. Similarly, Defendant does not dispute that the same or a very similar training manual was distributed to sales reps during training and used after training for demonstrations. Further, it is undisputed that all sales reps are not paid any compensation for attending

1

---

**Plaintiff's Opposition to Defendant's Motion to Deny Certification of FLSA Collective Class**
**Case No. CV 08-5198 EMC**

the training sessions. Based on these admittedly core consistent facts, Defendant has tacitly admitted that the sales reps are indeed similarly situated for purposes of class-wide analysis under the relevant *Portland Terminal* test, as well as the secondary 4-part test under 29 C.F.R. 785.27, which is applicable in the event this Court determines at the merits stage that class members were "employees" under *Portland Terminal,* or determined that they were "hired" prior to training. In fact, Defendant did not even address the 4-part test under 29 C.F.R. 785.27 anywhere in its FLSA Decert Motion. Defendant's glaring omission of the 4-part test is consistent with its treatment and characterization of the depositions of the 50 randomly selected opt-in Plaintiffs that Defendant itself initiated. As discussed in detail in Plaintiff's moving papers, the testimony of these witnesses was entirely consistent on the critical certification issues, and Defendant has now downplayed and ignored this testimony, and/or even twisted in some instances. Apparently unhappy with the results of these depositions, Defendant on its own, initiated and utilized a survey of questionable value, arriving at results that should be given very little weight, if any, as will be further explained herein. However suspect the survey may be, it still did yield some interesting tidbits of information, not all of which made their way into Defendant's brief.

One quick example of an important survey results which was ignored by Defendant, undoubtedly because it did not yield results the Defendant wanted was the question on the survey relating to whether the training was "mandatory". As noted in the declaration of Plaintiff's rebuttal survey expert, Phil Gorman, Defendant actually changed the language in this question from the "pre-test" survey to the final version which it rolled out to the broader class, and yet it could still not get the response it wanted. At the pre-test stage, the question asked whether the respondent "understood" that training was mandatory. Plaintiff does not yet know what the result of the pre-test was, as the Defendant refused to produce the pre-test data at its expert's deposition. However, Dr. Saad (Defendant's survey expert) testified at his deposition that at Defendant's counsel's request, he changed the question at the full survey so that it no longer inquired whether people "understood" the training to be mandatory, but rather whether they were affirmatively "told" that it was mandatory.

Even having placed this higher burden on the respondents, the resulting data indicates that of the 85% of the respondents who had a recollection on this issue, fully 89.4% of them recalled being

2

---

1  "told" that training was mandatory. *See CAH Dec., Ex. 1, Saad Survey Analysis Charts - Chart Q-19*.

2  The chart indicates that 15% of the respondents had no recall, leaving 85% with some opinion on the

3  issue. Of this group, 76.2% responded that they were told the "training" was mandatory.  The 76.2%

4  of the total group with a recall on the issue  yields 89.4% of those with a recall having the recollection

5  that they were "told" it was mandatory.  Not surprisingly, this survey response rate did not make its

6  way into Defendant's brief, nor into Dr. Saad's declaration.  It was simply in his file.

7         As noted above, while Defendant sparingly argues that there are variations with certain issues

8  under *Portland Terminal*, it is well established that FLSA cases, as well as other "pattern and practice"

9  employment cases, can proceed as collective or class actions based upon representative evidence and

10  other forms of common proof, even if liability does not turn on a single, undisputed written "policy"

11  *per se*.  Here, not only are the opt-in Plaintiffs similarly situated by virtue of Defendant's established

12  training policies, but also by the actual training practices, as the training is completely identical for all

13  sales reps.  By and large, the variations between class members stressed by Defendant are either

14  irrelevant for adjudicating causes of action under the FLSA, or are the kinds of differences routinely

15  permitted in collective actions, such as the amount of time an individual plaintiff spends in training.

16         Whatever differences there may be on the edges, there are multiple threshold issues that form

17  a necessary element of each Plaintiff's claim, and that should be efficiently heard in one proceeding.

18  Requiring thousands of young students to pursue separate civil actions for minimum wages in various

19  Courts throughout California simply is not a realistic or effective way of administering justice.  If

20  minor variations were sufficient to defeat collective action status, then large employers such as

21  Defendant would be able to insulate themselves from liability even in those cases where the unpaid

22  wages were of small amounts.  This would frustrate the core purpose of the FLSA, which is to ensure

23  that employees are paid for *all* hours worked.  Such a result cannot be - and is not - the law.

24  **II.**      **STATEMENT OF FACTS AND EVIDENCE**

25         Because Plaintiff does not wish to burden this Court with a regurgitation of the same facts

26  espoused in concurrently filed motions, Plaintiff hereby incorporates by reference the facts and

27  evidence cited to by Plaintiff in her concurrent Motion for Final Certification, and addresses herein

28  only new facts and evidence submitted in support of Defendant's Motion to Decertify the FLSA Class

3

**Plaintiff's Opposition to Defendant's Motion to Deny Certification of FLSA Collective Class**
**Case No. CV 08-5198 EMC**

1  and to Deny Certification of the Rule 23 class.

2       First, in addition to the depositions of the 50 randomly selected opt-in class members,
3  Defendant has submitted declarations of 52 current and former Vector sales representatives, <u>all of</u>
4  <u>whom are not opt-in members of the class</u>.  Just as was the case with the declarations submitted by
5  Defendant at the conditional certification phase, and as is true of the "testimonials" posted on Vector's
6  website, these declarants are hardly "representative" of the average class member, and in fact constitute
7  "statistical outliers," as most notably evidenced in terms of statistics relating to each declarant's
8  "active" tenure of selling (contract date to last commission date), as these same dates compare to
9  statistics applying to the FLSA and larger putative Rule 23 class as a whole.  These declarants, as
10 noted in the following paragraph in detail, are simply not representative of either the FLSA class or
11 the Rule 23 class.

