1
2
3
4
5 UNITED STATES DISTRICT COURT
6 NORTHERN DISTRICT OF CALIFORNIA
7
8 ALICIA HARRIS,                                    No. C-08-5198 EMC
9           Plaintiff,
10     v.                                            **ORDER GRANTING PLAINTIFF'S
                                                     MOTION TO CERTIFY FLSA
11 VECTOR MARKETING CORPORATION,                     COLLECTIVE ACTION; DENYING
                                                     DEFENDANT'S CROSS-MOTION TO
12         Defendant.                                DECERTIFY; GRANTING IN PART
                                                     AND DENYING IN PART PLAINTIFF'S
13 _____/             MOTION TO CERTIFY RULE 23
                                                     CLASS ACTION; AND GRANTING IN
14                                                   PART AND DENYING IN PART
                                                     DEFENDANT'S CROSS-MOTION TO
15                                                   DENY CERTIFICATION**
16                                                   **(Docket Nos. 330, 332, 336, 337)**
17

18        Plaintiff Alicia Harris has filed suit against Defendant Vector Marketing Corporation for

19 violation of, *inter alia*, certain provisions of the Fair Labor Standards Act ("FLSA") and California

20 Labor Code.  Ms. Harris has brought the action on behalf of herself and asks that the Court certify

21 her FLSA claim as a collective action and her state law claims as a class action pursuant to Federal

22 Rule of Civil Procedure 23.  Currently pending before the Court are Ms. Harris's motions to certify

23 the FLSA collective action and Rule 23 class action and Vector's cross-motions to decertify or deny

24 certification.

25        Having considered the parties' briefs and accompanying submissions, the oral argument of

26 counsel, and all other evidence of record, the Court hereby **GRANTS** Ms. Harris's motion to certify

27 the FLSA collective action and **DENIES** Vector's cross-motion to decertify.  The Court further

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  **GRANTS** in part and **DENIES** in part Ms. Harris's motion to certify the Rule 23 class action and

2  **GRANTS** in part and **DENIES** in part Vector's cross- motion to deny certification.

3  **I.   FACTUAL & PROCEDURAL BACKGROUND**

4      "Vector is a direct sales company that markets a line of high quality kitchen cutlery,

5  accessories, and sporting knives manufactured by Cutco Cutlery Corporation."  Docket No. 49

6  (Matheson Decl. ¶ 2).  "Vector sells and markets Cutco products . . . through the use of Sales

7  Representatives."  *Id.* (Matheson Decl. ¶ 4).  The parties agree that, at one point, Vector hired Ms.

8  Harris to be a Sales Representative to sell Cutco knives.  *See* Docket No. 37 (Arlie Decl., Ex. E)

9  (Sales Representative Agreement for Ms. Harris); Docket No. 52 (Harris Decl., Ex. C) (same).

10      As a general matter, before Sales Representatives begin selling the Cutco knives, they attend

11  an initial training, which typically lasts three days.  Trainees are not paid for their time spent in the

12  training.  According to Ms. Harris, trainees should have been paid for this time, and Vector's failure

13  to pay constitutes a failure to pay minimum wages under the FLSA, *see* 29 U.S.C. § 206, and the

14  California Labor Code, *see* Cal. Lab. Code § 1197, and further constitutes a violation of California

15  Business & Professions Code § 17200, which prohibits unfair competition.  Ms. Harris also asserts

16  that, during the training, trainees were improperly coerced into buying sample knife sets (to be used

17  for sales presentations) in violation of (1) California Labor Code § 2802 (which requires an

18  employer to reimburse its employees for necessary expenses), (2) the California Labor Code Private

19  Attorney General Act ("PAGA"), *see id.* § 2698 *et seq.*, and (3) California Business & Professions

20  Code § 17200.  Finally, Ms. Harris argues that Vector violated California Labor Code § 2802 by

21  failing to reimburse Sales Representatives for expenses incurred once they actually started selling

22  knives.

23      In June 2009, Vector moved for summary judgment on each of the above claims (as well as

24  other claims), noting that such claims may be asserted only by an employee and arguing that

25  trainees/Sales Representatives are not employees as defined by federal and state law.  With respect

26  to the above claims, the Court denied the motion, concluding that there was a genuine dispute of

27

28

2

United States District Court

For the Northern District of California

1  material fact as to whether trainees/Sales Representatives are employees.[1]  *See* Docket No. 71

2  (order).

3         Subsequently, in April 2010, Ms. Harris moved for conditional collective action certification

4  for her FLSA claim.  The Court granted the motion, finding that Ms. Harris had made a sufficient

5  showing to warrant conditional certification.  *See* Docket No. 176 (order).  After the Court issued its

6  order granting Ms. Harris's motion for conditional certification, a third-party administrator sent out

7  almost 48,000 notices and consent-to-join forms, of which about 5,000 were not deliverable.  *See*

8  Docket No. 230 (Wnorowski Decl. ¶¶ 6-7).  The deadline to opt-in was July 26, 2010.  *See id.*

9  (Wnorowski Decl. ¶ 14).  As of July 28, 2010, the third-party administrator had received and

10 processed 5,569 forms.  *See id.* (Wnorowski Decl. ¶ 15).  "Of this total forms filed, 86 were deemed

11 incomplete as they were not signed by the individual potential Class Member, 5,244 were deemed

12 complete, 203 were deemed duplicates of previously filed Consent to Join Forms, and 36 Consent to

13 Join Forms were submitted with a postmark after the deadline, or received via fax after the

14 deadline." *Id.* (Wnorwoski Decl. ¶ 15).

15        Subsequently, the Court permitted Vector to take the depositions of fifty of the "opt-ins."

16 Vector did so.  *See* Docket No. 339 (Saad Decl. ¶ 5); *id.* (Wilson Decl. ¶ 2(g)).  In addition, Vector,

17 on its own accord, obtained declarations from approximately fifty other Sales Representatives

18 operating in California.  Finally, Vector, on its own accord, conducted a survey of its Sales

19 Representatives operating in California.  *See id.* (Saad Decl. ¶ 12).  The survey was sent via e-mail

20 to approximately 40,000 people, of which about 25,000 were not deliverable.  *See id.* (Saad Decl. ¶

21 12).  At the close of the survey administration, 551 completed responses had been received.  *See id.*

22 (Saad Decl. ¶ 12).

23                    **II.    EVIDENTIARY OBJECTIONS**

24 A.    Ms. Harris's Objections

25        In support of its motions (and oppositions to Ms. Harris's motions), Vector has submitted (1)

26 declarations from approximately fifty Sales Representatives who state, *inter alia*, that they do not

27 _____

28        [1] The Court did grant Vector's motion for summary judgment with respect to other claims.

**United States District Court**

For the Northern District of California

1  wish to participate in the pending lawsuit and (2) a declaration from an expert, Mr. Saad, who, *inter*

2  *alia*, prepared and conducted the above-referenced survey.  Ms. Harris has objected to each of the

3  Sales Representative declarations as well as the Saad declaration.[2]

4      1.   <u>Sales Representative Declarations</u>

5      With respect to the Sales Representative declarations, Ms. Harris has made various

6  objections such as lack of personal knowledge, speculation, best evidence rule, improper lay

7  opinion, legal conclusion, and hearsay.  The majority of these objections have no merit.

8      For example, the Sales Representatives do have personal knowledge about their own

9  experiences.  Also, whether a Sales Representative has an interest in participating in the lawsuit

10  and/or wants Ms. Harris to represent him or her is not an improper lay opinion or a legal conclusion.

11      The only objection that is a closer call is the hearsay objection.  If, however, Vector is not

12  offering the evidence for the truth of the matter asserted – *e.g.*, for the effect on the Sales

13  Representatives as listeners – then the evidence is not hearsay at all, and therefore the objection

14  should be overruled.  Moreover, the objection arguably should be overruled because the reported

15  communications between Vector and the Sales Representative declarants are analogous to verbal

16  acts or are part of the res gestae; *i.e.*, they comprise the alleged policies and practices of Vector at

17  issue.  *See generally* 5-801 Weinstein's Fed. Evid. § 801.11[3], [4] (discussing verbal acts and the

18  verbal part of acts).  Finally, the evidence would be admissible under the residual hearsay exception

19  provided by Federal Rule of Evidence 807.  The Court notes that the declarations of the Sales

20  Representatives have circumstantial guarantees of trustworthiness as required by Rule 807 – *i.e.*,

21  each declaration is analogous to a statement against interest.

22      2.   <u>Saad Declaration</u>

23      With respect to the Saad declaration, Ms. Harris's argument is, in essence, that the

24  declaration is so unreliable that it should be excluded.  In particular, Ms. Harris criticizes the content

25  _____

26      [2] The Court notes that the Sales Representative declarations are essentially irrelevant to the parties' FLSA motions.  This is because the FLSA motions address whether the opt-ins are similarly situated, and therefore what the non-opt-ins have to say is largely immaterial.  Similarly, to the

27  extent the Saad declaration discusses the survey and its results, that information is essentially irrelevant to the parties' FLSA motions.  Again, the issue for the FLSA motions is whether the opt-

28  ins – and not other trainees/Sales Representatives – are similarly situated.

