1 | **MARLIN & SALTZMAN**
Stanley D. Saltzman, Esq. (SBN 90058)
2 | Louis M. Marlin, Esq. (SBN 54053)
Marcus J. Bradley, Esq. (SBN 174156)
3 | Christina A. Humphrey, Esq. (SBN 226326)
Kiley L. Grombacher, Esq. (SBN 245960)
4 | 29229 Canwood Street, Suite 208
Agoura Hills, California 91301
5 | Telephone:     (818) 991-8080
Facsimile:      (818) 991-8081
6 | ssaltzman@marlinsaltzman.com
louis.marlin@marlinsaltzman.com
7 | mbradley@marlinsaltzman.com
chumphrey@marlinsaltzman.com
8 | kgrombacher@marlinsaltzman.com

9 | *(Additional Plaintiff's counsel on next page)*

10 | Attorneys for Plaintiff and Proposed Class

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALICIA HARRIS, as an individual and on behalf of all others similarly situated, | **CASE NO. CV 08-5198 EMC** (Assigned to Hon. Edward M. Chen) |
| Plaintiff, | |
| v. | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND FOR AWARD OF COSTS** |
| VECTOR MARKETING CORPORATION, a Pennsylvania corporation; and DOES 1 through 20, inclusive, | |
| Defendants. | DATE: August 10, 2011<br>TIME: 10:30 a.m.<br>CTRM: 5, 17th Floor<br>JUDGE: HON. EDWARD M. CHEN |

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1 | **Additional Plaintiff's Counsel**

2 | **DIVERSITY LAW GROUP**
Daniel H. Chang, Esq. (SBN 183803)
3 | Craig S. Hubble, Esq. (SBN 200789)
Larry W. Lee, Esq. (SBN 228175)
4 | 444 S. Flower Street
Citigroup Center, Suite 1370
5 | Los Angeles, California  90071
Telephone:    (213) 488-6555
6 | Facsimile:    (213) 488-6554
dchang@diversitylaw.com
7 | chubble@diversitylaw.com
lwlee@diversitylaw.com
8 |
**LAW OFFICES OF SHERRY JUNG**
9 | Sherry Jung, Esq. (SBN 234406)
444 S. Flower Street
10 | Citigroup Center, Suite 1370
Los Angeles, California  90071
11 | Telephone:    (213) 488-6555
Facsimile:    (213) 488-6554
12 | sherryj23@hotmail.com

**TABLE OF CONTENTS**

Page

MEMORANDUM OF POINTS & AUTHORITIES ........................................................... 1

I. NATURE OF RELIEF SOUGHT ................................................................. 1

II. THE SETTLEMENT PROCESS HAS BEEN DUTIFULLY ADHERED TO AND SUCCESSFULLY CARRIED OUT ............................................................. 1

III. OVERVIEW OF ISSUES AND ARGUMENT .................................................. 3

IV. THE SETTLEMENT CLEARLY MEETS, AND EXCEEDS, THE STANDARDS FOR FINAL APPROVAL ................................................................. 6

    A. The Strength of the Plaintiffs' Case .................................................... 6

    B. The Risk, Expense, Complexity, and Duration of Further Litigation ............ 7

    C. The Risk of Maintaining Class Action Status ........................................ 7

    D. The Settlement Amount ................................................................. 8

    E. Extent of Discovery and the Procedural Posture ................................... 10

    F. The Experience and Views of Counsel ............................................... 10

    G. Government Participant ................................................................ 10

    H. Class Member Reaction ................................................................. 10

V. THE COSTS REQUESTED BY CLASS COUNSEL ........................................ 11

VI. CONCLUSION ..................................................................................... 11

# **TABLE OF AUTHORITIES**

Page

**FEDERAL CASES**

*Class Plaintiffs v. Seattle*
    955 F.2d 1268 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Glass v. UBS Financial Svcs., Inc.*
    2007 U.S. Dist. LEXIS 8476, at *9 (N.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8, 9

*Hanlon v. Chrysler Corp.*
    150 F.3d 1011 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Heritage Bond Litigation*
    2005 WL 1594403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Joel A. v. Giuliani*
    218 F.3d 132 (2nd Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# NOTICE OF MOTION

