**United States District Court**
For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8   ALICIA HARRIS,                              No. C-08-5198 EMC

9            Plaintiff,

10       v.                                     **ORDER DENYING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND FOR AWARD OF COSTS; DENYING AS MOOT PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND PLAINTIFF'S MOTION FOR FINAL APPROVAL OF AWARD OF CLASS REPRESENTATIVE'S INCENTIVE PAYMENT**

11   VECTOR MARKETING CORPORATION,

12           Defendant.

13   _____/

14

15                                             **(Docket Nos. 470, 476, 477)**

16

17

18           Previously, the Court granted Plaintiff Alicia Harris's motion for preliminary approval of a

19   class action settlement.  Although the Court granted preliminary approval, despite the vigor by

20   which this case has been litigated, it had concerns about the adequacy of the proposed settlement,

21   particularly with respect to the imposition of a claims process, the likelihood of a low claims rate,

22   and the provision that unclaimed moneys would revert back to Vector.  *See* Docket No. 466 (order).

23   Currently pending before the Court is Ms. Harris's motion for final approval, as well as her motion

24   for attorney's fees and costs and motion for an incentive award.  A hearing on the three motions was

25   held on August 10, 2011.  At the hearing on the motion for final approval, the Court indicated that,

26   despite the relatively low claim rate, it was inclined to grant the motion, albeit reluctantly.  Shortly

27   after the hearing, however, the Ninth Circuit issued its decision in *In re Bluetooth Headset Products*

28   *Liability Litigation*, No. 09-56683, 2011 U.S. App. LEXIS 17224 (9th Cir. Aug. 19, 2011).  After

**United States District Court**
For the Northern District of California

1  reviewing the decision, the Court asked the parties to provide supplemental briefing on the issue of

2  whether the parties' proposed class action settlement was fair, reasonable, and adequate in light of

3  *Bluetooth*.  A further hearing was held on September 23, 2011.

4        Having considered the papers submitted, including but not limited to the supplemental briefs,

5  the oral argument of counsel, and all other evidence of record, the Court hereby **DENIES** the motion

6  for final approval.  In light of that denial, the motion for fees and motion for an incentive award are

7  also **DENIED** as moot.

8  **I.   FACTUAL & PROCEDURAL BACKGROUND**

9  A.    <u>Terms of Proposed Settlement</u>

10        The Court has provided an overview of the proposed settlement in its order granting

11  preliminary approval.  *See* Docket No. 466 (Order at 2-7).  In a nutshell, under the proposed

12  settlement, Vector agreed to pay a maximum settlement amount of $13 million.  After deducting

13  items such as attorney's fees, costs, an incentive award, and the payment under the California Labor

14  Code Private Attorneys General Act ("PAGA"), the net settlement amount available to the class is

15  approximately $7.76 million.

16        Each subclass – *i.e.*, the training time subclass and the sample kit subclass – is allocated 50

17  percent of the net settlement amount; that is, each subclass is allocated approximately $3.88 million.

18  Each member of the training time subclass who files a claim will be awarded a net payment of

19  approximately $57.  Each member of the sample kit subclass who files a claim and returns the

20  sample kit will be awarded a net payment of approximately $75.  To be paid, a member of the

21  subclass – whether the training time subclass or sample kit subclass – must submit a timely claim

22  form.  Any unclaimed funds revert to Vector.

23  B.    <u>Response to Class Notice</u>

24        On May 9, 2011, the claims administrator sent out 68,345 notices.  *See* Docket No. 476

25  (Braun-Wronowski Decl. ¶ 6).  Out of these notices, 7,092 were undeliverable.  *See id.* (Braun-

26  Wronowski Decl. ¶ 9).  In other words, 61,253 notices were deliverable.  An additional 142 notices

27  were sent out on July 8, 2011.  *See id.* (Braun-Wronowski Decl. ¶ 7).  It is not clear from the record

28

**United States District Court**

For the Northern District of California

how many of the additional notices were not deliverable.  *See* Docket No. 488 (Ex. A) (updated claims report).

