UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA HARRIS,<br><br>        Plaintiff,<br><br>    v.<br><br>VECTOR MARKETING CORPORATION,<br><br>        Defendant.<br>_____/ | No. C-08-5198 EMC<br><br>**ORDER GRANTING PLAINTIFF'S RENEWED MOTION FOR FINAL APPROVAL**<br><br>**(Docket No. 505)** |

Previously, the Court denied Ms. Harris's motion for final approval of the class action settlement. The parties thereafter participated in a settlement conference with Judge Spero and reached a new settlement agreement, one which modified the terms of the prior settlement agreement. Ms. Harris now asks the Court to give final approval to the new, or modified, settlement agreement.

## I. FACTUAL & PROCEDURAL BACKGROUND

A. Prior Settlement Agreement

Under the old settlement agreement, the parties agreed to settle the case for a maximum payment by Vector of $13 million. *See* Docket No. 450 (Saltzman Decl., Ex. A) (Joint Stip. ¶¶ 2.H, 4.A). Anything not claimed would revert back to Vector. *See* Docket No. 450 (Saltzman Decl., Ex. A) (Joint Stip. ¶ 4.A).

Out of the $13 million, the net settlement amount available for the class would be approximately $7.76 million. *See* Docket No. 450 (Saltzman Decl., Ex. A) (Joint Stip. ¶¶ 2.I, 4.F-

1 G). Other monies would go to attorney's fees and costs ($4.19 million and $1 million respectively),[1]
2 the PAGA payment ($25,000),[2] and an incentive award to Ms. Harris ($25,000). ($25,000 PAGA
3 payment).[3]

4 Out of the $7.76 million available to the class, half would be set aside for the training
5 subclass and half set aside for the sample kit subclass. *See* Docket No. 450 (Saltzman Decl., Ex. A)
6 (Joint Stip. ¶ 4.F-G). Each member of the training subclass would get a net payment of
7 approximately $57 (a gross payment of approximately $94). *See* Docket No. 450 (Saltzman Decl.,
8 Ex. A) (Joint Stip. ¶ 4.G.1). Each member of the sample kit subclass would get a net payment of
9 approximately $75 (a gross payment of approximately $125). *See* Docket No. 450 (Saltzman Decl.,
10 Ex. A) (Joint Stip. ¶ 4.G.2). The class notice that was ultimately issued reflected these same
11 amounts. *See* Docket No. 450 (Saltzman Decl., Ex. 1A) (Class Notice at 1, 3) (specifying net and
12 gross amounts).

13 B.  Response to Class Notice

14 On May 9, 2011, the claims administrator sent out 68,345 notices. *See* Docket No. 476
15 (Braun-Wronowski Decl. ¶ 6). Out of these notices, 7,092 were undeliverable. *See* Docket No. 476
16 (Braun-Wronowski Decl. ¶ 9). In other words, 61,253 notices were deliverable. An additional 142
17 notices were sent out on July 8, 2011. *See* Docket No. 476 (Braun-Wronowski Decl. ¶ 7). It is not
18 clear from the record how many of the additional notices were not deliverable. *See* Docket No. 488
19 (Ex. A) (updated claims report).

20 As of July 8, 2011, there were four requests for exclusion from the settlement. *See* Docket
21 No. 476 (Braun-Wronowski Decl. ¶ 16); Docket No. 488 (Ex. A) (updated claims report). Also,
22 there were approximately two to four objections. *Compare* Docket No. 476 (Braun-Wronowski
23 Decl. ¶ 15) (stating that there were four objections), *with* Docket No. 488 (Ex. A) (updated claims
24 report) (indicating that there were two timely objections).

---

[1] *See* Docket No. 450 (Saltzman Decl., Ex. A) (Joint Stip. ¶ 4.C.1-2).

[2] *See* Docket No. 450 (Saltzman Decl., Ex. A) (Joint Stip. ¶¶ 2.K, 4.B).

[3] *See* Docket No. 450 (Saltzman Decl., Ex. A) (Joint Stip. ¶ 4.D).