12      Of the 52 declarants submitted by Defendant, only 42 are contained in the class lists provided
13 by the Defendant. (*See*, declaration of Martin Shapiro, Ph.D, submitted herewith, at ¶ 11).  According
14 to Dr. Shapiro's analysis of this group's average (mean) and median tenure with Vector, they are so
15 off the charts that they are obviously "cherry-picked", and clearly unrepresentative.  While still class
16 members of the Rule 23 class, they are the rare exception and not the norm, as is Ms. Harris.  The
17 mean number of weeks of tenure for these 42 is 84.21, as compared to the 7.27 for the <u>entire</u> Rule 23
18 class, (*See*, declaration of Martin Shapiro, Ph.D, submitted herewith, at ¶ 11), and as compared to the
19 FLSA class mean of 3 weeks (*See*, declaration of Martin Shapiro, Ph.D, submitted herewith, at ¶ 12).
20 As Dr. Shapiro notes, the odds of this group having been drawn from the larger groups randomly is
21 less than one in one quadrillion, so cherry picking this group was of no value.  Rather, the 50 randomly
22 selected deponents, analyzed in great detail by the Plaintiff in her motions, are actually the critical
23 group.  There is of course some irony in Plaintiff embracing the deponents, but it is clear that to the
24 extent that there is either reliable and strong anecdotal evidence before this Court, or something
25 beginning to take on true "sample" level strength, it is the random depositions, and not these cherry
26 picked declarants, or the results of a defendant driven survey.

27      Furthermore, 83% of the 52 declarants are current Vector sales representatives, whereas we
28 already know that in this revolving door enterprise, people are gone so quickly that they can hardly get

their feet wet with experience. Additionally, full 21 of these declarants, or 40%, are or have been Vector managers. Defendant's declarations, thus, should be given minimal weight by this Court.

Dr. Shapiro also addresses the same criteria as to the lack of representative nature of the declarants, with regard to the eleven declarations relied upon by Defendant in its opposition to the Conditional Cert motion. His analysis, at ¶ 13 of his declaration, again dispels any notion that those declarants could have been representative of anything.

To the extent the declarations are given any weight for facts of their experiences as opposed to the conclusions and opinions stated within them, it is worth noting that many of the declarations are in fact boilerplate, and express facts (not opinions) similar to the experience described by Alicia Harris in deposition. For example, each of the 51 sales representative declarants[1] stated that they created a customer list while in training and that they obtained a sample set of knives while in training. Forty-eight declarants attended the entire initial training session. Thirty-eight declarants commented that while they were in training, they made appointments to conduct sales presentations. Forty-nine of the declarants commented that there were limitations on how they could market and advertise Cutco products, and none declared to the contrary. Forty-five of them stated that they signed the Sales Representative Agreement at the end of training. Forty-seven declarants indicated they followed the training manual when they started conducting Cutco sales presentations. Given their long tenure with the Defendant, it is therefore not surprising that they would then add that at some point in time, they did not read or rely on the word for word presentation as much, but just followed the general outline. The reality of this class, however, is that the vast majority never lasted long enough to get anywhere near that point, as they were falling off the program after 4 to 8 weeks. In addition, the majority of the declarants indicated their managers initiated contact with them, with only two of the declarants indicating that their manager contacted them quarterly or never. *See Summary Chart of Defendant's 52 Declarations, CAH Dec., Ex. 2.*

As detailed in Plaintiff's Evidentiary Objections to the Declaration of Ali Saad, filed herewith, Defendant's survey and the data extrapolated therefrom is so inherently flawed that it cannot be considered by this Court. First and foremost, Defendant disingenuously administered its survey under

[1]One of the declarants was only a manager, and was offered for other reasons.

5

1  the guise that it was being conducted by "a third company not affiliated with Vector Marketing." *(See*
2  *Survey Invitation, CAH Dec., Ex. 3.)* Defendant also failed to inform the respondents that the survey
3  was being conducted in conjunction with an ongoing litigation and for the sole purpose of defeating
4  class certification.

5      The survey instrument itself provides clear evidence of its unreliability. From even a cursory
6  review of Defendant's survey questionnaire it is undeniably apparent that the document was crafted
7  by Defendant for the sole purpose of eliciting information which supports its claims and defense rather
8  than capturing all the data needed to provide cogent and accurate predictions. For example, Question
9  17 inquires:

10      *What statement best describes your understanding <u>at the time you were</u>*
11      *<u>accepted</u> for the three day training?*
12      ☐ *That I signed the Sales Representative Agreement before training*
13      *started*
14      ☐ *That I would be offered a Sales Representative Agreement upon*
15      *completion*
16      ☐ *That I might be offered a Sales Representative Agreement upon*
17      *completion*
18      ☐ *Not sure*
19  *(Saad Ex. C Doc. 335-9 p. 22)*

20      Needless to say, there are numerous problems with this loaded question. First, it presumes and
21  implies to the survey respondent that they were not hired prior to the training, but rather only
22  "accepted" into the training course. Moreover, this question presumes that each sales rep was
23  informed about the existence of a "sales representative agreement" at the time they were accepted into
24  training.[2] Most importantly, the question does not ask whether they would be offered a "job" at upon
25  the completion of the training course. Rather it asks if the sales rep understood he/she would be

26  _____

27      [2] A better survey question(s) should have been (1) Did you believe that you were hired by
    Vector for a sales rep position prior to attending training; and (2) At the time you attended training,
28  did you believe that you would become a sales rep for Vector once you finished the training course.

6

1  offered a "Sales Representative Agreement" upon completion. Nevertheless, Defendant clearly utilizes
2  this question to evaluate whether a *job* would be offered upon completion of the training course. This
3  type of question clearly is subject to legal interpretation, and it is not clear that Saad's survey has asked
4  the question in a way that is consistent with the legal interpretation that may prevail. (Gorman Decl.
5  at ¶21.) Ultimately, Question 17 captures data that is irrelevant to the litigation.  It doesn't matter
6  whether or not a person expected to be offered, or might have expected to be offered, or might have
7  expected to sign, a "Sales Representative Agreement."  What is critical is whether the sales
8  representatives believed they were employed by Vector at the time of the training.  Accordingly, a far
9  superior question to elicit such information would have been "When you started the training program
10 with Vector, did you believe that you would be working for Vector after you completed the training?"
11 (*Id.* at ¶21.)  Unfortunately, this is but one example of the survey's incomplete and overtly biased
12 construction.