**United States District Court**
For the Northern District of California

1  of the survey conducted and prepared by Mr. Saad as well as the response rate to the survey.  The

2  problem for Ms. Harris is that, as she herself admits in her brief, even challenges to defects in

3  methodology normally affect the weight to be accorded the survey and not its admissibility.  *See*

4  Pl.'s Obj. at 9; *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008)

5  (indicating that an expert's error in application of methodology would ordinarily go to weight of

6  expert's testimony, although a significant error might go to admissibility); *SR Int'l Bus. Ins. Co. v.*

7  *World Trade Ctr. Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006) (stating that, "[t]o the extent that

8  there are gaps or inconsistencies in [the expert's] testimony, those issues 'go to the weight of the

9  evidence, not to its admissibility'"); *Kudabeck v. Kroger Co.*, 338 F.3d 856, 861-62 (8th Cir. 2003)

10  (noting that "attacks regarding the completeness of [a doctor's] methodology go to the weight and

11  not admissibility of his testimony"); *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, No. C

12  07-03752 JSW, 2008 U.S. Dist. LEXIS 87625, at *21-22 (N.D. Cal. Oct. 16, 2008) (stating that,

13  "[i]n general, a court may admit a survey if it is conducted according to generally accepted

14  principles and if it is relevant" and that "[c]hallenges to defects in methodology normally affect the

15  weight to be accorded the survey, rather than its admissibility" – that is, unless " the methods used

16  are so deficient").  In the instant case, the Court is not persuaded that the survey and the results are

17  so deficient that they should be excluded, and therefore overrules the objection to the Saad

18  declaration.  Ms. Harris does not explain, for instance, why the weighting of the survey responses (to

19  account for the potential non-representativeness of the sample of respondents) was faulty.

20  B.    Vector's Objections

21        In support of her motions (and oppositions to Vector's motions), Ms. Harris has submitted a

22  declaration from an expert, Mr. Gorman, who largely provides criticisms of the declaration of Mr.

23  Saad.  Vector has objected to the declaration on various grounds.  Vector's objections are essentially

24  moot because the Court need not rely on Mr. Gorman's declaration in evaluating the pending

25  motions.  In fact, most of the criticisms made by Mr. Gorman in his declaration are common sense-

26  type criticisms that the Court may consider on its own, and thus do not warrant exclusion.  In any

27  event, the Gorman declaration as well as the Saad both pass muster under *Daubert v. Merrell Dow*

28

United States District Court

For the Northern District of California

*Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

### III.   FLSA MOTIONS

In her FLSA motion, Ms. Harris asks the Court to grant final collective action certification for a class consisting of all individuals who worked for Vector in the state of California as Sales Representatives from April 15, 2006, through May 12, 2010.[3]  As noted above, more than 5,000 individuals responded to the class notice and asked to be included in the collective action.  In its FLSA motion, Vector asks the Court to decertify the class.

A.   Legal Standard

Under the FLSA, employers must pay their employees a minimum wage.  *See* 29 U.S.C. § 206(a).  If an employer fails to do so, then an aggrieved employee may bring a collective action on behalf of himself and others "similarly situated."  *Id.* § 216(b).  Determining whether a collective action is appropriate is within the discretion of the district court.  *See Adams v. Inter-Com Sec. Sys.*, 242 F.R.D. 530, 535 (N.D. Cal. 2007) (Patel, J.).

"To maintain a collective action under the FLSA a plaintiff must demonstrate that the putative collective action members are similarly situated."  *Murillo v. Pacific Gas & Elec. Co.*, No. CIV. 2:08-1974 WBS GGH, 2010 U.S. Dist. LEXIS 20240, at *4 (E.D. Cal. Mar. 5, 2010); *see also Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1123-24 (E.D. Cal. 2009) (noting that a plaintiff has the burden of proving the similarly situated requirement).  Courts have generally held that the "similarly situated" standard under the FLSA is not as stringent a standard as the "common questions predominate" standard under Federal Rule of Civil Procedure 23(b)(3).  *See O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 584-85 (6th Cir. 2009); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996).

---

[3] In her opening brief, Ms. Harris identified the class period as April 15, 2006, through the resolution of this case.  *See* Pl.'s Mot. at 1.  However, the Court indicated in a previous order that the appropriate period is likely April 15, 2006, through May 12, 2010, as that was the period specified in the class noticed that was issued.  *See* Docket No. 304 (Order at 5-6); *see also* Docket No. 230 (Wnorowski Decl., Ex. 1) (class notice).  As reflected in her reply brief, Ms. Harris now appears to have accepted this preliminary ruling of the Court.  *See* Pl.'s Reply at 1 (clarifying that no request for a second class notice – to cover individuals working for Vector after May 12, 2010 – is being requested).

United States District Court

For the Northern District of California

Unfortunately,

> [n]either the FLSA nor the Ninth Circuit have [expressly] defined "similarly situated." [But a] majority of courts have adopted a two-step approach for determining whether a class is "similarly situated." Under this approach, a district court first determines, based on the submitted pleadings and affidavits, whether the proposed class should be notified of the action. At the first stage, the determination of whether the putative class members will be similarly situated "is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class." District courts have held that conditional certification requires only that "'plaintiffs make substantial allegations that the putative class members were subject to a single illegal policy, plan or decision.'"
>
> The second-step usually occurs after discovery is complete, at which time the defendants may move to decertify the class. In this step, the court makes a factual determination about whether the plaintiffs are similarly situated by weighing such factors as "(1) the disparate factual and employment settings of the individual plaintiffs, (2) the various defenses available to the defendant which appeared to be individual to each plaintiff, and (3) fairness and procedural considerations." If the district court determines that the plaintiffs are not similarly situated, the court may decertify the class and dismiss the opt-in plaintiffs' action without prejudice. Even when the parties settle, the court "must make some final class certification finding before approving a collective action settlement."

*Murillo*, 2010 U.S. Dist. LEXIS 20240, at *4-6.

In the instant case, the Court has already determined that Ms. Harris made an adequate showing at step one, *see* Docket No. 176 (order), and therefore notices were sent to the putative collective action members. *See generally* Docket No. 230 (Wnorowski Decl.). The Court now must decide whether Ms. Harris has made a sufficient showing at step two to obtain final certification for her FLSA collective action.

B.   <u>*Donovan* Test v. DOL/*Portland Terminal* Test</u>

As noted above, under the FLSA, employers must pay their employees a minimum wage. *See* 29 U.S.C. § 206(a). If, however, Ms. Harris and the putative collective action members were not employees of Vector, then they have no FLSA claim at all. Thus, at the outset of this case, the parties have disputed whether Ms. Harris and the putative collective actions members were employees or something else, be it independent contractors or trainees.

In its order granting conditional collective action certification, this Court explicitly endorsed use of the DOL/*Portland Terminal* trainee test in determining whether Ms. Harris and the putative

United States District Court

For the Northern District of California

1  collective action members were employees for purposes of the FLSA claim because they were

2  asking to be compensated for their time spent in initial training only.  The Court declined to apply

3  the *Donovan* independent contractor test which considers factors such as the alleged employer's

4  right to control the manner in which the work is to be performed.  *See* Docket No. 332 (Order at 7)

5  ("find[ing] that the *Portland Terminal*/DOL analysis of trainees rather than the *Donovan* test

6  applies").  The Court also indicated that, at the end of the day, under either test, the economic

7  realities were what was most important.  *See id.* (Order at 6, 10).

8       In spite of this ruling by the Court, Vector now seeks to resuscitate application of the

9  *Donovan* test, arguing that the test must be applied because Ms. Harris and the putative collective

10  action members were sent into training as independent contractors, and not employees.  *See* Def.'s

11  Mot. at 3 (arguing that "[t]here is no precedent or other authority that requires payment for the

12  training of people preparing to become independent contractors under the FLSA").  In essence,

13  Vector argues that the trainees must establish they were employees under the *Donovan* test *before*

14  applying the DOL/*Portland Terminal* test.  The Court rejects Vector's argument for several reasons.

15       First, the Court's prior ruling that the DOL/*Portland Terminal* test is applicable is the law of

16  the case.  Vector has not filed a motion to reconsider.

17       Second, Vector has cited no authority supporting its contention that the *Donovan* test must be

18  applied before getting into the DOL/*Portland Terminal* test when analyzing whether a trainee is an

19  employee for purposes of the FLSA.  Applying an additional layer would conflict with the stated

20  purpose of the DOL/*Portland Terminal* test which is to determine "whether trainees are employees

21  within the meaning of FLSA."  *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1026 (10th Cir.

22  1993).  Moreover, as noted above, both tests ultimately are targeted at examining the economic

23  realities of the parties' relationship.  Placed in its proper context, the DOL/*Portland Terminal* is

24  nothing more than an application of the economic realities test in the context of trainees.

25       Third, even if the *Donovan* test were independently applicable, the Court would look at the

26  economic realities of the relationship between Vector and trainees, and not the relationship between

27  Vector and the Sales Representatives who had already completed the training.  In other words, in

28  evaluating a *Donovan* factor such as control, the Court would not examine the control Vector

1   exercised over Sales Representatives who had already completed the training; rather, the Court

2   would be examining the control Vector exercised over the trainees during the initial training.

3   Hence, Vector's analysis is inapposite.

4          Finally, even assuming that Sales Representatives were, once they completed the initial

5   training, independent contractors under *Donovan*, that does not necessarily bar them from getting

6   paid for their time spent in initial training – *i.e.*, they could still be considered employees for

7   purposes of FLSA for the limited purpose of the time spent in initial training.  Vector cites no case

8   to the contrary.

9   C.     Step Two Analysis

10         As noted above, at step two,

11             the court makes a factual determination about whether the plaintiffs
               are similarly situated by weighing such factors as "(1) the disparate
12             factual and employment settings of the individual plaintiffs, (2) the
               various defenses available to the defendant which appeared to be
13             individual to each plaintiff, and (3) fairness and procedural
               considerations."

14

15   *Murillo*, 2010 U.S. Dist. LEXIS 20240, at *4-6.