**TO:   DEFENDANT AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 10, 2011, at 10:30 a.m., or as soon thereafter as the matter may be heard in the above-entitled court, located at 450 Golden Gate Avenue, Courtroom 5, 17th Floor, San Francisco, California, 94102, Plaintiff will and hereby does move this Court for an Order:

1. Granting final approval of the proposed settlement, and executing the [Proposed] Order Granting Final Approval of Class Action Settlement (filed contemporaneously herewith);

2. Certifying the Amended Settlement Class for purposes of settlement only;

3. Granting final approval of Class Counsels' and Epiq's request for reimbursement of costs.

This motion will be based on this Notice, the Memorandum of Points and Authorities and declarations filed herewith, and the pleadings and papers filed herein.

DATED:   July 20, 2011          **MARLIN & SALTZMAN**
                                **DIVERSITY LAW GROUP**
                                **LAW OFFICES OF SHERRY JUNG**

                                By:   /S/ Stanley D. Saltzman
                                      Stanley D. Saltzman, Esq.
                                      of Marlin & Saltzman
                                      Attorneys for Plaintiff

**MEMORANDUM OF POINTS & AUTHORITIES**

### I.  NATURE OF RELIEF SOUGHT

By this motion, plaintiff Alicia Harris seeks an order granting final approval to the class action settlement agreed upon between the certified class and defendant Vector Marketing Corporation. This case has been so heavily litigated before this Court that there is little the moving party could add now which might further inform this Court as to the course of the litigation. Throughout the case, the Court has been directly involved in all phases of the litigation, and has been called upon to issue numerous rulings on procedural, discovery and substantive matters.

Ultimately, the Court granted in part and denied in part the Plaintiff's Motion for Conditional Collective Action Certification, thereafter directing that notice of the same be issued so that putative class members could choose whether or not to "consent to join" Approximately 13% did so. Thereafter, the Court granted in part and denied in part Plaintiff's Motion for Final Collective Action Certification, as well as the Plaintiff's Motion for Rule 23 Certification. Thereafter, notice was once again mailed to all effected class members. After further significant litigation, the parties filed and fully briefed cross motions for summary adjudication. While these motions were pending, the parties agreed to attempt to reach a resolution by way of mediation before Antonio Piazza, Esq., which resulted in the settlement now before this Court. Plaintiff's Motion for Preliminary Approval of the settlement was granted by this Court. In its Order dated April 29, 2011, commencing at page 2 thereof, the Court extensively summarized the history of the action and provided an overview of the settlement. That summary is hereby incorporated by reference, so as to limit unnecessary duplication. The Court then provided its analysis of the factors which govern preliminary approval, as well as a "preview" of the factors which apply at the final approval stage now before the Court. The Court concluded its Order by granting the motion for preliminary approval.

Plaintiff will now address the factors applicable to motions for final approval.

### II.  THE SETTLEMENT PROCESS HAS BEEN DUTIFULLY ADHERED TO AND SUCCESSFULLY CARRIED OUT

Preliminary approval to the settlement, as noted above, was granted on April 29, 2011. The parties have complied with this Court's orders concerning the dissemination of class notice and the

---

1

**Notice of Motion/Motion for Final Approval and Award of Costs**       Case No. CV 08-5198 EMC

receipt of claims, objections and opt out notices. Filed contemporaneously herewith is the declaration of Rachel Braun, an employee of Epiq Systems, Inc. which, by order of this Court, is acting as the claims administrator. As stated therein, based upon Epiq's analysis of the records produced by the Defendant, the training time notice was originally mailed to 68,345 people. The Notices were mailed to the class on May 9, 2011. Each notice included a claim form, and a "no postage necessary" return envelope pre-addressed to the Claims Administrator. Of the largest group of recipients, which encompassed the entire training time sub-group, Epiq Systems Inc. has determined that 7,089 of the notices were not received by the addressees. Stated inversely, 61,256 notices and or reminders were not returned to Epiq, and are thus deemed to have been received. Those mailings which have been returned are sometimes referred to herein as the "undeliverables," and since both the initial mailing and the postcard were returned for those 7,089 persons, they are assumed not to have received either the notice or the reminder postcard.