Altogether, there were four requests for exclusion from the settlement.  *See* Docket No. 476 (Braun-Wronowski Decl. ¶ 16); Docket No. 488 (Ex. A) (updated claims report).  In addition, there were two to four objections.  *Compare* Docket No. 476 (Braun-Wronowski Decl. ¶ 15) (stating that there were four objections), *with* Docket No. 488 (Ex. A) (updated claims report) (indicating that there were two timely objections).

> 1.    Training Time Claim

Excluding the late claims, the final number of claims made for the training time subclass was 16,834.  *See* Docket No. 488 (Ex. A) (updated claims report).  If the nondeliverables are not counted, then the claims rate is 27.4 percent (*i.e.*, $16,834 \div (61,253 + 142)$).[1]

The gross payment (prior to deduction for fees and costs) on the training time claims is $1,582,396 (*i.e.*, 16,834 x $94).  The gross payment is 20.7 percent of the maximum verdict value of $7,648,650.[2]

The net payment (based on the $57 payment net of fees and costs) on the training time claims is $959,538 (*i.e.*, 16,834 x $57).  The net payment is 12.5 percent of the maximum verdict value of $7,648,650.  This percentage based on the net payment is a more accurate reflection of the size of the settlement since it reflects the amount actually received by the class and because the maximum verdict value does not include fees which would have been awarded in addition to class damages.

> 2.    Sample Kit Claim

Out of the total class, there are 52,232 class members who are also eligible for benefits by returning their sample knife kit.  *See* Docket No. 487 (Ex. A) (updated claims report).  The final

---

[1]  The Court assumes that the 142 additional notices that were sent out on July 8, 2011, were all deliverable.  Although it is likely that some were not deliverable, in all likelihood the number was small given that only 7,092 notices were not deliverable out the 68,345 original notices (*i.e.*, approximately 10 percent).

[2]  *See* Docket No. 466 (Order at 15 & n.6) (noting that the parties calculated the maximum verdict value by "multipl[ying] the number of Training Time class members (69,000) by the unpaid average wage for the training time ($110.85)").

3

**United States District Court**
For the Northern District of California

number of claims made for the sample kit subclass was 528. *See id.* This is a claims rate of 1 percent (*i.e.*, 528 ÷ 52,232).[3]

The gross payment on the sample kit claims is $66,000 (*i.e.*, 528 x $125). The net payment on the sample kit claims is $39,600 (*i.e.*, 528 x $75).

The maximum verdict for the sample kit claims should have been approximately $7,573,640 (*i.e.*, 52,232 x $145).[4] Thus, the gross payment on the sample kit claims is 0.9 percent of the maximum verdict value. The net payment on the sample kit claims is 0.5 percent of the maximum verdict value.

3. <u>Summary</u>

Thus, the total payment to the class members, if this settlement is approved, is $999,138 out of a total settlement class fund of $7.76 million (12.88%) and a total maximum verdict value of $15.22 million (6.56%).

## II. <u>DISCUSSION</u>

As a preliminary matter, the Court notes that it previously certified both an FLSA class and a Rule 23(b)(3) class. *See* Docket No. 375 (order, filed on 11/5/2010). Thus, the Court need not analyze whether the requirements for certification have been met[5] and focuses instead on whether the proposed settlement is fair, adequate, and reasonable.

A. <u>Final Approval Factors</u>

In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, a court typically considers the following factors:

---

[3] The record does not reflect how many notices out of the sample kit subclass were not deliverable. Thus, the Court assumes all notices issued were deliverable.

[4] *See* Docket No. 466 (Order at 21) (noting that, according to Ms. Harris, members of the sample kit subclass "each paid approximately $145.00 ($135 plus sales tax) for the sample kits).

[5] *See, e.g.*, *Denny v. Deutsche Bank, A.G.*, 443 F.3d 253, 270 (2d Cir. 2006) (stating that, "[b]efore certification is proper for any purpose – settlement, litigation, or otherwise -- a court must ensure that the requirements of Rule 23(a) and (b) have been met" and that "[t]hese requirements should not be watered down by virtue of the fact that the settlement is fair or equitable"); *Okudan v. Volkswagen Credit, Inc.*, No. 09-CV-2293-H (JMA), 2011 U.S. Dist. LEXIS 84567, at *6 (S.D. Cal. Aug. 1, 2011) (noting that a proposed settlement class still must meet the criteria of Rule 23(a) and (b)).