Excluding the late claims, the final number of claims made for the training time subclass was 16,834. *See* Docket No. 488 (Ex. A) (updated claims report). If the nondeliverables are not counted, then the claims rate is 27.4 percent (*i.e.*, 16,834 ÷ (61,253 + 142)).[4]

Out of the total class, there are 52,232 class members who are also eligible for benefits by returning their sample knife kit. *See* Docket No. 487 (Ex. A) (updated claims report). The final number of claims made for the sample kit subclass was 528. *See* Docket No. 488 (Ex. A) (updated claims report). This is a claims rate of 1 percent (*i.e.*, 528 ÷ 52,232).[5]

C.   New, or Modified, Settlement Agreement

The new, or modified, settlement agreement basically has the same terms as the old settlement agreement with the following exceptions.

1.   *Attorney's fees.* Instead of asking for $4.19 million in attorney's fees, Ms. Harris is now limiting her request to $2.8 million. *See* Docket No. 505 (Am. to Joint Stip. ¶ 1). This essentially frees up $1.39 million, which Vector has essentially agreed will not revert back to it but rather will be distributed to the original claimants and a cy pres account.[6] If the Court awards less than $2.8 million, then half of the remaining amount reverts to Vector and half is distributed to the cy pres. *See* Docket No. 505 (Am. to Joint Stip. ¶ 1).

2.   *Original claimants*. The class members who submitted claims under the old settlement agreement will get their claims enhanced by 20% – *i.e.*, $69 (instead of $57) for the training subclass and $90 (instead of $75) for the sample kit subclass. *See* Docket No. 505 (Am. to Joint Stip. ¶ 2) (differences of $12 and $15 respectively).

With 16,834 claimants for the training time claim, this means that Vector will pay an additional $202,008 (*i.e.*, 16,834 x $12). With 528 claimants for the sample kit claim, this means

---

[4] This assumes that the 142 additional notices that were sent out on July 8, 2011, were all deliverable. Although it is likely that some were not deliverable, in all likelihood the number was small given that only 7,092 notices were not deliverable out the 68,345 original notices (*i.e.*, approximately 10 percent).

[5] The record does not reflect how many notices out of the sample kit subclass were not deliverable. For purposes of this order, the Court assumes that all notices issued were deliverable.

[6] Vector will actually end up paying a little more than $1.39 million – approximately $20,000 more.

that Vector will pay an additional $7,920 (528 x $15). In short, out of the $1.39 million that was freed up, the class receives approximately $210,000. Given that the class was going to get about $1 million under the old settlement, this means that the class will now get about $1.2 million (net).

3. *Cy pres.* Out of the $1.39 million enhancement under the new settlement, $1.2 million will go to a cy pres account. The cy pres account will be distributed to eight different public interest organizations, each of which is related to employment. *See* Docket No. 505 (Am. to Joint Stip. ¶ 3.).

4. *Incentive award.* Ms. Harris continues to seek an incentive award of $25,000. The parties now expressly agree that anything not awarded will revert to Vector. *See* Docket No. 505 (Am. to Joint Stip. ¶ 4).

Under the new terms of the settlement agreement, the net payment to the class ($1.2 million) and the cy pres ($1.2 million) taken together are about 15.7% of the total maximum verdict value. (The training claim has a maximum verdict value of $7,648,650,[7] and the sample kit claim a maximum verdict value of approximately $7,573,640 (*i.e.*, 52,232 x $145).[8])

## II. DISCUSSION

A. <u>Motion for Final Approval</u>

As a preliminary matter, the Court notes that it previously certified both an FLSA class and a Rule 23(b)(3) class. *See* Docket No. 375 (order, filed on 11/5/2010). Thus, the Court need not analyze whether the requirements for certification have been met[9] and may focus instead on whether the proposed settlement is fair, adequate, and reasonable.

---

[7] *See* Docket No. 466 (Order at 15 & n.6) (noting that the parties calculated the maximum verdict value by "multipl[ying] the number of Training Time class members (69,000) by the unpaid average wage for the training time ($110.85)").

[8] *See* Docket No. 466 (Order at 21) (noting that, according to Ms. Harris, members of the sample kit subclass "each paid approximately $145.00 ($135 plus sales tax) for the sample kits).

[9] *See, e.g.*, *Denny v. Deutsche Bank, A.G.*, 443 F.3d 253, 270 (2d Cir. 2006) (stating that, "[b]efore certification is proper for any purpose – settlement, litigation, or otherwise – a court must ensure that the requirements of Rule 23(a) and (b) have been met" and that "[t]hese requirements should not be watered down by virtue of the fact that the settlement is fair or equitable"); *Okudan v. Volkswagen Credit, Inc.*, No. 09-CV-2293-H (JMA), 2011 U.S. Dist. LEXIS 84567, at *6 (S.D. Cal. Aug. 1, 2011) (noting that a proposed settlement class still must meet the criteria of Rule 23(a) and (b)).