13      Perhaps most alarming, however, is the fact that ***ninety-eight percent*** of the target population
14 did not submit responses.  Such a significant non-response rate severely limits the credibility of the
15 survey and its ability to accurately represent the vast majority of class members who did not respond.
16 At a minimum, it is clear that the survey results cannot be extrapolated to members of the opt-in class.
17 The survey population consisted solely of individuals who are not part of the opt-in class.
18 Accordingly, the survey's results are irrelevant and should be discounted by this Court.

19 **III.   ARGUMENT**

20      **A.   THE APPLICABLE TEST FOR EMPLOYEES VS. TRAINEES**

21      It is undisputed that Plaintiff's only claim under the FLSA is for minimum wages pertaining
22 to Defendant's unpaid training sessions.  As mentioned above, it is truly perplexing as to why
23 Defendant is attempting to argue against final FLSA class certification in the context of the
24 *Donovan*/Economic Realities test as expressed in *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370
25 (9th Cir. 1981), when this Court so clearly held in its May 18, 2010, conditional certification order that
26 for purposes of Plaintiff's claim for training time wages, whether one was a trainee or employee is to
27 be determined under the *Portland Terminal* test, and not the *Donovan*/Economic Realities test.

28      As previously briefed during the conditional certification stage, the *Donovan*/Economic

Realities test is simply the wrong standard and Plaintiff will not waste any further time in disputing this inapplicable test. Rather, Plaintiff will simply address this current Motion in the context of the *Portland Terminal* factor test, which is the only relevant test addressed by Defendant in its motion, and which involves the following six factors:

> (1)  The training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school;
>
> (2)  The training is for the benefit of the trainee;
>
> (3)  The trainees do not displace regular employees, but work under close observation;
>
> (4)  The employer that provides the training derives no immediate advantage from the activities of the trainees and on occasion his operations may actually be impeded;
>
> (5)  The trainees are not necessarily entitled to a job at the completion of the training period; and
>
> (6)  The employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

This Court held in its May 18 Cert Order that under Plaintiff's theory of strict reading of the DOL *Portland Terminal* test, so long as the "plaintiff demonstrates the inapplicability of any one factor, the FLSA applies," and the class members will be found to be employees during training. (Docket No. 176, p. 10:22-10:23).  While the Court determined that Plaintiff was similarly situated with respect to more than one factor in the conditional cert order, under Plaintiff's theory, conditional certification could have been granted if Plaintiff had demonstrated only one factor. The same standard applies at the final certification stage.  Further, even if the Court adopts the more "context" based realities of training time test, multiple factors support certification.  Thus, for purposes of seeking final certification, if Plaintiff demonstrates that Plaintiff and class members are "similarly situated" as to at least one of the six factors under its favored test, or can demonstrate "similarly situated" under the context test, Defendant's Motion should be denied and Plaintiff's Motion for Final Class Certification should be granted.  That is clearly demonstrated in Plaintiff's moving papers, and not defeated in Defendant's motion.

8

**B.     THE SIMILARLY SITUATED STANDARD**

The FLSA permits employees to bring an action as a collective action on "behalf of himself...and other employees" as long as they are "similarly situated." 29 U.S.C. §216(b). Collective actions are the appropriate mechanism for vindicating the rights of many employees who have been harmed by an employer's violations of the FLSA. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 684 (1946).  Courts routinely endorse the use of collective actions to address FLSA violations because these actions not only promote the broad remedial purposes of the Act, but also allow courts to efficiently manage multiple lawsuits alleging similar FLSA violations.  *See e.g., Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *Prickett v. DeKalb County*, 349 F.3d 1294, 1297 (11th Cir. 2003).

The key inquiry for maintaining a collective action is whether the plaintiffs are "similarly situated." The "similarly situated" standard is "more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir. 1996).  "Even at the decertification stage, similarly situated does not mean *identically situated.*" *Wilks v. Pep Boys*, 2006 U.S. Dist. Lexis 69537, at *9 (M.D. Tenn. Sept 26, 2006); *see Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528 (S.D. Tex. 2008).  While this factual nexus can be established with proof of a unified policy, such a finding is not required if plaintiffs can establish that they hold the same position and allege similar, though not necessarily identical, FLSA violations. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); *Grayson*, 79 F.3d at 1095; *Hill v. Muscogee County Sch. Dist.*, 2005 WL 3526669, at *2 (M.D. Ga. Dec. 20, 2005).  Plaintiffs need only be "similarly situated" and not "identically situated" to proceed as a collective action. *See, e.g., Wren v. RGIS*, 2007 WL 4532218, at *4 (N.D. Cal. Dec. 19, 2007); *Hipp*, 252 F.3d at 1217; *Falcon*, 2008 580 F. Supp. 2d at 534; *Hill*, 2005 WL 3526669, at *2.  After all, "[i]f one zooms in close enough on anything, difference will abound...But plaintiffs' claims need to be considered at a higher level of abstraction." *Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504, at *4 (D. Minn Sept. 24, 2007).  So long as the core duties of the position are the same or similar, courts are not to be bothered by the presence of other tangential duties, particularly if they are incidental or occur

Plaintiff's Opposition to Defendant's Motion to Deny Certification of FLSA Collective Class
Case No. CV 08-5198 EMC

1  infrequently.[3]

2      The decision whether to decertify a collective action is within the district court's sound

3  discretion. *See, e.g., Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995); *Falcon*, 580

4  F. Supp. 2d at 534. In exercising this discretion, the court's focus is on whether plaintiffs are

5  sufficiently similar, *i.e.* being subjected to similar training programs without compensation, and ***not***

6  on the merits of whether such work was compensable under the FLSA. *See, e.g., Thiessen v. Gen.*

7  *Elec. Capital Corp.*, 267 F.3d 1095, 1106-07 (10th Cir. 2001) (reversing decertification because

8  district court made merits determinations in the guise of deciding whether plaintiffs were similarly

9  situated); *Berger v. Cleveland Clinic Found.*, 2007 WL 2902907, at *21 (N.D. Ohio, Sept. 29, 2007)

10 (finding plaintiffs similarly situated, but deferring determination of whether defendant's actions

11 violated the FLSA).