16         In her papers, Ms. Harris focuses on the uniform way in which trainees are interviewed and

17   hired and the uniform way in which the initial training sessions are conducted in arguing that she has

18   satisfied the step two inquiry.  In turn, Vector spends much of its time arguing that even the

19   DOL/*Portland Terminal* test weighs strongly in its favor.  Both of the parties' positions have flaws.

20         For example, with respect to Ms. Harris's argument, the way in which trainees are

21   interviewed and hired is largely irrelevant.  Ms. Harris suggests that, if the trainees were in fact hired

22   prior to the training (instead of at the time of signing the Sales Representative Agreements), then the

23   Court could sidestep the DOL/*Portland Terminal* test altogether.  But even if the trainees were *hired*

24   prior to training, that does not establish that they were *employees* for purposes of the FLSA at the

25   time of hiring.

26         As for Vector's argument, the ultimate merits of the case are not being determined at this

27   stage.  What the Court is being called upon to evaluate at this juncture is whether there is enough

28

1   similarity between Ms. Harris and other putative collective action members such that the case should

2   proceed as a collective action.

3          Ultimately, the question for the Court is whether or not the DOL/*Portland Terminal* test is

4   capable of being evaluated on a collective basis.  As Judge Conti of this District has noted, "a proper

5   collective action [under the FLSA] encourages judicial efficiency by addressing in a single

6   proceeding claims of multiple plaintiffs who share 'common issues of law and fact arising from the

7   same alleged [prohibited] activity.'"  *Velasquez v. HSBC Fin. Corp.*, 266 F.R.D. 424, 427 (N.D. Cal.

8   2010) (Conti, J.); *see also Smith v. T-Mobile USA, Inc.*, CV 05-5274 ABC (SSx), 2007 U.S. Dist.

9   LEXIS 60729, at *9 (C.D. Cal. Aug. 15, 2007) (noting that, "[w]hile a unified policy, plan, or

10  scheme of discrimination may not be required to satisfy the liberal 'similarly situated' requirement,

11  some identifiable facts or legal nexus must bind the claims so that hearing the cases together

12  promotes judicial efficiency").  As discussed below, for the most part, the factors making up the test

13  can be evaluated on a collective basis – *i.e.*, there is sufficient uniformity.

14  D.    DOL/*Portland Terminal* Test

15         Based on *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947),

16             the Department of Labor's Wage and Hour Division has developed a
               test listing six criteria for determining whether trainees are employees
17             within the meaning of FLSA. . . . It provides:

18                 Whether trainees are employees under the Act, according to the
               WH Administrator, will depend upon all the circumstances
19             surrounding their activities on the premises of the employer. If all six
               of the following criteria apply, the trainees are not employees within
20             the meaning of the Act:

21             * The training, even though it includes actual operation of the facilities
               of the employer, is similar to that which would be given in a
22             vocational school[.]

23             * The training is for the benefit of the trainee[.]

24             * The trainees do not displace regular employees, but work under
               close observation[.]
25
               * The employer that provides the training derives no immediate
26             advantage from the activities of the trainees and on occasion his
               operations may actually be impeded[.]
27
               * The trainees are not necessarily entitled to a job at the completion of
28             the training period[.]

1

* The employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

2

3    *Reich v. Parker Fire Prot. Dist.*, *supra*, 992 F.2d at 1025-26.

4        As the Court noted in its order granting conditional collective action certification, some

5    courts have adopted the DOL test.  *See, e.g.*, *Atkins v. General Motors Corp.*, 701 F.2d 1124, 1127-

6    28 (5th Cir. 1983) (giving substantial deference to Wage and Hour Administrator's approach).

7    Others have not.  *See, e.g.*, *McLaughlin v. Ensley*, 877 F.2d 1207, 1209-10 & n.2 (4th Cir. 1989)

8    (declining to rely on DOL test and instead applying "the general test [of] whether the employee or

9    the employer is the primary beneficiary of the trainees' labor").  Still others have taken a somewhat

10   middle position, stating that the DOL test need not be strictly or rigidly applied and that the totality

11   of the circumstances instead controls whether a trainee should be deemed an employee for purposes

12   of the FLSA.  *See Reich*, 992 F.2d at 1026-27 (noting that "there is nothing in *Portland Terminal* to

13   support an 'all or nothing approach'" and concluding that the six criteria of the DOL test "are

14   relevant but not conclusive").

15       As noted above, the Court has adopted the DOL test but has not stated explicitly whether it

16   favors a strict application of the test or a more flexible application.  Ms. Harris argues for a strict

17   application of the DOL/*Portland Terminal* test instead of a looser application of the test which

18   focuses on the economic realities. For the benefit of the parties, the Court clarifies that it adopts the

19   second approach precisely because its flexibility permits the Court to take into account all the

20   economic realities of the relationship between the alleged employer and the trainees.  Also, as noted

21   by the Tenth Circuit in *Reich*, there is nothing in *Portland Terminal* itself to support an all or

22   nothing approach.

23       Below the Court discusses each of the DOL factors in assessing whether the FLSA claim is

24   capable of being resolved on a collective basis.  As the Court noted at the hearing, each of these

25   factors, except for the last, is evaluated on an objective basis.  In other words, the subjective

26   perceptions of the trainees are basically irrelevant; the focus of the test is on whether the policies

27   and practices of the employer are sufficiently consistent to warrant collective treatment for

28   certification purposes.

United States District Court
For the Northern District of California

1.      Whether Training is Similar to That Given in a Vocational School

Vector argues first that this factor has no application to the instant case because the factor is applicable only where the training includes actual operation of the facilities of the alleged employer. The Court rejects this argument.  It is true that the factor formally states: "The training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school."  However, as noted above, the factors of the test should not be rigidly applied; rather, the question is what are the economic realities of the relationship between the alleged employer and the trainees.  In any event, there is no evidence that Vector's practice in this regard lacks uniformity.

Vector further argues that, although its training may appear Vector/Cutco specific, the skills learned by the trainees are actually fungible, as demonstrated by the fact that "a number of college professors . . . use the Vector training materials as the backbone of college-level courses they teach in general sales and marketing."[4]  Def.'s Mot. at 20.

The problem for Vector is, as discussed above, this is a merits argument.  Vector does not argue that its training in California dramatically differs from site to site.  Indeed, Vector's use of a training manual establishes that there is enough uniformity for this factor to be evaluated on a collective basis.  *See* Docket No. 49 (Matheson Decl. ¶ 10) (stating that the training manual is "distributed to prospective Sales Representatives before and during the Training Programs at independent office locations throughout California").

2.      Whether Training is for Benefit of Trainee

This factor essentially bleeds into the first factor – *i.e.*, the more fungible the skills taught at the training, the more of a benefit there is for the trainee.  Thus, again, there is enough uniformity for this factor to be evaluated on a collective basis.

In its papers, Vector argues that the trainees expressed different opinions as to what benefits they obtained from training, but, as noted above, this factor turns on an objective analysis of the

---

[4] Vector also notes that at least some of the opt-ins indicated that they learned general skills. *See id.* at 21.  But as indicated above, the question of whether the training is similar to that offered in a vocational school is an objective question, not a subjective one.

United States District Court

For the Northern District of California

1  degree of consistency in Vector's policy and practice.  That is, the issue is not what the trainees'

2  subjective impressions of the training were, but rather what was the objective content of the training,

3  *i.e.*, whether it is the type of training that would benefit trainees.  *See also* note 4, *supra*.

4          3.        Whether Trainees Displace Regular Employees

5          There is no dispute between the parties that the trainees do not actually displace regular

6  employees, and therefore this factor is capable of resolution on a collective basis.

7          In her papers, Ms. Harris does make the contention that this factor ultimately weighs in her

8  favor because trainees are being trained to replace the soon-to-be gone Sales Representatives, whose

9  tenures with Vector tend to be very short.  That, however, is ultimately a merits argument.

10          4.        Whether Alleged Employer Derives Immediate Advantage from Trainees'

11                    Activities

12          In her papers, Ms. Harris contends that Vector's advantage comes from the following acts

13  that take place during training: (1) trainees buy sample knife sets; (2) trainees create potential

14  customer lists and set up appointments; and (3) trainees create potential recruit lists which are turned

15  over to their managers.

16          Although Ms. Harris has not provided evidence that Vector had any formal policy requiring

17  trainees, during training, to buy sample knife sets, create potential customer lists and set up

18  appointments, or create potential recruit lists, she has provided evidence that it was a common

19  enough practice for trainees to do so.  More specifically, she has cited to the deposition testimony of

20  the opt-ins.  That testimony reflects that the opt-ins with a fair amount of consistency purchased

21  sample knife sets,[5] *see* Docket No. 340 (Humphrey Decl., Ex. 19) (deposition testimony); that most

22  opt-ins created potential customer lists and set up appointments,[6] *see id.* (Humphrey Decl., Ex. 18)

23  _____

24          [5] That the opt-ins purchased sample knife sets was only reasonable given that a qualified
    sales presentation could not be completed by a Sales Representative without having a sample knife

25  set.  *See* Docket No. 49 (Matheson Decl., Ex F) (Sales Representative Agreement ¶ 6) (providing
    that "Sales Reps shall obtain and utilize a sample kit for demonstration purposes").  Many, although

26  not all, opt-ins specified that the purchase was made during training.

27          [6] Notably, many of the non-opt-ins did the same.  *See, e.g.*, Docket No. 335 (Ex. 1) (Adcock
    Decl. ¶ 12) (stating that he "made phone calls to some of the people on my list of potential

28  customers the third day of the Training Program to begin scheduling appointments to make sales
    presentations"; adding that the appointments were scheduled for a time after he had finished the

United States District Court

For the Northern District of California

1   (deposition testimony); and that most opt-ins created potential recruit lists.  *See id.* (Humphrey

2   Decl., Ex. 20) (deposition testimony).  Accordingly, the Court concludes that there is sufficient,

3   albeit not complete, uniformity to suggest a common practice by Vector to ask trainees for these

4   items.  Hence, this factor may be evaluated on a collective basis.