**The objection deadline has passed**. Only two class members out of the 61,256 mailings deemed to have been received filed objections, via letters which are being submitted to the Court with the Epiq declaration. No objections to either the settlement or the attorneys' fees sought, have been filed by anyone in a formal legal presentation, and no attorney drafted papers have been filed. As ordered by the Court, at page 26 of its Order granting preliminary approval, the motion for attorneys' fees was posted on counsel's website, and the Notice of Settlement so advised all class members. These two objections amount to an objection rate of .000032%.

**The opt-out deadline has also passed**. There were a total of only 3 timely opt-outs out of the 61,256 mailings deemed completed, representing a minuscule .000048% of the class. The remainder of the class members have either expressed their approval of the settlement by way of presenting claims, have acquiesced via silence, or have elected not to present a claim, object or otherwise express an opinion. Since we can never know why someone has not spoken up, in the absence of them doing so, the resulting differential yields an approval rating of over 99.999%, an extraordinary result.

At this time, the time limit for presenting a timely claim has passed. To date, 16,636 class members have submitted claims for the training time payment. This yields a claims rate as against the fund for training time claims, derived from the notices which were deemed delivered, of 27.15%.

1  Additional claims are still being received, and will be counted against the late claim fund until the next
2  and final deadline of August 8, 2011. Thus, the claims process is running efficiently and in accordance
3  with this Court's orders, and will continue to do so until fully completed.

### III.  OVERVIEW OF ISSUES AND ARGUMENT

The Court and the parties engaged in extensive examination of this settlement at the preliminary approval stage. From class counsel's perspective, the inquiries were probably more detailed than in any other case they have presented for approval. This was not surprising, given that throughout the course of this action, this Court engaged in probably the most in-depth involvement in a case that they had experienced in many years. The interesting and somewhat curious result, from class counsel's perspective, was that even after all of this Court's work on the matter, involving the many procedural, discovery and substantive matters presented and ruled on, the two sides truly still did not know which side might ultimately have the so-called "upper hand." While the court has ruled on some issues in favor of the Plaintiff, it has also ruled on other matters in favor of the Defendant.

Had the matter not settled, and then proceeded to the then-pending summary adjudication hearing, Class Counsel, while confident of their position, certainly could not be comfortable that the class would have prevailed. At this point, it seems to the class, and its counsel, that this "risk" issue, combined with the "reversion" issue, remain the critical issues for this final approval analysis. It appears that literally every other factor falls easily on the side of the granting final approval, with the factors all to be discussed herein. If the Plaintiff class had been assured of prevailing on its motion for summary adjudication, then counsel would submit that the settlement should not be granted final approval, since a significant risk analysis exposure was built into the resolution. On the other hand, if the outcome was questionable, and the risk of losing on a key issue such as the "immediate benefit" standard was real and could have easily impaired the entire case, then it is submitted that the settlement must be approved.

While this may seem simplistic, it is the reality of the litigation process. Predictability is simply not something that can be relied upon. Only two months ago, class counsel would not have predicted that our Unites States Supreme Court would issue the opinion that it did in the *AT & T v. Concepcion* matter, effectively enabling corporate defendants to protect themselves from further