**United States District Court**
For the Northern District of California

1   the strength of plaintiffs' case; the risk, expense, complexity, and
    likely duration of further litigation; the risk of maintaining class action
2   status throughout the trial; the amount offered in settlement; the extent
    of discovery completed, and the stage of the proceedings; the
3   experience and views of counsel; the presence of a governmental
    participant; and the reaction of the class members to the proposed
4   settlement.

5   *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003).

6        In *Bluetooth*, the Ninth Circuit indicated that additional factors should be considered,

7   particularly where a settlement agreement is negotiated prior to formal class certification.  *See*

8   *Bluetooth*, 2011 U.S. App. LEXIS 17224, at *27.  The court explained that,

9        [p]rior to formal class certification, there is an even greater potential
         for a breach of a fiduciary duty owed the class during settlement.
10       Accordingly, such agreements must withstand an even higher level of
         scrutiny for evidence of collusion or other conflicts of interest than is
11       ordinarily required under Rule 23(e) before securing the court's
         approval as fair.
12

13  *Id.*

14       Collusion, of course, is not "always . . . evident on the face of a settlement."  *Id.* at *28.

15  There can be, however, "more subtle signs that class counsel have allowed pursuit of their own self-

16  interests and that of certain class members to infect the negotiations."  *Id.*  In *Bluetooth*, the court

17  identified three such signs:

18       (1)   when class counsel receives a disproportionate distribution of
               the settlement, or when the class receives no monetary
19             distribution but counsel is amply rewarded;

20       (2)   when the parties negotiate a "clear sailing" arrangement
               providing for the payment of attorney's fees separate and apart
21             from class funds without objection by the defendant (which
               carries the potential of enabling a defendant to pay class
22             counsel excessive fees and costs in exchange for counsel
               accepting an unfair settlement); and
23

24       (3)   when the parties arrange for fees not awarded to revert to
               defendants rather than be added to the class fund.

25  *See id.* at *28-29.

26       In *Bluetooth*, the Ninth Circuit concluded that all three signs above were present.  First, the

27  attorney's fees were disproportionate to the class reward because the class received no monetary

28  distribution (although there was a cy pres award of $100,000) while fees in the amount of $800,000

5

**United States District Court**
For the Northern District of California

1   were set aside for the attorneys.  Second, there was a clear sailing agreement because the defendants

2   agreed not to object to an award of attorney's fees of up to $800,000.  Finally, there was a reverter

3   provision under which all fees not awarded would revert back to the defendants rather than be added

4   to the cy pres fund or otherwise used to benefit the class.  *See id.* at *29-30.

5   In their supplemental briefs and at the hearing, both parties argued that *Bluetooth* is not

6   applicable to the instant case.  The Court acknowledges that there are differences between *Bluetooth*

7   and the case at bar.  For example, in *Bluetooth*, little substantive work was done by counsel, whereas

8   here counsel have engaged in vigorous litigation before reaching settlement.  Also, in *Bluetooth*,

9   there was no monetary benefit to the class, whereas here the settlement has resulted in a net payment

10  to the class of nearly $1 million.  Finally, in *Bluetooth*, the settlement agreement was reached before

11  formal class certification; here, the settlement agreement was not reached until several months after

12  certification/denial of decertification.

13  Nevertheless, in spite of these differences, the Court rejects the parties' position that the

14  principles articulated in *Bluetooth* have no relevance to the case at bar.  Ultimately, *Bluetooth*

15  teaches that, as part of the Court's duty to insure the settlement is fair, adequate, and reasonable, it

16  should examine the overall settlement, including the relationship between class recovery and

17  attorney fees, to insure that counsel's self-interest did not infect the negotiations.  Simply because a

18  case settles after class certification does not preclude the possibility of such a conflict of interest.

19  This is particularly true when, even under the traditional *Molski* factors, the Court has serious

20  concerns about the fairness and adequacy of the settlement as discussed in this Court's previous

21  order and at the fairness hearing herein.