In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, a district court may consider some or all of the following factors:

> the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003).

In its order granting preliminary approval, the Court provided an assessment of these factors, *see* Docket No. 466 (Order at 22-24), and that assessment largely remains the same. The only factors that are deserving of additional analysis are (1) the reaction of the class members to the proposed settlement; (2) the strength of the plaintiffs' case; and (3) the amount offered in settlement.

With respect to the reaction of the class members, as indicated above, very few persons have opted out or objected. The limited number of opt-outs and objections indicates that, as a whole, the class does not find the proposed settlement problematic. As for the objections that have been made, the Court has evaluated them and concludes that they do not establish that the settlement is unfair. For example, one class member objected to the amount of attorney's fees requested, but the settlement agreement does not guarantee that class counsel will in fact be awarded that sum. Another class member objected on the basis that she is deserving of more money, at least $7,000, given her particular circumstances. Such a recovery is not realistic. Moreover, the objector was entitled to opt out rather than remain in the class.

Turning to the remaining factors, *i.e.*, the strength of the plaintiffs' case and the amount offered in settlement, the Court notes that these factors are related. For example, where the plaintiffs' case is weak, then a fair settlement may not have great value. *See Yeagley v. Wells Fargo & Co.*, No. C 05-03404 CRB, 2008 U.S. Dist. LEXIS 5040, at *8 (N.D. Cal. Jan. 18, 2008) (noting that, "while the settlement offers little of value to the class, plaintiff's case is weak and the class could not do better if the Court rejected the settlement"), *rev'd on other grounds*, 365 Fed. Appx. 886 (9th Cir. 2010). In contrast, the stronger the case, the more value the settlement should have in order to be fair and adequate.

In the instant case, there was considerable risk if the class were to take the case to trial. Most notably, if this Court or an appellate court were to find in Vector's favor on the fourth *Portland Terminal* factor (*i.e.*, whether the employer derives an *immediate* advantage from the activities of the trainees), then the class could lose on the training time claim. As for the sample kit claim, that claim was weak from the outset because a Sales Representative could get his or her deposit back by returning the sample kit. Finally, although this Court rejected Vector's argument that a Rule 23(b)(3) class should not have been certified because the FLSA collective action was a superior way of proceeding, *see* Docket No. 375 (Order at 28-30), there was authority to support Vector's position that a 23(b)(3) class for the state law claims was not proper in view of the FLSA opt-in class. *See Leuthold v. Destination Am.*, 224 F.R.D. 462 (N.D. Cal. 2004). Thus, there was a risk to class certification. The Court concludes that, in light of the above risks, the settlement reached by the parties is sufficiently fair, adequate, and reasonable such that it should be approved.

In so holding, the Court acknowledges that the fairness of the settlement with respect to the training claim – the stronger of the two claims – is a close call. In its order granting preliminary approval, the Court had expressed concern that, with a claims procedure for the training time claim, the actual pay-out to the class might be quite low. As it turns out, the claims rate – although not robust – was not inordinately low. Given the claims rate, the training time claim ultimately settled (on a net basis) for approximately 15.3 percent of the maximum verdict value.[10] Although this is a relatively small percentage, the Court cannot say that it renders the settlement unfair given the risks identified above. *Cf. Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 U.S. Dist. LEXIS 8476, at *13 (N.D. Cal. Jan. 26, 2007) (stating that, given the uncertainties involved in the litigation, it was reasonable for the parties to settle the case for approximately 25 to 35 percent of the amount of damages plaintiff could have hoped to prove at trial).

---

[10] The maximum verdict value for the training time claim was $7.6 million. *See* Docket No. 466 (Order at 15 & n.6) (noting that the parties calculated the maximum verdict value by "multip[lying] the number of Training Time class members (69,000) by the unpaid average wage for the training time ($110.85)"). The training time claim settled for approximately $1.16 million (*i.e.*, 16,834 x $69).

1    Furthermore, the Court notes that, in approving the settlement, which contains a cy pres
2 component, it has taken into account the Ninth Circuit's holding in *Nachshin v. AOL, LLC*, 663 F.3d
3 1034 (9th Cir. 2011). In *Nachshin*, the Ninth Circuit clarified that

> the cy pres doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the "next best" class of beneficiaries. Cy pres distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity.