12     When a defendant moves for decertification, courts look to three factors that assist them in

13 determining whether plaintiffs are similarly situated so as to survive decertification: 1) the factual and

14 employment settings of the individual plaintiffs; 2) whether defenses individual to each plaintiff are

15 present; and 3) fairness and procedural considerations. *See, e.g., Wren v. RGIS*, 2007 WL 4532218,

16 at *4; *Mooney*, 54 F.3d at 1215-16; *Falcon*, 580 F. Supp. 2d at 534; *Wilks*, 2006 U.S. Dist. Lexis

17 69537, at *9. All of these factors weigh in favor of maintaining this collective action through trial.

18     **C.    THE OPT-IN PLAINTIFFS ARE SIMILARLY SITUATED UNDER THE**

19         **APPLICABLE PORTLAND TERMINAL TEST**

20         **1.    Factor 1: Whether the Training is Similar to That Which Would be Given**

21             **in a Vocational School**

22     Defendant's main attack on this factor is based on a merits argument, claiming that the training

23 provided by Defendant to class members is "fungible." As stated above, merits arguments such as this

24 are completely improper during the class certification stage. Notwithstanding, it is worth noting that

25 by arguing the merits of this factor as it applies to its own training course, Defendant is essentially

26     [3] See also *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1362 (S.D. Fla. 2007)

27 (concluding that degrees of activities did not detract from the fact that the plaintiffs had the same
   tasks and duties and thus, were similarly situated); *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 265

28 (D. Conn. 2002).

**Plaintiff's Opposition to Defendant's Motion to Deny Certification of FLSA Collective Class**
**Case No. CV 08-5198 EMC**

1  stating that this factor can be determined on a collective basis.

2        While Defendant does attempt to argue that there are variations in this factor, the evidence

3  provided is sparse and without much weight.  Defendant cites testimony from merely four class

4  member deponents to support its assertion that a factual variation exists among class members who

5  felt that they "learned general skills" in training, as opposed to others who felt that the training "was

6  only applicable to the selling of Vector products." For example, Defendant cites the testimony of Larry

7  Stout in support of its assertion that some class members (the 3 class members it cites) felt that they

8  "learned general skills."  However, upon closer examination, Mr. Stout is unequivocal that he felt the

9  training was specific to selling Cutco knives:

10        **Q:**    **Let me ask it a different way.  Would you say that the majority of the**

11        **training that you attended with Vector was Vector specific, meaning it dealt with**

12        **the products or the company more than it taught just general sales?**

13        **Was it geared towards selling this particular product?**

14        **A:**    **Yes.**

15        **Q:**    **Okay.  Would you, if you had to give a percentage, would you say maybe**

16        **90 percent towards Vector products?**

17        **[OBJECTION OMITTED]**

18        **A:**    **Okay.  I have to say about more than that, 95 maybe.**

19        *Depo. Larry Stout, p. 123:3-123:19, See CAH Dec., Ex. 4*

20  As pointed out in Plaintiff's moving papers for Final Certification, p. 4, while it may be true that some

21  class members testified to learning generalized sales techniques, the vast majority of deponents,

22  including Mr. Stout, testified consistently with Alicia Harris that the training was specific to selling

23  Cutco knives.  *Dec. of Alicia Harris (Docket No. 134) at  ¶8 ; Compilation of Depo. Testimony re:*

24  *Training is Specific to Cutco, Ex.11 CAH Dec. (Docket No. 338-1, pp. 1-31)*

25        In addition to citing some vague language from a few of the opt-in Plaintiffs who were

26  deposed, Defendant further attempts to misdirect the Court's attention by citation to its expert witness'

27

28

1    declaration who issued a survey to non-opt-in sales reps.[4]   In doing so, Defendant has simply failed

2    to show the type of variations that warrant decertification. Most of Defendant's argument is based on

3    issues relating to whether the training was directly beneficial to Defendant or to the survey's non-opt-

4    ins.  Def Decert p. 22.  Such evidence is inapplicable to Factor No. 1, which examines the content of

5    the training itself, and not what the sales reps do with the training.   Rather, such evidence is more

6    appropriately argued under factors 2 (whether the training is for the benefit of the trainee) and 4

7    (whether employer that provides the training derives no immediate advantage from the activities of

8    the trainees).   Moreover, it is interesting to note that when deposed, Defendant's expert admitted that

9    he was not asked to provide an expert opinion as to the "fungibility" factor, and that he only provided

10   it upon reading the declarations that were provided by the few college professors.  *Saad Depo. at*

11   *88:18-90:17; 159:15-160:13, see CAH Dec., Ex. 5.*   Indeed, Defendant's expert did not do any sort

12   of scientific study to make this conclusion other than by reading some college professors' declarations.