5          The Court emphasizes that, in so concluding, it is not make any ruling on the merits – *i.e.*,

6   Vector is not precluded from arguing that none of the above acts constituted an *immediate* advantage

7   to Vector such that this factor ultimately weighs in its favor.  *See* Def.'s Mot. at 25 (arguing that

8   "[t]he only benefit occurs when the appointment is actually fulfilled, which is invariably after

9   training, *and* if a sale is made, which again is invariably after training") (emphasis in original);

10  Docket No. 295 (Mot. at 6-9) (arguing that there is no immediate benefit where, *e.g.*, a trainee is not

11  productive until after the training is over, or a trainee's work is supervised on the job and does not

12  obviate the need for regular employees' work, or a trainee's work is a de minimis benefit).  But

13  again, that is a merits argument, and the issue at this juncture is simply whether there is sufficient

14  uniformity such that the factor may be evaluated on a collective basis.

15         5.      Whether Trainees Are Necessarily Entitled to a Job

16         In her papers, Ms. Harris contends that this factor is conductive to consideration on a

17  collective basis because all fifty opt-ins deposed by Vector testified that they were presented with a

18  _____

19  training); *id.* (Ex. 9) (Burkhardt Decl. ¶ 11) (stating that, "[d]uring the second day of the Training
    Program, I wrote down a list of potential customers" and, "[o]n the following day of the Training

20  Program, I made phone calls to some of these people on my list to introduce myself and to begin
    scheduling appointments to make sales presentations"); *id.* (Ex. 24) (Golding Decl. ¶¶ 11-12)

21  (stating that, "[d]uring the second day of the Training Program, I wrote down a list of potential
    customers" and that "I made phone calls to the people on my list of potential customers after the

22  second day of training at home to practice calling up potential customers, to further refine the skill
    of building rapport that I learned in training, and to set up my initial sales appointment with people I

23  knew well"); *id.* (Ex. 35) (Lambros Decl. ¶¶ 12-13) (stating that, "[d]uring the second day of the
    Training Program, I created a list of prospective and potential customers" and that "I made phone

24  calls to the people . . . after the end of the second day of the training session to begin scheduling
    appointments to make sales presentations").

25         In its papers, Vector emphasizes that, with respect to the opt-ins, the potential customer lists

26  were not always turned over to the managers.  Vector thus argues that there is not sufficient
    uniformity.  However, even if there were a lack of uniformity as to this particular fact, there would

27  still be a benefit to Vector even if customer lists were not turned over to the managers if the trainees
    made appointments off these lists during training.  As discussed below, the Court does not make any

28  determination as to whether this benefit constitutes an *immediate* advantage for purposes of the
    DOL/*Portland Terminal* test, but there is evidence of some degree of consistency in this regard.

United States District Court

For the Northern District of California

1  Sales Representative Agreement.  Vector does not dispute this.  It argues, however, that there is

2  "direct evidence that those who complete training do not *necessarily* become sales representatives[;]

3  [o]ver 10% of those who complete training do not become Vector Sales Reps."  Def.'s Mot. at 26

4  (emphasis in original) (citing Docket No. 151) (Matheson Decl. ¶ 5).  Vector also notes that there

5  are other indications that trainees are not necessarily entitled to a job – *e.g.*, 55% of the people

6  invited to training do not show up, and 45% of the people who start training do not finish it.  *See id.*

7  (citing Docket No. 151) (Matheson Decl. ¶ 5).

8     The Court concludes that there is sufficient evidence that Vector had a common practice of

9  presenting trainees who completed the training to be presented with a Sales Representative

10  Agreement.  Vector's evidence does not negate this.  Even if more than 10% of the trainees who

11  finished the training did not go on to become Sales Representatives, that does not mean that Vector

12  did not offer those trainees jobs as Sales Representatives; they may have left on their own volition.

13  Vector has not provided any evidence that it rejected trainees who completed the training.  Even if

14  trainees could be rejected, *e.g.*, for drug use or dishonesty as contended at the hearing, this would

15  not disprove there was a consistent practice capable of collective evaluation.

16     6. <u>Whether Alleged Employer and Trainees Understand that Trainees Are Not Entitled</u>

17       <u>to Wages for Training Time</u>

18     As noted above, this is the only DOL factor that turns on subjective, rather than objective

19  evidence.  Nevertheless, at least part of this factor may be evaluated on a collective basis because

20  there is no dispute that Vector itself understood that trainees would not be entitled to wages for their

21  training time.  Vector contends, however, that ultimately this factor cannot be evaluated on a

22  collective basis because, as reflected by the deposition testimony of the opt-ins, there was no

23  common understanding on the part of the trainees: 34% of the opt-ins testified that they thought they

24  would be compensated, 30% of the opt-ins testified that they would not be, and 36% testified that

25  they were not sure.  *See* Docket No. 339 (Saad Decl., Ex. A2-a).  In her papers, Ms. Harris concedes

26  that the testimony of the opt-ins is "inconsistent."  Pl.'s Opp'n at 18.

27     While Vector has demonstrated a lack of uniformity with respect to the understanding of the

28  trainees, the Court does not find this problem to be so overwhelming that the FLSA claim, as a

15

whole, cannot be evaluated on a collective basis.  As Ms. Harris points out, this is but one factor in

the six-factor DOL test.  Moreover, the Court notes that, even the understanding of the trainees may

be subject to some collective analysis because there is evidence that all trainees were given Vector's

"Skills for Life" brochure, which expressly states that there is no compensation for time spent in

training.

       7.    <u>Summary</u>

      As reflected by the above, the DOL/*Portland Terminal* factors are largely susceptible to

collective treatment.  Moreover, even if the *Donovan* test applied, the degree of control exerted by

Vector over trainees during the training period – a key factor under the *Donovan* test – appears to be

a matter of consistent practice and policy and thus would also susceptible to collective treatment.

The Court therefore grants final certification with respect to the claim that Vector failed to pay

trainees minimum wages for the time spent in initial training in violation of the FLSA.  The Court

notes that final certification is appropriate even taking into account that, assuming trainees are

employees, an inquiry must still be made under 29 C.F.R. § 785.27 as to whether the training time

should be counted as working time.[7]  This is because, under the regulation, four specific criteria

must be met in order for training time not to be counted as working time, and at least three of the

four criteria ((a), (c), and (d)) may be evaluated on a collective basis.  Notably, in its papers, Vector

---

[7] The regulation provides:

> Attendance at lectures, meetings, training programs and similar activities need *not* be counted as working time if the following four criteria are met:
>
> (a)    Attendance is outside of the employee's regular working hours;
>
> (b)    Attendance is in fact voluntary;
>
> (c)    The course, lecture, or meeting is not directly related to the employee's job; and
>
> (d)    The employee does not perform any productive work during such attendance.[]

29 C.F.R. § 785.27 (emphasis added).

United States District Court<br>For the Northern District of California

**United States District Court**
For the Northern District of California

1   did not make any specific argument that the § 785.27 criteria may not be evaluated on a collective

2   basis.

3          To the extent Vector argues that fairness and procedural concerns weigh against final

4   certification, its argument is not persuasive.  For example, Vector's argument that the Court should

5   take into account that Vector's entire business model would be nullified if Vector were found liable

6   is not convincing, especially since the case that Vector relies on, *Bateman v. American*

7   *Multi-Cinema, Inc.*, 252 F.R.D. 647 (C.D. Cal. 2008), was recently overruled by the Ninth Circuit.

8   *See Bateman v. American Multi-Cinema, Inc.*, No. 09-55108, 2010 U.S. App. LEXIS 19934 (9th Cir.

9   Sept. 27, 2010).  The financial burden upon the defendant should the plaintiff prove a collective

10  FLSA violation is not a valid reason to deny certification.

11  E.     Statute of Limitations

12         As a final point, the Court takes note that a new issue has been raised by Vector in its

13  opposition to Ms. Harris's motion for final collective action certification – *i.e.*, that the class period

14  should start from August 2, 2008, rather than from April 15, 2006, as Ms. Harris desires.  Vector

15  argues that August 2, 2008, is the proper beginning date for the class period because, in a FLSA

16  collective action, there is a two-year statute of limitations, and while the statute of limitations for a

17  *named* plaintiff runs from the date that the plaintiff files the complaint, the limitations period for an

18  *opt-in* plaintiff runs from the opt-in date, which here was August 2, 2010.  *See* 29 U.S.C. §§ 255(a),

19  256(b).  Vector concedes that a longer statute of limitations – three years – is available where there

20  is a willful violation*, see id.* § 255(a), but here, Vector asserts, there is no evidence of a willful

21  violation.

22         The Court rejects Vector's position.  As Vector admits in a footnote in its opposition brief,

23  *see* Def.'s Opp'n at 20 n.10, it entered into a stipulation (in April 2009), which was later formalized

24  as an order, providing that,

25              [f]or purposes of the statute of limitation, to the extent that Plaintiff
             moves for conditional class certification under the Federal Fair Labor
26           Standards Act on behalf of the FLSA Class, any class conditionally
             certified as a result of said motion shall be certified with a class period
27           start date of April 15, 2006.