3

**Notice of Motion/Motion for Final Approval and Award of Costs         Case No. CV 08-5198 EMC**

1  consumer class actions by simply inserting "class action waiver" clauses into all adhesion contracts.
2  By relying on the Maritime Arbitration Act of 1926, involving parties with equal bargaining powers,
3  that is precisely what the Court did.  That is its right.  It remains to be seen whether that holding will
4  now be applied to employment class actions.  While this case is "safe" from that ruling, the very fact
5  that such dramatic rulings can be issued at any point in an action, especially one such as this where
6  numerous potential legal rulings could have been further challenged, dictates that class counsel always
7  remain both aggressive in its posturing while being open to realistic assessments of "risk" exposure.
8        Shortly after the *AT & T* ruling issued, there followed the decision in the *Dukes v. Wal-mart*
9  matter.  While probably more "predictable" as an end result than was the *AT & T* decision, the manner
10 in which the Supreme Court "reached" out in the *Dukes* case to issues beyond the rule 23(b)(2) claims
11 that were clearly framed, and ruled on 23(b)(3) issues which perhaps were not so clearly framed or
12 necessary to the ruling, again highlights the unpredictability of class action litigation, and litigation in
13 general.
14       Class counsel in this matter are now of course caught in the proverbial Catch-22.  To convince
15 this Court that the risk was and remains extreme, counsel might feel compelled to argue that they
16 believed they would lose the pending issues - or at least some of them.  But if the Court were to deny
17 the motion of final approval, and then the matter were to return to litigation, counsel for the class
18 would be arguing, and still believing, that they should prevail.  So, the question is, in the absence of
19 such extreme posturing, why is the settlement both fair and reasonable, deserving of final approval?
20       It is submitted that the answer lies in the combined factors of not only the risk assessment and
21 the value to be assigned to a case when that risk remains high, but also the risks of appeal, the costs
22 to be faced when not settling, the concerns about closing out actions, and the undeniable fact that at
23 the end of the day, this action has changed how this Defendant does business, and will do business.
24 The Court inquired at one point whether this settlement would "impact" this Defendant enough to
25 make a difference.  The question must be answered in the affirmative - why Defendant would want
26 to do this again, and face this type of litigation again.  Over and above its settlement payments, it has
27 been put to a substantial test of its historical manner of doing business.  It has revamped how it deals
28 with its trainees in relation to the provision of the sample kits.  If it does not revamp how it deals with

training time, there is a strong likelihood this litigation will be teed up yet again. Only time will tell.

In the meantime, despite all these risk factors, the Defendant did indeed agree to pay 85% of the value of the claim for training time to literally anyone who simply mailed in a pre-addressed and pre-stamped claim form in the envelope provided. This fund, created for the benefit of all the training time class members, was real and substantial, and there for the taking. This Court was concerned that perhaps the settlement might end up like some "coupon" deals, with a sub-ten percent claims rate. That did not occur. Defense counsel opined that the claim rate might equate to the opt-in rate of about twelve to thirteen percent, and argued that would be fine, because it would simply reflect the level of interest in the case. That did not occur.

Class counsel opined that they expected/hoped for a 30 percent plus claims rate. That has not yet occurred - but it has certainly come very close to that level. At the present time, just over 27% of those who received either or both the notice or the postcard have submitted claims. In the *Glass v. UBS* case previously referred to in detail in the motion for approval of the attorneys' fees, (*Glass v. UBS Financial Svcs., Inc.*, 2007 U.S. Dist. LEXIS 8476, at *9 (N.D. Cal. 2007)(granting final approval)), which had a 51% claims rate, the end result was a payment as against total exposure of the defendant of only 12.5% of its exposure. The Court therein acknowledged that the parties themselves estimated that the settlement reflected approximately 25% to 30% of the estimated value of the losses sued upon. Thus, with 51% of the claims having being presented, literally 12.5% of the exposure was paid by the defendant. In the case before this Court, the final payout as a percentage of the total exposure will far exceed that achieved in *Glass*. In this case, the settlement required payment of 85% of the value of the claims, as opposed to the 25 to 30% agreed to in *Glass*.

Given the exceedingly high initial payment level, the 27% claim rate as against 85% of the claim value yields a total take against exposure of at least 23%, almost twice that achieved in the *Glass* case. Both cases involve fees and costs being paid out of the funds created, as is customary, and both involved reversions. At the end of the day, the case before this Court, quite simply, will result in a total payment of at least 23% of the total that could have been awarded at trial had everything gone in favor of the class at trial, leaving aside the potential for an award of attorneys fees. Both matters involved the potential for fees being awarded, if the matters were won all the way through trial, and

5

**Notice of Motion/Motion for Final Approval and Award of Costs**        Case No. CV 08-5198 EMC

1  upheld on appeal.  So the comparison is direct, and the current case prevails on all comparisons.

## IV.  THE SETTLEMENT CLEARLY MEETS, AND EXCEEDS, THE STANDARDS FOR FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) provides that any compromise of a class action must receive Court approval.  The court has broad discretion to grant such approval and should do so where the proposed settlement is "fair, adequate, reasonable, and not a product of collusion."  *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998); *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2nd Cir. 2000).  In determining whether a proposed settlement should be approved, the Ninth Circuit has a "strong judicial policy that favors settlement, particularly where complex class action litigation is concerned." (*In re Heritage Bond Litigation*, 2005 WL 1594403, citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).)