22  Under *Bluetooth*, one sign of unfairness is a disproportionate fee award compared to the class

23  recovery.  Even in the absence of collusion (the Court finds no collusion here), there is a possibility

24  that a conflict of interest influenced the settlement.  Even in hard-fought cases as here, there exists a

25  danger that class counsel may, even if only unconsciously, strike a bargain which benefits counsel at

26  the expense of the class.  Furthermore, where the defendant is willing to accede to a fee request that

27  is substantially disproportionate to class recovery, there exists a distinct possibility that a balance

28  more favorable to the class could have been struck without additional expense to the defendant.

**United States District Court**
For the Northern District of California

1   This is not to suggest that fees which exceed actual class recovery are necessarily

2   disproportionate or reflect a conflict of interest.  It does suggest, however, and *Bluetooth* affirms,

3   that the reasons for that disparity should be scrutinized and that both components of the settlement –

4   class recovery and attorney fees – should not be reviewed in isolation.  Moreover, the mere assertion

5   that the class claims were first settled before any fee provision was negotiated does not insulate from

6   review a significant disproportion between the class recovery and fee award.  *See Bluetooth*, 2011

7   U.S. App. LEXIS 17224, at *32-33 (noting that "'[i]t is the settlement taken as a whole, rather than

8   the individual component parts, that must be examined for overall fairness[;] [t]he settlement must

9   stand or fall in its entirety'").  Notably, Justice O'Connor has suggested that courts should examine

10  whether there is "at least . . . *some* rational connection between the fee award and the amount of the

11  actual distribution to the class" or there could be "troubling consequences" – *e.g.*, the fund could be

12  misallocated between attorney's fees and the plaintiffs' recovery, thus decoupling class counsel's

13  financial incentives from those of the class.  *International Precious Metals Corp. v. Waters*, 530

14  U.S. 1223, 1224 (2000) (O'Connor, J.) (making above comments as part of a denial of certiorari

15  review).

16  B.   <u>Application of Final Approval Factors</u>

17      Having concluded that both the *Molski* and *Bluetooth* factors are to be taken into account, the

18  Court turns to application of those factors in the instant case.

19      In its order granting preliminary approval, the Court provided an assessment of the *Molski*

20  factors, *see* Docket No. 466 (Order at 22-24), and that assessment largely remains the same.  As

21  noted, the Court was concerned about the adequacy of the settlement wholly apart from the fee

22  provision.  The only factors deserving of additional analysis here are (1) the reaction of the class

23  members to the proposed settlement and (2) the amount offered in settlement.

24      With respect to the reaction of the class members, as indicated above, very few persons have

25  opted out or objected.  The limited number of opt-outs and objections indicates that, as a whole, the

26  class does not find the proposed settlement problematic.  Even so, that does not make the settlement

27  fair, reasonable, and adequate.  In fact, the Court finds that one of the objections complaining that

28

United States District Court
For the Northern District of California

the attorney's fees are excessive, *see* Docket No. 478 (Salzman Decl., Ex. B) (objection from Michael Crabbs), does in fact raise a problematic issue as discussed below.

Turning to the amount offered in settlement, the Court acknowledges that, where there is significant litigation risk, a settlement will reflect that risk by producing a lower settlement amount compared to the maximum verdict that could be obtained after a trial on the merits.  Given the substantial risks herein, the Court is not necessarily troubled by the fact that the case settled for a potential fund of $13 million.  Rather, the Court's concern is that the $13 million figure is largely illusory and was substantially undercut by other provisions in the parties' settlement agreement – in particular, as discussed in the order granting preliminary approval, the provision requiring a claims process for the training time claim and the provision that all unclaimed funds revert back to Vector.  *See* Docket No. 466 (Order at 16-21).  Taken together, these provisions all but guaranteed that Vector would pay out substantially less than $13 million to the class.  *See In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 405 (D. Mass. 2008) (noting that that, "in a reversionary common fund *or* a claims-made settlement, the defendant is likely to bear only a fraction of the liability to which it agrees") (emphasis added).  And in fact, as noted above, the actual payout to the class is less than $1 million, only 12.88 percent of the $7.76 million settlement fund and 6.56 percent of the maximum verdict value.