*Id.* at ----.

In the instant case, Vector argues that the additional $1.39 million that was freed up constitutes an "unclaimed fund," and therefore a cy pres distribution is appropriate. While, as a formal matter, the money cannot be characterized as an unclaimed fund (*e.g.*, it is more than likely that those who did make claims under the original settlement would want more money if given the opportunity to stake out an additional claim), the Court is satisfied that, as a practical matter, the money may be so characterized. This is because, if the $1.39 million were to be made available to the entire class (more than 60,000 people), then each class member would get more money but not that much more. Therefore, it is likely that the response of the class would not be materially different – *i.e.*, the vast majority of class members would not make a claim. Thus, at the end of the day, the original claimants would be getting only a bit more and the rest of the fund would be unclaimed; that unclaimed amount would fairly be put into the cy pres, similar to the result under the new settlement.

Furthermore, Vector has stated it would not participate in a settlement that would significantly enhance the per class member award (*e.g.*, if the unclaimed funds were distributed to those members who filed a claim resulting in an award close to full verdict value of their training time claim). Vector states it believed the claims lacked merit and a full award per claimant would constitute an unjust windfall. Thus, redistributing $1.39 million directly to the class is not an available option.

Under these circumstances, the Court is satisfied that the cy pres distribution here is appropriate and consistent with *Nachshin*. The Court also notes that the cy pres beneficiaries

1  identified by the parties are all proper, taking into account "the nature of the plaintiffs' lawsuit, the
2  objectives of the underlying statutes, and the interests of the silent class members, including their
3  geographic diversity." *Id.*

4  Finally, the new settlement obviates the Court's previously stated concern relating to
5  potential unfairness and collusion under *In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d
6  935 (9th Cir. 2011). Unlike the initial settlement, the award to the class (directly and via cy pres)
7  under the new settlement is not substantially outstripped by a "clear sailing" attorney fee provision.
8  Furthermore, the new settlement provides that if the fee award is reduced from the requested
9  amount, there is no full reversion to Vector. Instead, half will go to the class.

10  Accordingly, the Court grants final approval to the new, or modified, settlement proposed by
11  the parties.

12  B.  Motion for Attorney's Fees and Costs

13  1.  Attorney's Fees

14  As indicated above, Ms. Harris is now seeking only $2.8 million in attorney's fees (instead
15  of $4.19 million). The new fee request is approximately 21.5% of the total settlement (*i.e.*, $13
16  million x 21.5% ≈ $2.8 million). In the renewed motion, Ms. Harris notes (as this Court noted
17  above) that this puts fees on par with the money to the class and the cy pres combined ($2.4 million
18  total). She also points out that the new amount requested is even less than the lodestar, which is
19  claimed to be $3,046,763.75. *See* Docket No. 470 (Mot. at 8).

20  The Court concludes that the new fee request is fair. First, 25% is the benchmark if the
21  percentage method is used, *see Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1407 (9th Cir. 2002),
22  and Ms. Harris is now asking for less than the benchmark. That discount from the benchmark is
23  warranted because, although the settlement for the class is adequate, it is far short of the total
24  settlement fund of $13 million. As this Court previously noted, given the 1% response rate on the
25  sample kit claim, the final amount allocated to that claim (over $3.8 million) was practically
26  illusory. Thus, were the 25% benchmark to apply to the full $13 million, the fee award would be
27  unduly inflated. The discount here is warranted. Second, as Ms. Harris argues, fees are now on par
28  with the money to the class and the cy pres combined (roughly 1:1). The Court is not faced with a

1  situation where fees are disproportionate to the class award as in *Bluetooth.* Third, while the
2  claimed lodestar is arguably excessive (particularly in terms of hours), the Court takes into account
3  the fact that class counsel did spent additional time working on the case since the fee motion was
4  filed back in June 2011.

Accordingly, the Court grants the motion for attorney's fees in the amount of $2.8 million.

2.   Costs

Ms. Harris also asks that class counsel be reimbursed for their costs, totaling $411,522.12, and for the costs incurred or to be by the claims administrator (Epiq Systems, Inc.), not to exceed $250,000.