13   *Id.*

14          Thus the appropriate inquiry for purposes of certification analysis is whether the training itself

15   was the same or similar for the opt-ins, so that at the liability phase of the case the issue of whether

16   the training was of the type that would be given in a vocational school can be determined as to the

17   entire class.   As shown in Plaintiff's Motion for Final Class Certification, the training is in fact

18   essentially identical as to each and every sales rep in California. *Dec. of Alicia Harris (Docket No. 134)*

19   *at ¶8; Training Seminar Agenda, Ex. 13, CAH Dec. (Docket No. 338-3, pp. 1-78).*  Indeed, each and

20   every sales rep that attended training sessions received the same training manual that was used during

21   the training session. *Compilation of Documents Produced by Various Class Members at Deposition,*

22   *Ex. 15 CAH Dec. (Docket No. 338-5, pp. 1-60)*

23

24          [4] In this respect, as noted in the section above, Plaintiff objects to any evidence provided by
     Defendant's expert, Ali Saad, as his purported results are based on a survey of individuals who are
25   not part of the opt-in class.  Thus, the survey's results are based upon individuals who are not part
     of Plaintiff's FLSA claim and therefore irrelevant to the FLSA motion.  Indeed, Mr. Saad, during his
26   deposition, admitted that the opt-in population and the non-opt-in population are two different
     populations with different biases. *(Saad Depo. at 83:24-85:6, See CAH Dec., Ex. 5).*  Thus, this
27   purported expert testimony from Mr. Saad on the survey results he provided should be disregarded
     for this motion, or at best given minimal weight.
28                                                    12

1      Moreover, in its May 18 Order, the Court also looked to the training manual itself, and nothing

2   more, in finding that the training showed "consistency and uniformity as to the nature and content of

3   the training." (Docket No. 176, pp. 10-11). Not surprisingly, Defendant does not even dispute or

4   argue that its training sessions are different amongst the sales reps in California. Indeed, if the training

5   itself were different amongst the sales reps, then one would wonder how Defendant's college

6   professors would be able to make conclusory claims about the training sessions as a whole. There is

7   simply no doubt that the training provided by Defendant to its sales reps is completely identical and

8   similarly situated amongst all of the opt-in Plaintiffs, thus making this case susceptible to

9   class/collective treatment.

10      **2.      Factor 2:  Whether the Training is for the Benefit of the Trainee and**

11          **Factor 4:  Whether the Employer Derives No Immediate Advantage from**

12          **the Activities of the Trainees**

13      Once again, Defendant bases its arguments relative to both of these factors on the merits of the

14   claims, rather than focusing on class certification standards. In making such merits-based arguments,

15   Defendant relies upon cases such as *Donovan v. American Airlines*, 686 F.2d 267 (5th Cir. 1982) and

16   *Donovan v. Trans World Airlines, Inc.*, 726 F.2d 415 (8th Cir. 1984).

17      What is most interesting about these cases is that the issues about whether the training was

18   beneficial to the trainee or the employee (as well as all of the other *Portland Terminal* factors) were

19   decided on behalf of all other trainees in each and every case (and not determined on a case-by-case

20   basis), which is very similar to a class-wide basis. *See e.g., American Airlines*, 686 F.2d at 268; *Trans*

21   *World Airlines*, 726 F.2d at 416. Because the training was identical for each and every trainee, the

22   Courts were able to decide these cases on a trainees-wide basis.

23      It is no different in this case. As stated many times in prior motions, including the concurrent

24   Motion for Final Class Certification, the training for each and every sales rep is completely identical

25   and similar. *Dec. of Alicia Harris (Docket No. 134) at ¶8; Training Seminar Agenda, Ex. 13, CAH*

26   *Dec. (Docket No. 338-3, pp. 1-78); Compilation of Documents Produced by Various Class Members*

27   *at Deposition, Ex. 15 CAH Dec. (Docket No. 338-5, pp. 1-60)*

28      Indeed, Defendant has never disputed this fact, as the training is what it is. What Defendant

13

**Plaintiff's Opposition to Defendant's Motion to Deny Certification of FLSA Collective Class**
**Case No. CV 08-5198 EMC**

1  attempts to do is to distract the Court with irrelevant evidence. Specifically, Defendant uses snippets

2  of the sales reps' deposition testimony and declarations to show that the sales reps themselves had

3  various answers as to whether they found the training to be beneficial to themselves or to Defendant.

4  However, that is not the evidence that the Court should even look at when considering this factor. The

5  feelings or observations of how beneficial the employee himself/herself finds the training to be later

6  on in their careers is not the principal evidence to be examined under this factor.

7         Rather, the Court must principally look at the training and curriculum itself in determining

8  whether the training is for the purpose of providing the employer with an immediate advantage or

9  whether the training is for the benefit of the trainee. Indeed, this proposition is clearly supported by

10  all of the case law cited by Defendant. *See e.g., American Airlines*, 686 F.2d at 268-70, 272 (in

11  determining whether the training was for the benefit of the employee or whether the employer derived

12  immediate benefit from the trainees, the Court looked at the curriculum of the training itself); *Trans*

13  *World Airlines*, 726 F.2d at 417 (in determining whether the training was for the benefit of the

14  employee or whether the employer derived immediate benefit from the trainees, the Court looked at

15  the curriculum of the training itself); *Reich v. Parker Fire Protection Dist.*, 992 F.2d 1023, 1028-29

16  (10th Cir. 1993) (in determining whether the training was for the benefit of the employee or whether

17  the employer derived immediate benefit from the trainees, the Court looked at the training curriculum

18  and the training activities itself); *Ulrich v. Alaska Airlines, Inc.*, 2009 U.S. Dist. Lexis 10104, *9-*17

19  (W.D. Wash. 2009) (in determining whether the training was for the benefit of the employee or

20  whether the employer derived immediate benefit from the trainees, the Court looked at the curriculum

21  of the training itself). Clearly, none of the Courts in these cases looked to the trainees' own personal

22  beliefs or feelings as to whether the training was beneficial to him/her or whether the training provided

23  an immediate advantage to the employer. Instead, each and every Court looked to the training

24  curriculum and activities itself to make these determinations.

25         Indeed, if Defendant's position were accepted, that a Court is required to determine these

26  factors by looking at the trainees' own personal beliefs or experiences, it would lead to illogical results.

27  More specifically, under Defendant's position, every employer would have to speculate, guess, or

28  predict whether the training they provide to their trainees would be more beneficial to the trainee

14

1  and/or would provide an immediate advantage to the employer. The employer would then have to

2  decide whether they are required to pay certain trainees for the training time, based solely on such

3  guesses and predictions. Taking it one step further, if the trainee personally felt that the training was

4  fungible at the time of the training, but after years of work experience decided that the training was

5  in fact not fungible, the employee would then be allowed to go back ask the employer for his/her

6  wages for attending the training sessions. Needless to say, under Defendant's proposition of how these

7  factors should be determined, it would clearly lead to illogical results. Rather, and consistent with the

8  other Courts, these factors should be determined from the context of the training curriculum itself.