28

United States District Court
For the Northern District of California

1  Docket No. 32 (stipulation and order).  Given the strict language of the stipulation, the Court holds

2  Vector to the April 15, 2006, start date.

3        Vector argues still that the stipulation should not be given any effect given the particular

4  circumstances – *i.e.*, the stipulation was entered into only so that Ms. Harris and the potential

5  collective action members would not be prejudiced as a result of any delay associated with Vector's

6  filing of an early summary judgment motion.  Vector notes that the stipulation states that "Plaintiff

7  desires to *timely* seek conditional certification under the Federal Fair Labor Standards Act on behalf

8  of the FLSA Class," *id.* (emphasis added), and here Ms. Harris did not timely move for conditional

9  certification after the resolution of the summary judgment motion.  Therefore, according to Vector,

10  the stipulation should have no force.  While Vector's position is not without some merit, Vector

11  could have asked for relief from the stipulation based on Ms. Harris's delay but it never did so.

12  Furthermore, Vector has not shown sufficient cause to be relieved of its stipulation with Ms. Harris.

13  F.    Final Certification

14        Accordingly, the Court grants Ms. Harris's motion for final certification and denies Vector's

15  cross-motion to certify.  The Court certifies as a collective action Ms. Harris's FLSA claim.  The

16  FLSA class is defined as all individuals who worked for Vector in the state of California as Sales

17  Representatives from April 15, 2006, through May 12, 2010.

18                          **IV.    RULE 23 MOTIONS**

19        In her Rule 23 motion, Ms. Harris seeks class certification for the following state claims

20  only: (1) failure to pay for initial training (California Labor Code § 1197); (2) failure to reimburse

21  expenses (California Labor Code § 2802); (3) violation of PAGA, based on the failure to reimburse

22  and the coerced purchase of the sample knife set; and (4) unfair competition based on the coerced

23  purchase of the sample knife set (California Business & Professions Code § 17200).[8]  Vector, in its

24  own Rule 23 motion, asks the Court to deny class certification.

25

26  _____

27        [8] Ms. Harris is not moving for class certification with respect to the California Labor Code
     §§ 226 and 201/203 claims, *see* Pl.'s Mot. at 1 n.2 – apparently, not even to the extent she may have

28  a claim for injunctive relief (as opposed to damages which the Court dismissed at the summary
     judgment phase).

**United States District Court**
For the Northern District of California

A.      Legal Standard

Rule 23 governs class actions.  Under this rule, a class action may be maintained only if: (1) each of the requirements of Rule 23(a) is satisfied, and (2) one of the requirements of Rule 23(b) is satisfied.  Under Rule 23(a),

> [o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1)    the class is so *numerous* that joinder of all members is impracticable;
>
> (2)    there are questions of law or fact *common* to the class;
>
> (3)    the claims or defenses of the representative parties are *typical* of the claims or defenses of the class; and
>
> (4)    the representative parties will fairly and *adequately* protect the interests of the class.

Fed. R. Civ. P. 23(a) (emphasis added).

As for Rule 23(b), Ms. Harris is asking for certification pursuant to subdivision (3), presumably because the primary relief being sought on behalf of the class is damages.  Under Rule 23(b)(3), a class action may be maintained if

> the court finds that the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
> (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3) (emphasis added).

**B.      Claims Related to Training v. Post-Training Claim**

Before embarking on a Rule 23(a) and (b) analysis, the Court notes, as a preliminary matter, that a distinction should be made between (1) claims related to the initial training and (2) the post-training claim.

The claims related to the initial training are as follows: the claim for failure to pay minimum wages for the initial training, *see* Cal. Lab. Code § 1197; the claim for unfair competition based on the failure to pay minimum wages for the initial training and for the coerced purchase of the sample knife set,[9] *see id.*; the claim for violation of PAGA based on the coerced purchase of the sample knife set, *see* Cal. Lab. Code § 2698 *et seq.*; and the claim for failure to reimburse to the extent based on the coerced purchase of the sample knife set.  *See* Cal. Lab. Code § 2802.  There is only one post-training claim remaining in this action – the claim for failure to reimburse expenses incurred once Sales Representatives actually started selling knives.  *See id.*

The Court draws a distinction between the above claims because, even though certification generally should be approached on a claim-by-claim basis, *see Bertulli v. Independent Ass'n of Cont'l Pilots*, 242 F.3d 290, 296 (5th Cir. 2001) (stating that "[a] class should be certified on a claim-by-claim basis"), as a practical matter, the claims related to the training may be evaluated together as each involves the predicate question of whether trainees should be deemed employees for purposes of California law.  The post-training claim is different because, there, the issue is not whether *trainees* should be deemed employees but rather whether *Sales Representatives* should be deemed employees – a predicate to its substantive claim for reimbursement for expenses incurred under California Labor Code § 2802.

With respect to the issue of whether *Sales Representatives* (as opposed to trainees) should be deemed employees, the parties agree that the appropriate test to use under California law is the *Borello* test, where the principal question is "'whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.'"  *S.G. Borello &*

---

[9] According to Ms. Harris, the coerced purchase of the sample knife set took place during training.  Therefore, claims based on the coerced purchase relate to the initial training.

United States District Court

For the Northern District of California

*Sons, Inc. v. Department of Indus. Relations*, 48 Cal. 3d 341, 350 (1989).  In addition to the factor of the right to control, other factors that are considered include

> (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship.

*Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1, 10 (2007) (noting that "there are a number of additional factors in the modern equation").

The parties dispute, however, what the appropriate test is for the issue of whether *trainees* should be deemed employees.  According to Vector, the *Borello* test is still applicable.  According to Ms. Harris, an eleven-factor test adopted by the California Division of Labor Standards Enforcement ("DLSE") – six of which are the same as the factors used in the DOL/*Portland Terminal* test – is the proper test.[10]  *See* DLSE Op. 1998.11.12, at 1-2.

---

[10] The five additional factors are as follow.

> (6)   The employer and the trainees or students understand that the trainees or students are not entitled to wages for the time spent in training.

> (7)   Any clinical training is part of an educational curriculum.

> (8)   The trainees or students do not receive employee benefits.

> (9)   The training is general, so as to qualify the trainees or students for work in any similar business, rather than designed specifically for a job with the employer offering the program. In other words, on completion of the program, the trainees or students must not be fully trained to work specifically for only the employer offering the program.

> (10)  The screening process for the program is not the same as for employment, and does not appear to be for that purpose, but involves only criteria relevant for admission to an independent educational program.

21

United States District Court

For the Northern District of California

The Court does not agree with either Vector or Ms. Harris.  Vector's position is problematic because many of the factors in the *Borello* test are largely inapplicable in a training situation.  *Cf.* Docket No. 176 (Order at 5) (rejecting application of *Donovan* test for FLSA claim because "some of the factors make little sense in a training situation – *e.g.*, the worker's opportunity for profit or loss").  Moreover, at least one state court has characterized *Borello* as an economic realities test. *See JKH Enters., Inc. v. Department of Industrial Relations*, 142 Cal. App. 4th 1046, 1054 (2006). Under an economic realities approach as applied to trainees, the issue is not what are the economic realities of the relationship between Vector and its Sales Representatives, but rather what are the economic realities of the relationship between Vector and its trainees.  As previously noted,  the DOL/*Portland Terminal* test uses factors geared toward the latter.  For reasons similar to why the Court applies the DOL/*Portland Terminal* test rather than the *Donovan* test to trainees, it refuses to apply the *Borello* test to this context.

On the other hand, Ms. Harris's position is not entirely correct either.  Notably, in a DLSE opinion letter issued approximately six months ago, the DLSE rejected the previously used eleven-factor test and concluded that the DOL/*Portland Terminal* six-factor test should be used.  *See* DLSE Op. 2010.04.07, at 4.  This Court adopts the approach of the DLSE in that recent opinion letter – *i.e.*, it shall apply the DOL/*Portland Terminal* test in determining whether Vector's trainees should be deemed employees.

To the extent Vector argues that the DLSE's opinion should not be given any deference, the Court agrees that the opinion is not controlling.  However, DLSE opinions "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Bell v. Farmers Ins. Exchange*, 87 Cal. App. 4th 805, 815 (2001) (internal quotation marks omitted); *see also Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 563 (2007) (noting that DLSE

---

(11)   Advertisements for the program are couched clearly in terms of education or training, rather than employment, although the employer may indicate that qualified graduates will be considered for employment.

DLSE Op. 1998.11.12, at 2.

United States District Court

For the Northern District of California

1    advice and opinion letters are "entitled to no deference" but adding that "this court may adopt the

2    DLSE's interpretation if we independently determine that it is correct").  Here, the DLSE reasonably

3    adopted the DOL/*Portland Terminal* test because "the similar definitions for 'employee' and

4    'employ' under the FLSA and State law manifest a consistency which warrants similar

5    interpretation."   DLSE Op. 2010.04.07, at 4.

6    C.      Certification for Claims Related to Training

7            For the claims related to the initial training, the Court concludes that certification is

8    appropriate.  Both the Rule 23(a) and 23(b) requirements have been met.

9            1.      Rule 23(a)

10           As noted above, the Rule 23(a) requirements are (1) numerosity, (2) adequacy, (3) typicality,

11   and (4) commonality.

12                  a.      Numerosity

13           In the instant case, Vector has not contested numerosity.  *See* Def.'s Mot. at 2 (stating that

14   "[t]he only [Rule 23(a) requirement Ms. Harris] can meet is numerosity").  Moreover, there is

15   sufficient evidence supporting numerosity – *i.e.*, the number of FLSA class notices that were issued,

16   not to mention the number of FLSA opt-ins.  *See James v. City of Dallas*, 254 F.3d 551, 570 (5th

17   Cir. 2001) (stating that, "[t]o satisfy the numerosity prong, a plaintiff must ordinarily demonstrate

18   some evidence or reasonable estimate of the number of purported class members") (internal

19   quotation marks omitted).  Although the Rule 23 motion is for the state claims only, and not the

20   FLSA claim, the FLSA claim provides a good benchmark for numerosity, particularly because the

21   state claim for unpaid training time is based on the same set of facts as the FLSA claim for unpaid

22   training time.