The fairness, reasonableness and adequacy of any class action settlement depends on "the relative strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel;...and the reaction of class members to the proposed settlement."  *Glass v. UBS Financial Svcs., Inc.*, 2007 U.S. Dist. LEXIS 8476, at *9 (N.D. Cal. 2007)(granting final approval).

### A.  The Strength of the Plaintiffs' Case

Undeniably, as set forth in the Court's April 29 Order granting preliminary approval, substantial issues were pending at the time the settlement was reached which could have fallen in favor of either side.  Plaintiff was confident of the strength of her motion for summary adjudication, and the Defendant seemed equally confident of the strength of its arguments.  The matters were heavily briefed, fully supported by evidentiary documents and experts on both sides, and ready for argument. It is precisely that type of presentation that makes for case resolution by settlement.  The agreement of the Defendant to pay 85% of the value of both the training time and the sample kit claims reflected its recognition of its exposure.  The claims process has revealed that approximately 27% of the training time class members have elected to participate by simply signing and mailing in their claims.

While the Court did indeed rule earlier in the action that it would apply the *Portland Terminal*

6

**Notice of Motion/Motion for Final Approval and Award of Costs**     Case No. CV 08-5198 EMC

1  rule, as Plaintiff requested, the Court also indicated that it would consider the rule in the context of the
2  "economic realities" of the relationship between the parties, such that Plaintiff defeating any one of
3  the six factors would not dictate a plaintiff win, but rather the entirety of the relationship would be
4  examined.  Within this relationship, the Defendant relied heavily upon the fourth factor, the
5  "immediate benefit" rule, and during several discovery hearings the Court reflected upon the ultimate
6  meaning of that factor. HAD THAT FACTOR BEEN DECIDED IN DEFENDANT'S FAVOR, which
7  of course Plaintiff did not think should occur, it would have been very possible for the Defendant to
8  prevail on the entire case.  Regardless of this Court's ruling on the issue, *i.e.*, even if in Plaintiff's
9  favor, factor four presented a possible appellate issue for the Defendant to pursue.  This too was a
10 heavy factor in the settlement analysis.
11       Overall, it seems clear that this first final approval factor weighs heavily in favor of approval.
12       **B.    The Risk, Expense, Complexity, and Duration of Further Litigation**
13       Following on the analysis in the immediate preceding section, it is self-evident that the risks,
14 expenses, complexity of the action and the expected duration of the litigation all collectively weigh
15 heavily in favor of approval.  The costs in maintaining an action on behalf of over 60,000 class
16 members, where multiple mailings have been required, and yet more could have been triggered, are
17 enormous.  Class counsel, true to their word, incurred or carried all these costs, and did whatever it
18 took to move the matter forward.
19       With the likelihood of appeal of a successful plaintiffs' verdict obviously high (the Defendant
20 twice sought review of pre-trial matters), and with the winds of class action law attacks constantly
21 creating a headwind, it is now more true than ever that a settled case is a successful case.  That does
22 not mean giving away cases, but certainly when the starting number is 85% of exposure, the end
23 number has to be given high marks.  The claims process herein, easily meeting or beating the claims
24 rates in similar cases, as declared to by Epiq in its capacity as a claims administrator of such claims,
25 gives strength to the result.
26       **C.    The Risk of Maintaining Class Action Status**
27       This Court has firmly guided the certification process, and Plaintiff was confident that the
28 result would not change pre-trial.  Post-verdict, however, assuming one was entered in favor of the

7

Notice of Motion/Motion for Final Approval and Award of Costs            Case No. CV 08-5198 EMC

class, the issue would again be ripe. This being a federal court proceeding, the Ninth Circuit might have been called upon to finally address the Court's prior rulings. In the wake of *AT & T,* as well as *Dukes*, it is still way too early to predict the eventual fallout. Perhaps the rulings would stand, and perhaps not. Perhaps the *Leuthold* argument remains in Plaintiff's favor, and perhaps not. Overall, it is simply undeniable that the challenge, and the uncertainty triggered by the same, would unfold. This factor must easily favor the settlement.