Significantly, this modest payout was not unexpected by the parties in negotiating the settlement.  At the hearing on preliminary approval, Ms. Harris's counsel indicated he expected a claim rate of about 30 percent on the training time claim.  Vector's counsel appeared to anticipate an even lower claims rate.  In short, both parties fully anticipated that, by imposing a claims process, the actual payout to the class on the training time claim would not substantially exceed the approximately $1 million that was in fact claimed.  Neither party expected the class would recover anything near the full $3.88 million fund set aside the training time claim.  And, given the requirement that the sample knife kit be returned as a condition of filing a claim on the knife kit claim, both parties fully expected the amount claimed on that fund would be less than that claimed against the training time fund; neither side seemed shocked when less than 1 percent of sample kit fund ($3.88 million) was claimed.  In reality, the fund for the sample kits provided in the Settlement

**United States District Court**
For the Northern District of California

1  Agreement proved to be virtually illusory.  Furthermore, as previously noted, the settlement

2  provided that all unclaimed moneys would revert to Vector.  No cy press or pro rata distribution to

3  the class was provided.

4       Consistent with *Bluetooth*, the Court compares the limited payout to the class (actual and

5  expected) to the unopposed claim of fees by class counsel.  The Court examines whether a

6  disproportionate part of the settlement is being awarded to class counsel under the "clear sailing"

7  provision of the Settlement Agreement.  Here, class counsel seeks an unopposed award roughly four

8  times greater than the actual and expected payout to the class (approximately \$4 million compared to

9  approximately \$1 million).  While this is not as extreme a situation as that in *Bluetooth* (\$800,000 in

10  fees and no monetary distribution to the class), and while the Court does not hold that a 4:1 ratio is

11  inherently problematic, the imbalance between the fee award and the class recovery is troubling in

12  this case because:  (1) as in *Bluetooth*, there is a clear sailing agreement and fees not awarded revert

13  back to Vector, and (2) there are substantial questions as to the adequacy of the class benefits given

14  the imposition of a claims process (where there is no clear need for one) and reversion of unclaimed

15  funds to Vector.

16       The Court is left with the fact that Vector and class counsel reached an agreement whereby

17  counsel may be awarded the lion's share – 80 percent – of the total payout, a result the parties

18  anticipated.  Class counsel argues that the fee award is not excessive since it constitutes a reasonable

19  percentage of the total settlement fund of \$13 million.  To be sure, the Court is cognizant of the fact

20  that the Ninth Circuit has held that in awarding attorneys fees in a class action, the percentage

21  benchmark must be measured against the full fund established by the settlement and not actual

22  payout to the class.  *See Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026, 1027 (9th

23  Cir. 1997) (holding that the lower court had "abused its discretion by basing the fee on the class

24  members' claims against the fund rather than on a percentage of the entire fund or on the lodestar").

25  *But see Strong v. Bellsouth Telecomms., Inc.*, 137 f.3d 844, 852 (5th Cir. 1998) (holding that district

26  court did not abuse its discretion in basing fee award on actual payout rather than reversionary

27  fund).  But the determination of what is a reasonable fee presents a question different from whether,

28  under *Bluetooth*, the overall settlement is fair, reasonable, and adequate.  Indeed, because attorney's

United States District Court

For the Northern District of California

fees under current Ninth Circuit law may be based on the size of the fund theoretically available rather than an actual amount claimed and paid to the class, there is an inherent risk of a conflict of interest between counsel and the class, a risk far more extant than if fees were based instead on actual class recovery.  It is in this context that scrutiny under *Bluetooth* is particularly warranted.

That risk is underscored here inasmuch as class counsel explained they were reluctant to push for direct payment to class members on the training time claim instead of a claims process, because they feared Vector may have been unwilling to pay a higher aggregate sum to the class in settling that claim, thus resulting in a payout of far less than $57 per class member.[6]  Yet, class counsel was able to negotiate for themselves a fee award and cost reimbursement of over $4 million.

In the final analysis, while the class recovery was modest relative to the maximum verdict value, the amount allocated for fees under the "clear sailing" provision was relatively generous, exceeding the lodestar ($3,046,763) by 37.5 percent.  In short, as in *Bluetooth*, this is a case where all three signs indicate the fee allocation infected the adequacy and fairness of the class recovery.