The Court notes that the amounts requested do not exceed the amounts agreed to in the parties' settlement agreement (*i.e.*, $1 million total). The Court further notes that counsel and the claims administrator have provided evidence supporting their claims that costs in the above amounts have been or will likely be incurred. *See* Docket No. 476 (Lee Decl. ¶ 3 & Ex. A) ($144,241,44); *id.* (Jung Decl. ¶ 3 & Ex. A) ($40,481.25); Docket No. 478 (Saltzman Decl. ¶ 6 & Ex. A) ($226,799.43); Docket No. 476 (Braun-Wronowski Decl. ¶ 20) (noting that, for Epiq, costs in the amount of $68,111.71 were incurred from January 1, 2011, through March 31, 2011, for mailing the notice of certification and that an additional $180,386.42 has been incurred from April 1, 2011, through June 30, 2011). Although the Court has questions about some costs (*e.g.*, the lump sum of $15,000 incurred by Ms. Jung for class administration) and, arguably, some costs may have been unnecessary (*e.g.*, travel costs for multiple attorneys to attend certain hearings or conferences), these costs, as a whole, appear reasonable and were incurred.

Accordingly, the Court grants the motion for costs, both as to costs incurred by counsel as well as costs incurred or likely to be incurred by Epiq. Counsel is awarded costs in the amount of $411,522.12 and Epiq is awarded the costs incurred not to exceed $250,000.

C.   Motion for Incentive Award

Finally, Ms. Harris asks to be awarded $25,000 as an incentive payment.

> It is well-established in this circuit that named plaintiffs in a class action are eligible for reasonable incentive payments, also known as service awards. In fact, the Ninth Circuit recently noted that

incentive payments to named plaintiffs have become "fairly typical" in class actions. However, while incentive payments have become increasingly common, there is no entitlement to an incentive payment. Rather, "[s]uch awards are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." When incentive payments are part of a settlement, the court must carefully consider the disparity created by incentive payments to named plaintiffs because "excessive payments to named class members can be an indication that the agreement was reached through fraud or collusion." Particularly, the Ninth Circuit has cautioned that, "if class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard."

When considering a request for an incentive payment, the court must evaluate each request individually, taking into account the following factors: (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; (3) the duration of the litigation and the amount of time and effort the plaintiff expended in pursing it; and (4) the risks to the plaintiff in commencing the litigation, including reasonable fears of workplace retaliation, personal difficulties, and financial risks. Additionally, to ensure that an incentive payment is not excessive, the court must balance "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment."

*Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2011 U.S. Dist. LEXIS 38667, at *92-94 (N.D. Cal. Apr. 1, 2011). Several courts in this District have indicated that incentive payments of $10,000 or $25,000 are quite high and/or that, as a general matter, $5,000 is a reasonable amount. *See, e.g.*, *Thieriot v. Celtic Ins. Co.*, No. C 10-04462 LB, 2011 U.S. Dist. LEXIS 44852, at *21-22 (N.D. Cal. Apr. 21, 2011) (noting that incentive payment of $25,000 is on the "high end," although ultimately awarding that amount); *Chu v. Wells Fargo Invs., LLC*, Nos. C 05-4526 MHP,C 06-7924 MHP, 2011 U.S. Dist. LEXIS 15821, at *14 (N.D. Cal. Feb. 16, 2011) (stating that $10,000 is "perhaps somewhat on the high end of the acceptable range for the size of the class [approximately 2,700 members] and the amount of the settlement [$6.9 million]"); *Jacobs v. California State Auto. Ass'n Inter-Ins. Bureau*, No. C 07-00362 MHP, 2009 U.S. Dist. LEXIS 101586, at *13-14 (N.D. Cal. Oct. 27, 2009) (stating that "[a] $ 25,000 incentive payment is quite high for this district, in which a $ 5,000 payment is presumptively reasonable"; rejecting $25,000 request and awarding $7,500 instead); *Hopson v. Hanesbrands Inc.*, No. CV-08-0844 EDL, 2009 U.S. Dist. LEXIS 33900,

at *27-28 (N.D. Cal. Apr. 3, 2009) (stating that, "[i]n general, courts have found that $ 5,000 incentive payments are reasonable"); *see also* Wren, 2011 U.S. Dist. LEXIS 38667, at *96 (noting that "there is ample case law finding $5,000 to be a reasonable amount for an incentive payment").