9       As already noted, and which Defendant does not dispute, because Defendant's training

10  curriculum for its sales reps, and the activities that each sales rep is required to undertake during each

11  training session is nearly identical and similar, Plaintiff will also be able to offer common proof as to

12  these factors on a class-wide basis.

13           **3.**    **Factor 3:  Whether the Trainees Displace Regular Workers**

14       Not surprisingly, Defendant essentially admits that this factor is similarly situated as to the

15  sales reps, as Defendant admits that the trainings are all held in training classrooms, rather than in job

16  situations.[5]  Indeed, this was also the Court's holding in its May 18 Order. (Docket No. 176, p. 11).

17       What is surprising is that Defendant claims that because this factor supports Defendant on the

18  merits, this factor is either a "plus factor for Vector or a non-factor in the analysis of decertification

19  of the collective action." Defendant could not be more wrong in this regard. As already mentioned

20  above, the certification/decertification stage is not the time to rule on the merits of the claims. The

21  purpose and goal at certification is instead to determine whether the claims and issues are similarly

22  situated so that they can later be tried on a class-wide basis.

23       Clearly, since Defendant admits that this factor is identical for all sales reps' training courses,

24  there should be no doubt that the sales reps are similarly situated for this factor as well. Furthermore,

25  as noted by Plaintiff in her moving papers, at p. 19, this factor may be relevant for merits determination

26  _____

27       [5] This also further supports Plaintiff's position that Defendant does not dispute the manner
in which training is provided to each and every sales rep, thus making the training nearly identical

28  and similarly situated for all sales reps.

**Plaintiff's Opposition to Defendant's Motion to Deny Certification of FLSA Collective Class**
**Case No. CV 08-5198 EMC**

1   in that statistical evidence reveals that trainees may not be <u>displacing</u> employees, but rather <u>replacing</u>

2   employees. Since Vector knows based on its own historical data that 63.88% of its sales force is gone

3   within four weeks, and that fully 79.72% will be gone in eight weeks, all the trainees in Vector's

4   revolving door enterprise are being trained to displace all those who came through the door only weeks

5   earlier. *Dec. of Martin Shapiro (Docket No.329-2) at ¶9.*

6       As such, this factor is actually a factor in favor of Plaintiff, and against Defendant.

7       **4.   Factor 5:  Whether the Trainees are not Necessarily Entitled to a Job at**

8       **the Completion of the Training Period**

9       As already shown in Plaintiff's concurrent Motion for Final Class Certification, 48 of the 50

10  deponents (the other two simply could not recall) believed that they had already been hired for the job

11  after their interviews and before any training had begun. *Compilation of Testimony re: How Applicants*

12  *Were Told He or She Was Hired, Ex. 4 CAH Dec. (Docket No. 334-4, pp. 1-35)*  This evidence alone

13  should be more than enough to show that the sales reps were similarly situated in understanding

14  whether they were entitled to a job before or after the completion of training.

15      Notwithstanding, even assuming that sales reps were purportedly only "accepted into training"

16  and not actually offered or hired for the job, as Defendant claims, the evidence still supports that the

17  sales reps are similarly situated for this factor as well.  While Defendant notes the key words in this

18  factor as "not necessarily" and "entitled," Plaintiff also points to the other key term of "at the

19  completion of the training period."

20      Specifically, the Court should look at this factor as to whether, ***upon completion of the entire***

21  ***training session***, each sales rep was entitled to a sales rep position with Vector.  In other words,

22  whether the training sessions simply provides Defendant with a "labor pool" from which Defendant

23  has the discretion to hire (or not hire) someone.  *See e.g., Portland Terminal*, 330 U.S. at 149-50

24  (1947) (finding that once the trainees completed their course of instruction, they were included on a

25  labor pool list from which the company could draw upon when their services were needed); *American*

26  *Airlines*, 686 F.2d at 271 (finding that the product of American Airlines' training was merely a labor

27  pool of potential employees); *Alaska Airlines*, 2009 U.S. Dist. Lexis 10104, at *5 (citing that "persons

28  who attend a school train for employment in a particular industry may become a labor pool but until

16

1  they are hired, they are not employees).

2      In support of its argument, Defendant cites to its expert's survey that asks "Which statement

3  best describes your understanding at the time you were accepted for the three-day training seminar?"

4  Needless to say, there are numerous problems with this loaded question. First, it presumes and implies

5  to the survey respondent that they were not hired prior to the training, but rather only "accepted" into

6  the training course. Second, the question does not ask whether they would be offered a "job" at upon

7  the completion of the training course. Rather, the answers this survey question allowed the

8  respondents to choose from were all in the context of the "Sales Representative Agreement" such as

9  whether the sales rep understood he/she would be offered a "Sales Representative Agreement" upon

10  completion. Clearly, this factor does not ask about "sales representative agreements" but rather

11  whether a *job* would be offered upon completion of the training course. Moreover, this question

12  presumes that each sales rep was informed about the existence of a "sales representative agreement"

13  at the time they were accepted into training.[6] Needless to say, this question is completely loaded and

14  should be given no evidentiary weight.

15      Rather, as admitted to by Defendant's own corporate representative, Paul Matheson, and the

16  training guides distributed to branch and district managers from Vector's corporate office, during the

17  third day of training, each sales rep is automatically furnished with the sales rep agreement to review

18  and sign. *Matheson Depo. 104:24-105:7, 99:9-12; (CAH Dec., Docket No. 334-4, pp. 1-17); see also*

19  *training guides previously submitted.* Thus, upon completion of the training, <u>each sales rep is indeed</u>

20  <u>entitled to a job with Defendant</u>. There is absolutely no evidence that *upon completion of the*

21  *training*, the trainees are then placed into some sort of "labor pool" for Defendant to eventually choose

22  from, as was the case in *Portland Terminal*. Rather, the evidence is clear that each and every sales rep

23  received a sales rep agreement upon completion of their training, thus entitling each of them to a job.