23                  b.      Adequacy

24           Here, Vector contests both the adequacy of Ms. Harris and her counsel.  Vector's challenge

25   to Ms. Harris is based on her alleged lack of credibility.  Vector's challenge to Ms. Harris's counsel

26   is based on "their blatant failure to verify the veracity of [Ms.] Harris'[s] statements and/or their

27   implicit condoning of her false statements."  Def.'s Mot. at 11.  Vector also makes an argument that,

28

United States District Court

For the Northern District of California

1   even if Ms. Harris's credibility is not a problem, she is still an inadequate representative with respect

2   to Sales Representatives who were younger than eighteen years old during the relevant period.

3                                       i.      Credibility of Ms. Harris

4           The Court agrees with Vector that Ms. Harris's credibility may be a relevant consideration

5   with respect to the adequacy analysis.  As noted by one court, "[t]he honesty and credibility of a

6   class representative is a relevant consideration when performing the adequacy inquiry 'because an

7   untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims.'"  *Searcy v.*

8   *eFunds Corp.*, No. 08 C 985, 2010 U.S. Dist. LEXIS 31627, at *15 (N.D. Ill. Mar. 31, 2010); *see*

9   *also In re Computer Memories Secs. Litig.*, 111 F.R.D. 675, 682 (N.D. Cal. 1986) (Lynch, J.)

10  (stating that "it is self-evident that a Court must be concerned with the integrity of individuals it

11  designates as representatives for a large class of plaintiffs").  Furthermore, "'[a] class is not fairly

12  and adequately represented if class members have antagonistic or conflicting claims,' and a plaintiff

13  with credibility problems may be considered to have interests antagonistic to the class."  *Ross v. RBS*

14  *Citizens, N.A.*, No. 09 CV 5695, 2010 U.S. Dist. LEXIS 107779, at *13 (N.D. Ill. Oct. 8, 2010).

15          That being said, "[c]redibility problems do not automatically render a proposed class

16  representative inadequate."  *Ross*, 2010 U.S. Dist. LEXIS 107779, at *14; *see also In re Computer*

17  *Memories*, 111 F.R.D. at 682 (stating that "questions of personal integrity are but one factor the

18  Court must consider in making the adequacy determination.").  "Only when attacks on the credibility

19  of the representative party are so sharp as to jeopardize the interests of absent class members should

20  such attacks render a putative class representative inadequate."  *Lapin v. Goldman Sachs & Co.*, 254

21  F.R.D. 168, 177 (S.D.N.Y. 2008) (internal quotation marks omitted).  There is "inadequacy only

22  where the representative's credibility is questioned on issues directly relevant to the litigation or

23  there are confirmed examples of dishonesty, such as a criminal conviction for fraud."  *Ross*, 2010

24  U.S. Dist. LEXIS 107779, at *14; *see also Gooch v. Life Investors Ins. Co. of Am.*, 264 F.R.D. 340,

25  349 (M.D. Tenn. 2009) (stating that "[a]ny issues of the Plaintiff's credibility should be tied to his

26  claims in this action"; adding that the inquiry "'into the representatives' personal qualities is not an

27  examination into their moral righteousness, but rather an inquiry directed at improper or

28  questionable conduct arising out of or touching upon the very prosecution of the lawsuit'"); *Del*

1  *Campo v. American Corrective Counseling Servs., Inc.*, No.: C 01-21151 JW (PVT), 2008 U.S. Dist.

2  LEXIS 106837 (N.D. Cal. May 12, 2008) (stating that, "'[g]enerally, unsavory character or

3  credibility problems will not justify a finding of inadequacy unless related to the issues in the

4  litigation'").

5      In the instant case, Vector argues that there are credibility issues with Ms. Harris that are

6  directly relevant to the litigation.  According to Vector, Ms. Harris has lied about, in particular, (1)

7  Vector's level of control over her (no telephone calls with her managers, no reading from the

8  manual, and not calling her managers during the presentations) and (2) the people to whom she

9  made presentations (never made several presentations).  Notwithstanding Ms. Harris's arguments to

10  the contrary, there are credibility problems here, as discussed below.  But these credibility problems

11  are not directly relevant *to the claims related to the training*.  As discussed above, the Court is not

12  applying the *Borello* test – where the right to control is a key factor – to the claims related to the

13  training.  Both (1) and (2) above are not directly relevant to the claims related to the training because

14  they concern Ms. Harris's conduct post-training.  Therefore, credibility problems regarding Vector's

15  level of control does not render Ms. Harris an inadequate representative.

16      For the claims related to training, therefore, the Court does not find there to be a credibility

17  problem that should bar Ms. Harris from being a fair and adequate representative.  Moreover, the

18  Court concludes that Ms. Harris has made an adequate showing that she will be a fair and adequate

19  representative as to these claims.  She has participated in this litigation, and there do not appear to be

20  any conflicts between Ms. Harris and the putative class.

21      To the extent Vector argues that Ms. Harris cannot be a fair and adequate representative for

22  Sales Representatives who were younger than eighteen during the relevant period, the Court

23  disagrees.  Ms. Harris would be an inadequate representative only if there were a conflict between

24  her interests and those of Sales Representatives younger than eighteen.  *See Corley v. Entergy Corp.*,

25  220 F.R.D. 478, 483 (E.D. Tex. 2004) (noting that "'[d]ifferences between named plaintiffs and

26  class members render the named plaintiffs inadequate representatives only if those differences create

27  conflicts of interest between the named plaintiffs' interests and the class members' interests'");

28

United States District Court

For the Northern District of California

1    *Cobell v. Norton*, 213 F.R.D. 43, 45 (D.D.C. 2003) (indicating that inadequate representation issues

2    arise where there is a potential or actual conflict between the representative and the class members).

3       Here, there is no evidence that there would be any conflict.  For example, for the claims for

4    failure to reimburse, violation of PAGA, and unfair competition (all based on the coerced purchase

5    of the sample knife set), there is absolutely no difference between Ms. Harris's interests and the

6    interests of Sales Representatives younger than eighteen.

7       As for the claim for failure to pay for initial training, there is no conflict either.  It is true that

8    California "state minimum wage laws specifically exclude outside salesmen from coverage," *Grubb*

9    *& Ellis Co. v. Spengler*, 143 Cal. App. 3d 890, 897 (1983), and outside salesperson has been defined

10   as "'any person, 18 years of age or over, who customarily and regularly works more than half the

11   working time away from the employer's place of business selling tangible or intangible items or

12   obtaining orders or contracts for products, services or use of facilities.'" *Ramirez v. Yosemite Water*

13   *Co.*, 20 Cal. 4th 785, 795 (1999) (quoting Wage Order No. 7-80, 2(I)).  But as Ms. Harris points out,

14   she is not asking for compensation for time spent working as a Sales Representative; rather, she is

15   seeking only compensation for time spent in training and therefore the outside salesperson

16   exemption is irrelevant.

17                ii.     Competence of Ms. Harris's Counsel

18       Because Ms. Harris's credibility problems do not render her inadequate for the claims related

19   to the training, the Court reject Vector's argument that her counsel is also inadequate.  The Court

20   also deems counsel adequate based on the information provided by Ms. Harris regarding counsel's

21   experience.  For example, the Marlin & Saltzman law firm has represented plaintiffs in class actions

22   and complex litigation for some fifteen years.  Many of these cases were employment-related actions

23   and involved a significant settlement in favor of the class.  *See* Docket No. 329 (Saltzman Decl. ¶¶

24   3-4, 7).

25          c.     Commonality/Typicality

26          The commonality and typicality requirements of Rule 23(a) tend to
merge.  Both serve as guideposts for determining whether under the

27          particular circumstances maintenance of a class action is economical
and whether the named plaintiff's claim and the class claims are so

28

1

2

> interrelated that the interests of the class members will be fairly and
> adequately protected in their absence.

3  *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 158 n.13 (1982).

4         For the claims related to the initial training, the commonality/typicality requirements are

5  easily met.  These claims all share a common question of law -- *i.e.*, whether the trainees should be

6  deemed employees under California law.  Moreover, the facts to be analyzed with respect to this

7  legal question are largely the same, as discussed above with respect to the FLSA motions.

8         2.      Rule 23(b)(3)

9         For Rule 23(b)(3), Ms. Harris must make a sufficient showing of (1) predominance and (2)

10  superiority.

11              a.      Predominance

12         "'The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

13  cohesive to warrant adjudication by representation.'"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

14  1022 (9th Cir. 1998).  "Implicit in the satisfaction of the predominance test is the notion that the

15  adjudication of common issues will help achieve judicial economy."  *Valentino v. Carter-Wallace,*

16  *Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  "When common questions present a significant aspect of

17  the case and they can be resolved for all members of the class in a single adjudication, there is clear

18  justification for handling the dispute on a representative rather than on an individual basis."  *Hanlon*,

19  150 F.3d at 1022.

20         In the instant case, common questions predominate for the claims related to the initial

21  training.  As noted above, for all of these claims there is a common question of law – *i.e.*, whether

22  the trainees should be deemed employees under California law – and the facts to be analyzed with

23  respect to this legal question are largely the same.  As to nearly all the six DOL/*Portland Terminal*

24  factors, common questions predominate.  Even though the predominance requirement of Rule

25  23(b)(3) is more rigorous than the "similarly situated" test of the FLSA, based on the above analysis

26  of the DOL/*Portland Terminal* factors, the Court concludes the Rule 23(b)(3) requirement is met.