### D. The Settlement Amount

The Plaintiff class has largely addressed the issues which arise under this factor in the previously filed attorneys fee motion, as well as above. While the Court was clearly concerned with the eventual claims rate, and so stated, it appears that the end result will be very close to the 30% which the Class was hoping for. The discussion of the *Glass* case asserted in the fee motion is fully applicable to this motion, and to this section, and that section is respectfully incorporated herein.

Furthermore, both *Glass* and this matter involve claims where a victorious plaintiff would be entitled to recover attorneys fees. In the *Glass* analysis, there was no attempt by the Court to back out the fees when determining ultimate value and percentages. Rather, the amount found to be paid was considered in light of the payment of the percentage of the fees under the common fund doctrine, just as the USSC has consistently held it should be done. So in computing the totality of the Defendant's eventual payment, the total fees and costs deducted should come off the top, and then the balance paid out added to that sub-total, thus arriving at the ultimate payment. In this case, the payments to the class members who made claims will likely reach the gross amount of $1,569,800.00,[1] inclusive of fees and costs apportioned to those claimants, and then the balance of the fees and costs would come out of the remainder of the common fund created, whether or not the class members made claims. This is as the USSC has directed, as cited in the fee motion. The end result would be that the Defendant would pay out a total of approximately $3,395,772.00 of the $6.5 million fund created for the training time claim.

During prior settlement hearings and briefing, the issue of the reversion was heavily discussed. In this Court's Order of April 29, the Court succinctly concluded that claims processes, including

---

[1] Until all late claims are received and processed, these numbers are estimates, but not likely to change significantly.

8

**Notice of Motion/Motion for Final Approval and Award of Costs**        Case No. CV 08-5198 EMC

1  reversions, are indeed quite common. In "operation," as this Court alluded to that term, this particular
2  reversion will result in those persons making claims still receiving a gross award of 85% of their
3  potential training time claim. The payment of fees out of that amount, and apportioned costs, is
4  entirely normal and customary, just as occurred in the *Glass* case. There, as noted above and in the
5  fee motion, the **net result at the end of the day was that 12.5% of the total defendant exposure**
6  **was paid out, and the settlement was approved.** Here, the total to be paid out in relation to the
7  training time claim will be in excess of 23%, almost double the result in *Glass*. Thus, in operation,
8  the settlement will permit those who filed claims to receive 85% of what they could have recovered
9  after a trial. The only way to avoid the payment of the fees out of the contingent shares would be to
10 risk everything at trial, and then on appeal. This is a reasonable and fair end game.
11         As discussed by class counsel in argument, absent reversion the end game number would
12 simply have reflected a lower total to be divided up and paid out to the entirety of the class, including
13 the thousands who will not be found. It is apparent in any negotiation that both sides are applying
14 some sort of "modeling" to predict end numbers. In this case, as it relates to the training time claim,
15 it appears from its arguments that the Defendant was predicting a lower claims rate, perhaps something
16 akin to the opt-in rate. That did not occur. But if the final pre-settlement negotiation had focused on
17 an "all-in" number, then it is clear that everyone would have received substantially less, and those who
18 actually made claims in this claims settlement would likely have been rewarded for their actions with
19 less than half of the number they are currently scheduled to receive. IF, as is clearly the case based on
20 both Ninth Circuit and Supreme Court law, claims made settlements with reversions are indeed proper,
21 then this weighing process, and the predictions made on both sides, are entirely proper and making
22 claims payments to those who submit claims is also proper. The claims process herein was as simple
23 as possible. It is both respectfully and humbly submitted that this factor weighs in favor of approval
24 as to the training time claim.
25         With regard to the sample kit claim, and the requisite return of the product, that is actually even
26 more straightforward to address. As this Court noted in the preliminary approval Order, and
27 previously in relation to motions to dismiss, in the absence of the direct action under Labor Code
28 section 450, the remaining claim was purely restitutionary. The value of the total claim was indeed

9

**Notice of Motion/Motion for Final Approval and Award of Costs**          Case No. CV 08-5198 EMC

1  approximately equal to the value of the total training time claims (*See,* Order of April 29, 2011, at page
2  21).  Thus, an equal fund of $6.5 million dollars was created, and anyone interested in obtaining their
3  share was invited to send back the knives with a pre-paid UPS label, so as to receive the payment.  To
4  the surprise of class counsel, only about 500 such claims have been tendered.  We expected more,
5  albeit less than the training time claim total.  Nonetheless, after all was litigated, and the rights were
6  established, the total fund was created for the benefit of all.  The choice was then there to be made.
7  That less people than class counsel expected submitted the request, does not alter the fact that the right
8  to exercise the choice was established.  Moreover, on a going forward basis, Vector has changed its
9  business model effective January 1, 2011 and no longer charges its trainees for their sample kits.  Thus,
10 the settlement effectively accomplished everything that could have been accomplished even by way
11 of continued and successful litigation.