Ms. Harris protests that, even if there were some imbalance between the fee award and class award, the settlement agreement between the parties does not contain either a clear sailing arrangement or a reverter provision.  Neither argument is availing.  First, the Ninth Circuit made clear in *Bluetooth* that the essence of a clear sailing arrangement is that the defendant agrees not to object to a fee award up to a certain amount.  Such a provision was contained in the settlement agreement here.  Second, in the instant case, the unawarded fees might, as an initial matter, have gone back to the fund but there is no dispute any unclaimed funds would revert back to Vector. Here, it was obvious to the parties that the fund would not be exhausted and that Vector would

---

[6] There was no practical impediment to dispensing with a claims process for the training time claim since Vector has a record of each class member who participated and all would be entitled to the same pay as each went through the same training period.  *See* Docket No. 466 (Order at 16-18).  Although class counsel argued that, if no claims process had been used for the training time claim, then Vector would not have agreed to a net payout of $57 per class member, there is little to suggest that a low claims rate (even class counsel estimated at best only a claims rate of 30 percent on the training time claim) and a payout of $57 was more beneficial to the class in the aggregate as opposed to a lower payout with no claims process.

**United States District Court**
For the Northern District of California

1   benefit from the reversion.  Thus, the settlement agreement did contain in essence a reverter

2   provision comparable to that identified as problematic by the Ninth Circuit in *Bluetooth*.[7]

3          In sum, taking into account the *Molski* and *Bluetooth* factors, the Court concludes that,

4   despite the vigorous representation by Ms. Harris's counsel throughout this litigation and the lack of

5   any conscious collusion,  the settlement proposed by the parties is not fair, reasonable, and adequate.

6          As a final point, the Court notes it does not hold that the settlement should have been

7   structured in any particular way to render it fair, reasonable, and adequate.  In fact, there appear to

8   be numerous ways the settlement could have been structured to mitigate the disproportion and dispel

9   an inference of unfair compromise the Court finds problematic here – *e.g.*, by not requiring a claims

10  procedure for the training time claim, increasing the payout to class members, reducing the fee

11  award, eliminating the reversion or providing for only a partial reversion, setting up a cy pres fund

12  or second class distribution for any unclaimed funds or unawarded attorney's fees, or any

13  combination thereof.[8]  As to the latter, it is noteworthy that, since Vector was willing to pay out up

14  to $4 million in fees, there is no obvious reason why any fees not awarded could not have been

15  directed to a cy pres account or to a second distribution to the class.  *See Bluetooth*, 2011 U.S. App.

16  LEXIS 1722, at *34 (stating that "[t]he clear sailing provision reveals the defendant's willingness to

17  pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too

18  much for its fees").

19  ///

20  ///

21  ///

22  ///

23  _____

24          [7]  The Court notes that, at the hearing, class counsel claimed that any unawarded fees would
    actually result in a higher pro rata distribution to each class member.  But, based on the Court's

25  review of the settlement agreement, there is nothing on the face of the agreement that indicates such.
    *See* Sett. Agreement § 4.A (providing that "[a]ny and all unclaimed Settlement funds shall be

26  retained by Defendant"); *id.* § 4.G.1 (providing that member of the training time subclass will each
    receive approximately $57 net, "an amount determined by dividing one half of the Net Settlement

27  Amount [$3.88 million] by the number of members of this subclass (approximately 69,000),
    provided that said subclass member submits a valid and timely Claim Form").

28          [8]  *See* note 7, *supra*.

11

### III.   <u>CONCLUSION</u>

The Court does not mean to impugn the integrity of class counsel or counsel for Vector. Both have proven able and both have litigated this case with vigor.  Nonetheless, for the foregoing reasons, the motion for final approval of the proposed settlement is denied.  The accompanying motions for fees and an incentive award are rendered moot.

This order disposes of Docket Nos. 470, 476, and 477.

A case management conference shall be set for October 28, 2011 at 11:00 a.m.


IT IS SO ORDERED.


Dated:  October 12, 2011

_____
EDWARD M. CHEN
United States District Judge