Implicitly cognizant of the above case law, Ms. Harris defends the $25,000 requested by noting that (1) she spent more than 100 hours on this case (which included being deposed twice); (2) her private information was disclosed (*e.g.*, telephone, school, and work records) and she had to explain to family and friends why they were being subpoenaed; (3) her future employment is threatened because she agreed to be a class action plaintiff; and (4) unlike the rest of the class, she is giving Vector a release of all claims.

For the most part, the Court finds these arguments unpersuasive. First, that Ms. Harris has spent more than 100 hours on this case is not particularly compelling, especially because some of the time spent on the case was tied to issues with the merits of her individual claim. Second, her suggestion that her future employment is threatened is entirely speculative. Courts typically have a concern about retaliation where the plaintiff is still employed by the defendant; that is not the case here. Finally, the fact that Ms. Harris is giving up all of her claims against Vector is not enough to justify an award in the amount of $25,000. When asked at the hearing what additional claims she had against Vector, Ms. Harris indicated that she had incurred expenses post-training. But those expenses were likely very minimal as even Ms. Harris has basically admitted during this litigation that she did not work as a Sales Representative for a long period of time.

The only point raised by Ms. Harris that does give the Court some pause is the fact that Vector pursued disclosure of her private information and subpoenaed her family and friends. The Court notes that, on the one hand, Vector's conduct was not completely unjustified. For example, according to Vector, it never received from Ms. Harris a request for payment for qualified sales presentations ("QSPs"). Therefore, it was not unreasonable for Vector to make inquiry as to whether Ms. Harris actually made QSPs to the persons she subsequently identified. Also, it was reasonable for Vector to seek Ms. Harris's telephone records in order to evaluate her claim that was in constant contact with her managers. But, on the other hand, Vector's conduct in other ways

bordered on the being overly aggressive – in particular, Vector's pursuit of Ms. Harris's school and employment records and its challenge to Ms. Vector's competency.

Given the above, the Court shall award Ms. Harris more than the typical incentive award, but not the $25,000 requested. Notably, the case law on which Ms. Harris relies justifying such awards are distinguishable. For example, in *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995), and *Glass*, 2007 U.S. Dist. LEXIS 8476, the amounts obtained for the class were vastly larger than the settlement amount obtained here ($67 million and $45 million), and, in *Van Vranken*, there was actually a trial in which the class representative testified. In *Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998), the class representative had spent "hundreds of hours" on the case and there was a finding by a special master that he reasonably feared workplace retaliation. *Id.* at 1016. Similarly, in *Brotherton v. Cleveland*, 141 F. Supp. 2d 907 (S.D. Ohio 2001), the class representative spent approximately 800 hours working on the lawsuit. None of these extreme facts exist here.

Taking into account the totality of the circumstances, the Court concludes that an incentive award of $12,500 is more than fair to compensate Ms. Harris for her time and efforts on the litigation.

### III. CONCLUSION

In sum, in accordance with the above, the Court grants the motion for final approval, grants the motion for fees and costs, and grants the motion for an incentive award. With respect to fees, the award is limited to $2.8 million. With respect to costs, class counsel is awarded costs in the amount of $411,522.12 and Epiq is awarded the costs incurred not to exceed $250,000. Finally, Ms. Harris is awarded an incentive payment of $12,500.

The case is dismissed with prejudice and without costs to any party, other than as specified in the settlement agreement and this order.

Upon entry of this order, Ms. Harris and the settlement class members who have not opted out of the settlement shall be deemed to have released the "Released Parties" of the "Released Claims" (as defined in the settlement agreement).

Without affecting the finality of this judgment in any way, the Court retains jurisdiction over (a) implementation of the settlement and the terms of the settlement agreement; (b) distribution of the settlement proceeds; and (c) all other proceedings related tot he implementation, administration, consummation, and enforcement of the terms of the settlement agreement and/or settlement, as well as the administration of claims. The time to appeal from this judgment shall commence upon its entry.

In the event that the "Settlement Effective Date" (as defined in the settlement agreement) does not occur, this judgment shall be rendered null and void and shall be vacated, nunc pro tunc, except insofar as expressly provided to the contrary in the settlement agreement, and without prejudice to the status quo ante rights of Ms. Harris, the settlement class members, and Vector.

The Court instructs the Clerk of the Court to enter judgment in accordance with this opinion. This order disposes of Docket No. 505.

IT IS SO ORDERED.

Dated: February 6, 2012

_____
EDWARD M. CHEN
United States District Judge