24  This is strongly supported by the fact that 50 out of the 50 randomly selected opt-in deponents testified

25  that they were all presented with a sales rep agreement to sign. Thus, based on Defendant's own pmk

26   

27      [6] A better survey question(s) should have been (1) Did you believe that you were hired by
Vector for a sales rep position prior to attending training; and (2) At the time you attended training,

28  did you believe that you would become a sales rep for Vector once you finished the training course.

17

1   testimony, as well as the testimony of each and every opt-in deponent, it is clear that the sales reps are

2   similarly situated in that they are all entitled to a sales rep position with Defendant upon the

3   completion of training.

4          **5.    Factor 6:  Whether the Employer and the Trainees Understand that the**

5          **Trainees are Not Entitled to Wages for the Time Spent in Training**

6          Defendant readily admits that it clearly understood that trainees were not entitled to wages for

7   training time.  Defendant submits evidence that its "Skills for Life" brochure, which discloses that the

8   training time was not-compensable, was provided to all trainees.  This same evidence was relied upon

9   by this Court in its May 18 Order that Defendant's "evidence suggests that trainees are uniformly told

10  prior to training (*i.e.*, during the interview process) that they will not be paid for the time spent in

11  training."

12         While it is true that the testimony of the deponents is inconsistent as to whether they

13  ***understood they were to be paid or not paid for time spent in training***, their understanding as to

14  whether they were legally "entitled" to payment of wages is unclear and was unexplored by Defendant

15  in depositions, and constitutes the very issue being litigated in this case.   Furthermore, any

16  inconsistency as to class members' understanding is not fatal to certification, as under Plaintiff's theory,

17  Defendant must meet all six factors of the *Portland Terminal* test [*see e.g., Summa v. Hofstra Univ.*

18  (E.D.N.Y. 2010) 2010 U.S. Dist. LEXIS 53153, *29), and Plaintiff has demonstrated that at least one

19  factor, and likely more than one factor, can be adjudicated on a class wide basis.  As stated earlier,

20  even under the 'context" based tests, the Plaintiff has more than demonstrated that similar situated

21  issues abound.  As such, Defendant's motion should be denied and Plaintiff's Motion for Final FLSA

22  Certification should be granted.

23         **D.    THERE ARE NO INDIVIDUAL DEFENSES TO PLAINTIFFS' CLAIMS THAT**

24         **RENDER COLLECTIVE TREATMENT INAPPROPRIATE**

25         Continued collective treatment of opt-in Plaintiffs' claims is appropriate because Defendant's

26  defenses can be addressed on a class wide basis. *See Falcon*, 580 F. Supp. 2d at 540-41; *Pendlebury*

27  *v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1362-63 (S.D. Fla. 2007); *Wilks*, 2006 U.S. Dist. Lexis

28

---

18

1  69537, at \*23-\*25.[7]  Indeed, Defendant's primary defenses in this case are ideally suited for collective

2  action treatment.  As discussed, Defendant has consistently attempted to argue the merits of this case

3  on a class-wide basis, thus indicating that their defenses will be the same for each and every opt-in

4  Plaintiff.  Moreover, as discussed in detail above, nearly all of the *Portland Terminal* factors will be

5  determined in the context of Defendant's own identical training and curriculum, as opposed to the class

6  members' personal beliefs or opinions about the training.  The issues to be addressed at the liability

7  stage will focus not on the individual members of the Plaintiff class, but rather on Defendant's policies

8  and the patterns shown by common, representative proof.  The questions about Defendant's training

9  course do not require each class member to testify because they turn on the undisputed training

10  curriculum that each opt-in Plaintiff experienced.  The jury need not hear testimony from thousands

11  of sales reps to determine, for instance, whether the training is of the same type provided in vocational

12  schools, or whether the training is designed to allow Defendant to receive an immediate advantage

13  from the trainees.

14       As such, Defendant's argument that there are individualized defenses which would warrant

15  decertification must be denied.

16  **E.     FAIRNESS AND PROCEDURAL CONSIDERATIONS WEIGH HEAVILY IN**

17  **FAVOR OF COLLECTIVE TREATMENT**

18       The broad remedial purpose of the FLSA creates a strong presumption in favor of protecting

19  employees.  *Falcon*, 580 F. Supp. 2d at 541; *Reich v. Circle C. Invs. Inc.*, 998 F.2d 324, 329 (5th Cir.

20  1993); *Vela v. City of Houston*, 276 F.3d 659, 666-67 (5th Cir. 2001) (construing exemptions to FLSA

21  narrowly).  In applying the FLSA, courts are mindful of the statute's dual objectives of lowering costs

22  to plaintiffs for vindicating their employment rights as well as effectively resolving common issues

23  of law and fact in one proceeding.  *See, e.g., Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170

24  (1989); *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997).

25       These dual objectives weigh heavily against Defendant's motion to decertify and in favor of

26

27       [7] Moreover, the presence of individualized defenses does not preclude collective treatment.
See, e.g., *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 484 (E.D.N.Y. 2001); *Glass v. IDS Fin. Servs.*

28  *Inc.*, 778 F. Supp. 1029, 1081 (D. Minn. 1991).

19

1   collective treatment. Decertification of the present case could result in over 5,000 individual claims

2   that would be highly impractical to pursue given the amount in controversy for each opt-in and the

3   resources available to them individually. *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342,

4   1351 (N.D. Ga. 2002); *Pendlebury*, 518 F. Supp. 2d at 1363. Furthermore, the creation of over 5,000

5   individual suits would prevent the efficient resolution of common issues of law and fact in a single

6   proceeding. To disband all of the opt-ins and disperse them to courts across California would raise

7   a whole host of problems surrounding issue preclusion and/or *stare decisis*. *Pendlebury*, 518 F. Supp.