27

28

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    b.    Superiority

2        Finally, given the predominance of a common question of law and facts, the Court concludes

3    that a class action is superior to other available methods for fairly and efficiently adjudicating the

4    claims related to the initial training.

5        In its papers, Vector argues that a superior way of proceeding would be to deny Rule 23

6    certification and to have the state law claims (including the claims related to the initial training)

7    prosecuted as part of the FLSA collective action – in effect, there would be no Rule 23 certification

8    with its opt-out procedure under Rule 23(b)(3).  The main opinion relied upon by Vector is Judge

9    Walker's opinion in *Leuthold v. Destination Am.*, 224 F.R.D. 462 (N.D. Cal. 2004).

10       While some courts have followed Judge Walker's approach in *Leuthold*, *see, e.g.*,

11   *Campanelli v. Hershey Co.*, No. C 08-1862 BZ, 2010 U.S. Dist. LEXIS 92364, at *15 (N.D. Cal.

12   Aug. 13, 2010), a number of courts have allowed both a FLSA collective action and a Rule 23 class

13   action for any state law claims.  *See Lindsay v. Government Emples. Ins. Co.*, 251 F.R.D. 51, 57

14   (D.D.C. 2008) (citing cases).

15       Having considered the various decisions, this Court declines to follow *Leuthold* in this case.

16   First, the parties do not dispute that the FLSA claim here does not preempt the state law claims.  Yet

17   if the Court were to require this case to be prosecuted solely under the FLSA, it would in practical

18   terms have a preemptive effect on the state law claims.  *See Cortez v. Nebraska Beef, Ltd.*, 266

19   F.R.D. 275, 294 (D. Neb. 2010).  To the extent Vector disputes this effect on the ground that the

20   state law claims are still substantively preserved, only procedurally altered, it ignores the fact that

21   the procedural difference between the FLSA and Rule 23 is significant.  Given the likely difference

22   in class sizes between an opt-in FLSA class and an opt-out Rule 23 class, the rights of the class as a

23   whole to prosecute the state claims would be substantially diminished were Rule 23 class

24   certification denied as a result of FLSA certification.  The likely practical effect of denial of Rule 23

25   certification is that the state wage claims, which are substantively different and broader than the

26   FLSA claim, will be dropped.

27       Second, were FLSA certification to bar Rule 23 certification of state claims, claimants with

28   rights under both the FLSA and state law would be faced with a trilemma.  They must either:  (1)

28

United States District Court

For the Northern District of California

1   forego their FLSA claims altogether in contravention of the remedial purposes of the FLSA; (2)

2   forego their state wage claims in violation of the spirit of the savings claims of the FLSA, *see* 29

3   U.S.C. § 218(a) (permitting states and municipalities to enact stricter wage and hour laws); or (3)

4   split their claims and prosecute their state claims via class action in state courts while maintaining

5   their FLSA claims in federal court, resulting in a multiplicity of actions.  It is highly doubtful that

6   Congress in establishing the FLSA certification procedure would have intended such perverse

7   consequences.

8           Third, a paradoxical result would obtain if the Court were to deny Rule 23 certification

9   simply because of the existing FLSA claim.  Plaintiffs bringing *only* state claims under Rule 23

10  would be afforded greater rights than those who bring both state claims *and* FLSA claims.  That

11  paradox cannot be fully rationalized by the contention that those employees who fail to opt-in under

12  FLSA have indicated their conscious refusal to participate in a Rule 23 class action.  As the court in

13  *Cortez* noted, "there may be a number of reasons the employees failed to opt-in to the action that had

14  nothing to do with a belief they were not actually aggrieved."  *Id.*  Here, the state law claims are

15  substantively more expansive than the FLSA claim – *i.e.*, they go beyond the failure to pay wages

16  for the initial training.  Therefore, a Sales Representative's decision not to opt-in to the FLSA claim

17  is not necessarily an indication that he or she does not want to participate in a lawsuit involving

18  different substantive claims.  Furthermore, inadvertence, as opposed to a conscious decision not to

19  participate, is a likely factor in opt-in situations.  Fear of retaliation is another possibility.

20          Fourth, *Leuthold* notably rests in part on Judge Walker's determination that there was

21  significant hostility to the lawsuit amongst the potential class members.  But, in the instant case,

22  there is at most hostility exhibited by the Sales Representatives whose declarations Vector

23  submitted.  It is hard to say that, based on these fifty plus declarations, there is significant hostility

24  with respect to the class as a whole, which numbers over 40,000 people.

25          Fifth, with more than 5,000 opt-ins to the FLSA class, it is hard to argue that the state law

26  claims so predominate that supplemental jurisdiction should be rejected – another part of the

27  reasoning underpinning Judge Walker's decision in *Leuthold*.  The number of opt-ins here is

28  substantial.  Moreover, the question of whether state law claims predominate for purposes of

supplemental jurisdiction ultimately turns on "the type of claim, not the number of claimants." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 162 (S.D.N.Y. 2008); *see also Lindsay*, 448 F.3d at 425 n.12 (stating that, "[i]f 'state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals'").

Finally, the Court notes that at least some courts have rested their decisions on whether to certify on whether the state law claims were originally brought in state court. If the state law claims were originally brought in state court, then that would favor certification of a Rule 23 class. As explained by one court:

> Origination of the suit is an important factor because of the difference between Rule 23's "opt-out" requirement and Section 216(b)'s "opt-in" requirement. In *Riddle*, the Court was concerned that such a difference would create a scenario in which "the Rule 23 class would likely dwarf the FLSA class, making the state law claims dominate the federal suit." This result would undermine Congress' intent in enacting the FLSA's opt-in requirement by letting plaintiffs into federal court through the state law wage claims, even when plaintiffs did not take action to get there. Here, the plaintiffs brought their IMWL and IWPCA claims in federal court rather than state court, thereby creating the potential for the scenario we were concerned about in *Riddle*.

*Ervin v. OS Rest. Servs.*, No. 08 C 1091, 2009 U.S. Dist. LEXIS 56062, at *5-6 (N.D. Ill. Mar. 2, 2009). In the instant case, Ms. Harris initially filed in state court. In view of this fact and the number and breadth of the state claims asserted herein, to deny Rule 23 certification because of FLSA certification would allow the FLSA tail to wag the state claim dog.

Vector has raised an objection based on manageability. While manageability is a concern where there is both an opt-in and an opt-out procedure and an attendant risk that class notices might be perceived as contradictory, the confusion can be dealt with by a carefully worded Rule 23 class notice. The fact that the FLSA class notice has already issued in the instant case will substantially lessen the confusion.

### 3.   Certification

For the foregoing reasons, the Court concludes that, for all claims related to the initial training, Ms. Harris has made an adequate showing that the requirements of Rule 23(a) and 23(b)(3)

United States District Court

For the Northern District of California

1   have been satisfied.  Accordingly, the Court grants the request for certification of a Rule 23(b)(3)

2   class with respect to the claims related to the training period.  The class is defined as all individuals

3   who worked for Vector in the state of California as "Sales Representatives" from October 15, 2004

4   through the date of the class notice.  *Cf.* Docket No. 304 (Order at 5-6) (agreeing with approach of

5   Judge Armstrong to end the class period on the date of the class notice).

6   D.      Certification for Post-Training Claim

7            While, for the reasons stated above, the Court certifies for class action treatment the claims

8   related to the initial training, the Court denies certification with respect to the post-training claim,

9   *i.e.*, that part of the § 2802 claim based on expenses incurred as a Sales Representative.  For the

10  post-training claim, the Court concludes that there are problems with adequacy, commonality,

11  predominance, and superiority.

12           1.      Adequacy

13           With respect to the post-training claim, there are significant credibility problems with Ms.

14  Harris.  As noted above, for the post-training claim, the *Borello* test is applicable, and, under the

15  *Borello* test, the principal question is "'whether the person to whom service is rendered has the right

16  to control the manner and means of accomplishing the result desired.'"  *Borello*, 48 Cal. 3d at 350.

17  During her deposition, Ms. Harris testified about Vector's level of control over her, stating, *e.g.*, that

18  every day either she would call her manager or her manager would call her, with each conversation

19  lasting five to ten minutes.  *See* Docket No. 339 (Wilson Decl., Ex. M-2) (Harris Depo. at 87).  But

20  Ms. Harris was never able to provide any telephone records supporting this testimony.  As Vector

21  points out, her T-Mobile phone records show no calls being made to or received from her managers.

22  *See id.* (Wilson Decl. ¶ 3).  Ms. Harris's suggestion that she could have used a Boost Mobile phone

23  to communicate with her managers is not substantiated.  *See id.* (Sprint Custodian of Records Decl.

24  ¶¶ 5-6) (stating that no account existed for Ms. Harris).  While there is evidence that Ms. Harris

25  exchanged text messages with her managers via her T-Mobile phone, she did not testify about the

26  text messages, which are a far different matter from a five- to ten-minute phone calls.  Moreover,

27  there was no text messaging on a daily basis.  *See* Docket No. 343 (Humphrey Decl., Ex. 34) (text

28  messaging records).  Furthermore, there were credibility issues raised about her testimony regarding

United States District Court

For the Northern District of California

1    her sales presentations.  For example, Vector obtained testimony from persons to whom Ms. Harris

2    allegedly made presentations.  Several of these persons testified that Ms. Harris never made

3    presentations to them; others testified that she never, during the presentations, read word-for-word

4    from the training manual or called her managers, as she claimed during her deposition.