12       **E.**      <u>**Extent of Discovery and the Procedural Posture**</u>

13       This factor clearly weighs heavily in favor of approval.  Discovery was extensive, and there
14 were several rounds of certification briefing, two rounds of summary judgment briefing and numerous
15 other hearings.  There were over 50 class member depositions and numerous depositions of corporate
16 and plaintiff witnesses.  The parties were clearly well informed as to all the relevant issues, and able
17 to make informed decisions relating to the settlement issues for the case.

18       **F.**      <u>**The Experience and Views of Counsel**</u>

19       This factor is always complicated, because even given the obvious experience of counsel, it
20 is also self-evident that counsel are proponents of the settlement.  Every settlement has issues that
21 could have gone another way, and this case is no exception.  Given the totality of the circumstances,
22 however, class counsel is extremely comfortable that the overall resolution is both fair and reasonable,
23 and should be approved.  Counsel asks that this Court consider the informed views of class counsel,
24 such that this factor should be considered in favor of the settlement.

25       **G.**      <u>**Government Participant**</u>
26       This issue is not pertinent to this case, given the lack of governmental involvement.

27       **H.**      <u>**Class Member Reaction**</u>
28       As stated above, there have been only two (2) objections to this settlement, and no attorney

drafted objections. Two out of over 60,000 notices is, simply stated, minuscule. While neither objection is without thought, the weight of two objections is greatly overwhelmed in terms of class reaction by the more than 16,500 claims submitted. The class reaction to the settlement must be considered a very strong factor in favor of the approval of the overall resolution.

Plaintiff respectfully submits that the settlement easily exceeds the criteria for final approval, such that it is well within the range of what would be fair, reasonable, and adequate in this case. The Plaintiff class thus requests that the Court take the final step in the approval process – granting this motion for final approval of the settlement.

## V.  THE COSTS REQUESTED BY CLASS COUNSEL

The actual expenses incurred in pursuit of this action were extraordinary, including such items as expert fees, deposition costs, subpoena costs, the extensive notice mailing costs, mediation fees, travel costs, and numerous other necessary expenses in relation to the action. As set forth in the declarations of counsel, the costs incurred total $400,000.00. The Notice mailed to all the class members informed them of the scope of the expenses as to which reimbursement would be sought. It is requested that those expenses now be ordered reimbursed.

In addition, as set forth in the declaration submitted by Rachel Braun of Epiq Systems, Inc., Epiq has incurred administrative expenses in relation to the settlement in the total sum of "not to exceed" $250,000.00, as agreed with the parties, and now also asks that said sum be ordered paid.

## VI.  CONCLUSION

For all the foregoing reasons and taking into consideration the interests of the Class in timely relief, and the expense and uncertainty of continued litigation, the proposed Settlement should be granted final approval by the Court. Plaintiffs request that the Court:

(1)  grant final approval of the proposed Settlement between Plaintiffs and Plaintiff Class and Defendant Vector Marketing.;

(2)  grant final approval of the payment to Epiq Systems, Inc. from the Settlement Fund for the administration of the Payout Fund;

(3)  grant final approval of the attorneys fees, costs, and incentive payments requested in the contemporaneously filed motion therefore;

(4) enter final judgment in this action in the form of the Order and Final Judgment submitted herewith; and

(5) retain continuing jurisdiction over the implementation, interpretation, administration, and consummation of the settlement.

DATED: July 20, 2011

**MARLIN & SALTZMAN**
**DIVERSITY LAW GROUP**
**LAW OFFICES OF SHERRY JUNG**


By:  /S/ Stanley D. Saltzman
Stanley D. Saltzman, Esq.
of Marlin & Saltzman
Attorneys for Plaintiff