8   2d at 1363.

9        While Defendant criticizes the number of individuals who have opted in to the class, which it

10   represents to this Court as 10-11%, but which is actually closer to 13%,[8] the percentage of opt-ins is

11   actually within the average range of opt-in rates in other FLSA actions. For example, in *Wren v. RGIS*

12   *Inventory Specialists*, 256 F.R.D. 180 (N.D. Cal. 2009), Judge Spero held that an opt-in rate of less

13   than 10% was sufficient to grant final FLSA certification, as well as certification pursuant to Rule 23.

14   *Id.* at 193, 203, 212-13. See also *Falcon*, 580 F. Supp. 2d at 529-30, 538, n. 11 (denying defendant's

15   motion for decertification of FLSA class and finding that an opt-in rate of 3.8% to be sufficient; *Wilks*,

16   U.S. Dist. Lexis 69537 at *5-*6 (denying defendant's motion for decertification despite a response rate

17   of 0.3395%). Indeed, as one ABA article noted, the typical opt-in rate in FLSA collective actions is

18   in the "5-20%" range. *See* Bettina W. Yip, Daniel E. Turner & Anthony Collins (ABA Section of

19   Labor and Employment Law, EEO Committee), Defensive Strategies for Preventing Certification of

20   Wage and Hour Collective and Class Actions, § I (March 23, 2006). *See CAH Dec., Ex. 6.*

21        Defendant further argues that because the opt-in Plaintiffs are not similarly situated, it would

22   be "unfair" to certify this case. However, as already discussed above, many, if not all, of the *Portland*

23   *Terminal* factors can be tried on a class-wide basis. Thus, should this Court find that the opt-in

24   Plaintiffs are similarly situated, this Court should also find that the Defendant would be accorded with

---

25        [8] In her declaration submitted with the Court, Rachel Wnorowski of Epiq Systems stated that

26   47,961 packages were mailed to names on the class list with 5003 packages returned and

27   undeliverable; and that 5,569 individuals returned consent to join forms to Epiq. 5,569 /
     (47961-5569) =12.96% opting into the class. Decl. of Rachel Wnoroski (Docket. No. 230) para.

28   Nos. 6, 7, and 15.

**Plaintiff's Opposition to Defendant's Motion to Deny Certification of FLSA Collective Class**
**Case No. CV 08-5198 EMC**

1  appropriate fairness and procedural considerations.

2        Defendant also attempts to argue that allowing this case to proceed on a class-wide basis is
3  unfair as it would threaten the Defendant's business.  However, there is absolutely no legal basis to
4  support any argument that a defendant gets to defeat certification in order to protect an enterprise that
5  may running in an illegal or improper way.  Public policy would certainly not support any such claim.
6  Rather, where the amounts of each class member's claim is small, such actions in fact warrant
7  certification.  *Donohue v. Francis Servs., Inc.*, 2004 WL 1406080, at *1 (E.D. La. June 22, 2004)
8  (refusing to decertify a collective action on allegations that the class was too large and noting that
9  "[a]dopting defendants' reasoning would lead to the absurd result that employers could escape FLSA
10 liability by making sure to underpay vast numbers (rather than smaller numbers) of their employees").
11 If this Court ultimately rules that the class members must be paid for this particular training program,
12 then the Defendant will have to do so, and then construct a program that complies with California and
13 FLSA law.

14       While this Court can consider Defendant's right to due process, that interest must be balanced
15 against the competing rights of plaintiffs who likely would be unable to afford an individual trial.
16 *Falcon*, 580 F. Supp. 2d at 541.  In doing so, most courts have concluded that the plaintiffs' interests
17 must be balanced with due process concerns in the FLSA context, but not that they should be denied.
18 *Id.*; *Glass v. IDS Fin. Servs.*, 778 F. Supp. 1029, 1081-82 (D. Minn. 1991) (denying decertification
19 despite due process interests of defendant because collective treatment was necessary to protect the
20 rights of the more vulnerable plaintiffs); *Wilks*, 2006 U.S. Dist. Lexis 69537, at *25-*27.

21       For such reasons, Defendant's fairness argument should be rejected.

22 **IV.**    **CONCLUSION**

23       A collective action under the FLSA may be maintained even if employee work settings and
24 experiences are not completely identical.  Undoubtedly, some degree of variation is to be expected and
25 is inevitable.  Plaintiff and class members need not prove they are identically situated, but merely that
26 they are similarly situated.  This showing has clearly been satisfied in this case.  As the court held in
27 *Falcon*:

28       Although the incentives created by Starbucks' conflicting mandates may not have led

**Plaintiff's Opposition to Defendant's Motion to Deny Certification of FLSA Collective Class**
**Case No. CV 08-5198 EMC**

all managers nationwide to act in lockstep…the deposition testimony supports a finding that the opt-in plaintiffs currently before the Court were, in fact, affected similarly. It would certainly not be in the interest of judicial economy to decertify a class of similarly situated plaintiffs simply because, after discovery, it becomes apparent that the alleged policy was not as uniform as plaintiffs believed at step one. An employer should not be allowed to escape class liability simply because some managers do not commit FLSA violations as long the evidence shows that there is a factual or legal nexus that binds together the claims of the opt-in plaintiffs before the Court. (emphasis added)

2008 580 F. Supp. 2d at 536.

As shown herein, Plaintiff will be able to establish many, if not all, of the *Portland Terminal* factors on a class-wide basis.  For all the foregoing reasons, this Court should deny Defendant's motion.

DATED:   October 6, 2010

**MARLIN & SALTZMAN**
**DIVERSITY LAW GROUP**
**LAW OFFICES OF SHERRY JUNG**


By: _____/S/_____
        Christina A. Humphrey, Esq.
        of Marlin & Saltzman
        Attorneys for Plaintiff and plaintiff class

22

**Plaintiff's Opposition to Defendant's Motion to Deny Certification of FLSA Collective Class**
**Case No. CV 08-5198 EMC**