5            2.    <u>Commonality</u>

6            Another issue is whether there is sufficient commonality with respect to the *Borello* test, in

7    particular, the right-to-control factor.  The Court agrees with Ms. Harris that "it is the right to

8    control, not the exercise of the right, which bears on the status of the work arrangement."  *Borello*,

9    48 Cal. 3d at 357 n.9.  However, the Court does not agree with Ms. Harris that there is sufficient

10   commonality simply because the Sales Representative Agreement gives Vector the authority to

11   terminate the Agreement for good cause.  *See* Docket No. 37 (Arlie Decl., Ex. D) (Sales

12   Representative Agreement ¶ 8).  The analysis is more complex.

13           First, in *Borello*, the California Supreme Court looked at an employer's right to discharge as

14   one indicia of whether or not there was an employment relationship – *i.e.*, criteria separate and apart

15   from the right to control.  *See Borello*, 48 Cal. 3d at 350 (stating that "the right to control work

16   details is the 'most important' or 'most significant' consideration" but that there are "'secondary'

17   indicia of the nature of a service relationship," such as the right to discharge at will).  *But see*

18   *Isenberg v. California Employment Stabilization Comm'n*, 30 Cal. 2d 34, 39 (1947) (in case

19   predating *Borello* by several decades, stating that "[s]trong evidence of this right [to control] is

20   shown by the right of the principal to discharge the worker").

21           Second, Vector's theoretical right to terminate, as part of its right to control, it is not

22   necessarily dispositive.  Under California law, "[o]ne of the means of ascertaining whether or not

23   this right to control exists is the determination of whether or not, if instructions were given, they

24   would have to be obeyed."  *Toyota Motor Sales U.S.A. v. Superior Court*, 220 Cal. App. 3d 864, 875

25   (1990) (internal quotation marks omitted).  Thus, even if "it is not the control actually exercised, but

26   that which may be exercised which is determinative," *id.*, the control that is actually exercised may

27   be informative of the control that may be exercised.  The right to terminate alone does not establish

28   control over the details of the mode and manner of work where the documentation is ambiguous as

32

United States District Court
For the Northern District of California

1    to the mandatory nature of the employer's directives and whether and how they would be enforced.

2    *See Dahl-Beck Elec. Co. v. Rogge*, 275 Cal. App. 2d 893, 900-01 (1969) (stating that, "where no

3    express agreement is shown as to the right of the claimed employer to control the mode and manner

4    of doing the work, the existence or nonexistence of the right must be determined by reasonable

5    inferences drawn from the circumstances shown") (internal quotation marks omitted).  In this

6    respect, the Court notes that there is evidence of significant variation regarding the actual level of

7    control exercised over Sales Representatives.  The evidence presented by the parties indicates that,

8    at the outset, Sales Representatives were more likely to communicate with their managers on a

9    frequent basis but that, over time, as the Sales Representatives became more experienced, that

10   communication – and therefore control – decreased.[11]  Thus, while the law appears somewhat

11   nebulous, the actual exercise of control may have some bearing in the analysis here.[12]

12          Ms. Harris points out that most Sales Representatives worked for Vector for only short

13   periods of time and thus argues that there is sufficient commonality of experience.  But even if most

14   Sales Representatives worked for Vector for limited periods of time, the fact remains that the class

15   that Ms. Harris seeks to have certified extends to all Sales Representatives working for Vector and

16   the longer-working Sales Representatives do not appear to be an insignificant number.  At the

17   hearing, Ms. Harris suggested that there could be subclasses depending on how long a Sales

18   Representative worked for Vector, but this poses substantial manageability problems.  Ms. Harris

19   has not suggested a clear, administrable, and principled way to divide the Sales Representatives into

20   subclasses, particularly in a way that would align with a variety of control levels.

21

22

23   _____

24          [11] For example, the opt-ins generally testified about frequent communication with the
     managers but the survey respondents and the Sales Representatives who submitted declarations in
25   support of Vector indicated that communications with their managers was much more variable.  *See,
     e.g.*, Docket No. 339 (Saad Decl., Ex. A14).

26          [12] While the court in *Toyota Motor* noted that "[p]erhaps no single circumstance is more
27   conclusive to show the relationship of an employee than the right of the employer to end the service
     whenever he sees fit to do so," *Toyota Motor*, 220 Cal. App. 3d at 875 (internal quotation marks
28   omitted), the Sales Representative Agreement allowed Vector to terminate for good cause only, not
     at will.

33

**United States District Court**
For the Northern District of California

3.      Predominance and Superiority

Even assuming commonality were not a problem because the right to control is a dominant factor in the *Borello* analysis, Rule 23(b)(3) requires that common questions predominate. Regarding predominance, Vector correctly points out that, for the post-training claim, there may be substantial variance as to what kind of expenses were even incurred by Sales Representatives in the first place. Some Sales Representatives may have used a personal car; others may not have (*e.g.*, they may have taken a bus or walked). Some Sales Representatives may have used a cell phone; others may not have (*e.g.*, used a phone at the Vector local office). And even if all Sales Representatives used cell phones, the plans likely differed (*e.g.*, some may have had a flat rate, while others may have incurred extra charges). Furthermore, some Sales Representatives may have incurred expenses the necessity of which is likely to be challenged (*e.g.*, purchasing clothing). California Labor Code § 2802 provides that "[a]n employer shall indemnify his or her employee for all *necessary* expenditures or losses incurred." Cal. Lab. Code § 2802 (emphasis added). Ms. Harris has not demonstrated that there were common types of expenses incurred by Sales Representatives, *see generally* Docket No. 333 *et seq.* (Humphrey Decl.) (not including deposition testimony about common expenses). More important, she has not demonstrated that evaluation under § 2802 of the "necessity" of various expenses incurred in a variety of contexts may be done on a relatively uniform basis.

The Court acknowledges that, arguably, Vector had a uniform policy or practice of not reimbursing for any expenses and that the different expenses incurred would simply be an issue of individualized damages, which, under Ninth Circuit law, should not alone defeat certification. *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) (stating that "damage calculations alone cannot defeat certification"; "'[t]he amount of damages is invariably an individual question and does not defeat class action treatment'"). But the Ninth Circuit has suggested that a relevant factor in the predominance analysis is whether damages calculations would be straightforward. For example, in *Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001), the Ninth Circuit commented:

> Individualized issues are few, and most of them are likely to be relatively easy.  For example, the damages for individual class members will entail a straightforward calculation of which days and how many hours they would have worked, and how much they would have earned in tips.  Because dealers' tips were counted and divided in the casino cashier's cage, Sands has detailed written records of the tips employees earned in the past.  Because Sands required its dealers to pool tips, there is no variation in tip earnings based on individual performance.  We recognize that there may be some variation among the individual employees, as well as some potential difficulty in proof, in demonstrating that they would have worked on July 4th.  But given the number and importance of the common issues, we do not believe that this variation is enough to defeat predominance under Rule 23(b)(3).

*Id.* at 1163.  *See also Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 402 (C.D. Cal. 2008) (noting that "[d]ifferences in wages and hours often do not prevent class certification, if there are ways to avoid testimony by every class member"; adding that "the Ninth Circuit has suggested that variation in actual wages is a relatively easy issue, where the employer has payroll records that would indicate the actual compensation that each employee received").  Determining the necessity of the variety of expenses incurred by Vector Sales Representatives appears to involve qualitative as well as quantitative analysis, not a "straightforward calculation."

Even if the individualized damages would not defeat the predominance requirement, at the very least, they should be considered on the issue of superiority – more specifically, manageability.  As the court in *Ortega v. J.B. Hunt Transp., Inc.*, 258 F.R.D. 361 (C.D. Cal. 2009) acknowledged, "'[t]he amount of damages is invariably an individual question and does not defeat class action treatment'" but "the Court should consider whether and how such individual determinations would need to be made in evaluating 'the difficulties likely to be encountered in the management of a class action.'"  *Id.* at 370-71.  *See also Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990) (stating that the "'manageability' requirement includes consideration of the potential difficulties in notifying class members of the suit, calculation of individual damages, and distribution of damages").  Based on the difficulty of calculating individual damages, the Court has serious concerns about the manageability of the post-training claim under § 2802 under the facts of this case.

United States District Court
For the Northern District of California

1    4.    <u>Certification</u>

2         For the foregoing reasons, the Court denies class certification for the post-training claim, *i.e.*,

3    that part of the § 2802 claim that seeks reimbursement of expenses incurred while Sales

4    Representatives were actually selling knives.

5                              V.    **CONCLUSION**

6         For the reasons discussed above, the Court grants final certification for the FLSA collective

7    action.  The Court also grants class certification under Rule 23(a) and (b)(3)with respect to Ms.

8    Harris's state law claims related to the initial training, but denies such certification for claims arising

9    out of post-training activities.

10        In conclusion, the FLSA class certified is defined as all individuals who worked for Vector

11   in the state of California as Sales Representatives from April 15, 2006, through May 12, 2010.  The

12   Rule 23 class (for claims related to the training period only) is defined as all individuals who worked

13   for Vector in the state of California as "Sales Representatives" from October 15, 2004 through the

14   date of the class notice.

15        The Rule 23 class notice shall be mailed no later than **November 12, 2010**.  The deadline for

16   the Rule 23 class members to opt out is **December 27, 2010**.  These are the only modifications to the

17   Court's case management scheduling order.  All other deadlines remain the same.

18        The parties shall immediately meet and confer to reach agreement on the wording of the Rule

19   23 class notice.  If there is any dispute about the wording, the parties must file a joint letter no later

20   than **November 10, 2010**, stating what the dispute is and the parties' respective positions.  The letter

21   shall be no longer than three single-spaced pages.  The parties should fax a courtesy copy of the

22   letter to the Court at (415) 522-4200.

23        This order disposes of Docket Nos. 330, 332, 336, and 337.

24        IT IS SO ORDERED.

25

26   Dated:  November 5, 2010

27   _____

28   EDWARD M. CHEN
     United States Magistrate Judge